AMOS KENDALL, POSTMASTER GENERAL OF THE UNITED STATES, PLAINTIFF IN ERROR V. THE UNITED STATES, ON THE RELATION OF WILLIAM B. STOKES ET AL.

Contracts for carrying the mail of the United States, were made by S. & S., with the postmaster general of the United States, out of which certain allowances and credits were made in favour of S. & S., by that officer; and the amount of the same was passed to the credit of S. & S., with the general post office. The successor of the postmaster general struck out the allowances and credits in the accounts, and thus a large sum of money was withheld from the contractors. S. & S. presented a memorial to congress; and an act was passed, authorizing and directing the solicitor of the treasury of the United States to settle and adjust the claims of S. & S., according to the principles of equity; and directing the postmaster general to credit S. & S. with whatever sum of money the solicitor should decide should be due to them. The solicitor of the treasury made a decision on the claims of S. & S., and communicated the same to the postmaster general; who, thereupon, carried to the credit of S. & S. a part, but refused to credit a part of the amount allowed by the solicitor. S. & S. applied to the President of the United States, who referred the subject to congress; and the senate of the United States determined that no further legislation on the subject was necessary, and that the decision of the solicitor of the treasury ought to be complied with by the postmaster general. The postmaster general continued to withhold the credit. S. & S. applied to the circuit court of the United States for the District of Columbia, for, a mandamus, to be directed to the postmaster general, commanding him to credit them with the amount found to be due to them from the United States, according to the decision of the solicitor of the treasury. A peremptory mandamus was finally ordered, and the postmaster general brought the case before the Supreme Court, by a writ of error. By the Court—It has been considered by the counsel on the part of the postmaster general that this is a proceeding against him to enforce the performance of an official duty, and the proceeding has been treated as an infringement on the executive department of the government; which has led to a very extended range of argument on the independence and duties of that department; but which, according to the view taken by the Court of the case, is entirely misapplied. We do not think the proceeding in this case interferes, in any respect whatever, with the rights and duties of the executive; or that it involves any conflict of powers between the executive and judicial departments of the government. The mandamus does not seek to direct or control the postmaster general in the discharge of his official duty, partaking, in any respect, of an executive character; but to enforce the performance of a mere ministerial act, which neither he nor the President had any authority to deny or control. The judgment of the circuit court was affirmed.

By the act of congress directing the solicitor of the treasury to adjust and settle the accounts of S. & S., the postmaster general is vested with no discretion or control over the decision of the solicitor; nor is any appeal or review of that decision provided for by the act. The terms of the submission was a matter resting entirely in the discretion of congress; and if they thought proper to vest such a

[Kendall v. The United States.]

power in any one, and especially as the arbitrator was an officer of the government; it did not rest with the postmaster general to control congress, or the solicitor, in that affair. It is unnecessary to say how far congress might have interfered by legislation after the report of the solicitor: but if there was no fraud or misconduct in the arbitrator; of which none is pretended or suggested; it may well be questioned whether S. & S. had not acquired such a vested right as to be beyond the power of congress to deprive them of it.

The right of S. & S. to the full amount of the credit, according to the report of the solicitor of the treasury, having been ascertained and fixed by law; the enforcement of that right falls properly within judicial cognizance.

It was urged at the bar, that the postmaster general was alone subject to the direction and control of the President of the United States with respect to the execution of the duty imposed on him by the law under which the solicitor of the treasury acted; and this right of the President was claimed as growing out of the obligation imposed upon him by the constitution, to take care that the laws be faithfully executed. By the Court—This doctrine cannot receive the sanction of this Court. It would be vesting in the President a dispensing power, which has no countenance for its support in any part of the constitution; and is asserting a principle, which, if carried out in its results to all cases falling within it, would be clothing the President with a power to control the legislation of congress, and paralyze the administration of justice.

To contend that the obligations imposed on the President to see the laws faithfully executed, implies a power to forbid their execution; is a novel construction of the constitution, and is entirely inadmissible.

The act required by the law to be done by the postmaster general is, simply to credit S. & S. with the full amount of the award of the solicitor of the treasury. This is a precise, definite act, purely ministerial; and about which the postmaster general has no discretion whatever. This was not an official act in any other sense than being a transaction in the department where the books and accounts were kept: and was an official act in the same sense that an entry in the minutes of the Court, pursuant to an order of the Court, is an official act. There is no room for the exercise of discretion, official or otherwise: All that is shut out by the direct and positive command of the law; and the act required to be done is, in every just sense, a mere ministerial act.

The common law, as it was in force in Maryland when the cession of the part of the state within the District of Columbia was made to the United States, remained in force in the district. The writ of mandamus which issued in this case in the district court of the District of Columbia, must be considered as it was at common law, with respect to its object and purpose; and varying only in the form required by the different character of the government of the United States. It is a writ, in England, issuing out of the king's bench, in the name of the king, and is called a prerogative writ, but considered a writ of right; and is directed to some person, corporation, or inferior court, requiring them to do some particular thing, therein specified, which appertains to their office, and which is supposed to be consonant to right and justice: and where there is no other adequate, specific remedy, such a writ, and for such a purpose, would seem to be peculiarly appropriate to the present case. The right claimed is just, and established by positive law; and the duty required to be performed is clear and specific; and there is no other adequate remedy.

The cases of M'Intire v. Wood, 7 Cranch, 504; and M'Cluny v. Silliman, 6 Wheat.

[Kendall v. The United States.]

349, have decided that the circuit courts of the United States, in the several states, have no power to issue a mandamus against one of the officers of the United States.

The result of the cases of M'Intire v. Wood, and M'Cluny v. Silliman clearly is, that the authority to issue the writ of mandamus to an officer of the United States, commanding him to perform a specific act, required by a law of the United States, is within the scope of the judicial powers of the United States, under the constitution: but that the whole of that power has not been communicated by law to the circuit courts of the United States in the several states. It is a dormant power, not yet called into action and vested in those courts. And there is nothing growing out of the official character of a party, that will exempt him from this writ; if the act to be performed is merely ministerial.

It is a sound principle, that in every well-organized government the judicial powers should be co-extensive with the legislative; so far, at least, as they are to be enforced by judicial proceedings.

There is, in the District of Columbia, no division of powers between the general and state governments. Congress has the entire control over the district for every purpose of government; and it is reasonable to suppose, that in organizing a judicial department in this district, all the judicial power necessary for the purposes of government would be vested in the courts of justice. The circuit court in the district is the highest court of original jurisdiction; and, if the power to issue a mandamus in such a case as that before the Court exists in any court, it is vested in that court.

At the date of the act of congress establishing the government of the District of Columbia, the common law of England was in force in Maryland; and of course remained and continued in force in the part of the district ceded by Maryland to the United States. The power to issue a mandamus in a proper case, is a part of the common law; and it has been fully recognised as, in practical operation in a case decided in the court of that state.

The power to issue the writ of mandamus is, in England, given to the king's bench only, as having the general supervising power over all inferior jurisdictions and officers; and is co-extensive with judicial power. And the same theory prevails in the state governments of the United States, where the common law is adopted, and governs in the administration of justice; and the power of issuing this writ is generally confided to the highest court of original jurisdiction.

There can be no doubt but that, in the state of Maryland, a writ of mandamus might be issued to an executive officer commanding him to perform a ministerial act required of him by the laws: and, if it would lie in that state, there can be no good reason why it should not lie in the District of Columbia, in analogous cases.

The powers of the Supreme Court of the United States, and of the circuit courts of the United States to issue writs of mandamus, granted by the 14th section of the judiciary act of 1789, is only for the purpose of bringing the case to a final judgment or decree, so that it may be reviewed. The mandamus does not direct the inferior court how to proceed, but only that it must proceed, according to its own judgment, to a final determination; otherwise it cannot be reviewed in the appellate court. It is different in the circuit court of the District of Columbia, under the adoption of the laws of Maryland, which included the common law.

The power of the circuit court of the District of Columbia to exercise the jurisdiction to issue a writ of mandamus to a public officer to do an act required of him by law, results from the 3d section of the act of congress, of February 27, 1801;

[Kendall v. The United States.]

which declares that the court and the judges thereof shall have all the power by law vested in the circuit courts of the United States. The circuit courts referred to were those established by the act of February 13th, 1801. The repeal of that law, fifteen months afterwards, and after the circuit court for this district had been organized, and had gone into operation, under the act of 27 February, 1801; could not, in any manner, affect that law any further than was provided by the repealing act.

It was not an uncommon course of legislation in the states, at an early day to adopt, by reference, British statutes; and this has been the course by legislation in congress, in many instances, when state practice and state process has been adopted. And such adoption has always been considered as referring to the law existing at the time of adoption: and no subsequent legislation has ever been supposed to affect it; and such must, necessarily, be the effect and operation of such adoption.

No court can in the ordinary administration of justice, in common law proceedings, exercise jurisdiction over a party unless he shall voluntarily appear, or is found within the jurisdiction of the court, so as to be served with process. Such process cannot reach the party beyond the territorial jurisdiction of the court. This is a personal privilege, which may be waived by appearance; and if advantage is to be taken of it, it must be by plea, or some other mode, at an early stage of the cause.

IN error to the circuit court of the United States in the District of Columbia, for the county of Washington.

On the twenty-sixth day of May, 1837, William B. Stokes, Richard C. Stockton, Lucius W. Stockton, and Daniel Moore, presented a petition to the circuit court of the District of Columbia, for the county of Washington, stating, that under contracts duly and legally made by them with the late William T. Barry, then postmaster general of the United States, and duly authorized by law, they were entitled to certain credits and allowances on their contracts for the transportation of the mail of the United States; that the credits and allowances were made and given to them on their contracts, and amounts of money actually paid on such accounts; that some time in 1835, William T. Barry resigned his situation as postmaster general, and Amos Kendall was appointed to the office; that after he had entered on the duties of his office, he undertook to re-examine the contracts entered into by his predecessor, and the credits and allowances made by him; and ordered and directed the allowances and credits to be withdrawn, and the petitioners recharged with divers payments they had received.

The petitioners state that they were dissatisfied with these proceedings of Amos Kendall, as postmaster general; and, believing he had

exceeded his authority, and being unable to adjust their differences with him, they addressed a memorial to the congress of the United States. A copy of the memorial was annexed to the petition.

The memorial stated, at large, all the circumstances which the petitioners considered as affecting their case; the proceedings of the postmaster general in the matter; and the heavy grievances done to the memorialists by the course adopted by the postmaster general. They ask such proceedings on the part of congress as its wisdom and justice may direct.

The petition states that congress passed an act, which was approved by the President of the United States on the 2d of July, 1836, which act provided, " that the solicitor of the treasury be and he is hereby authorized and directed to settle and adjust the claims of William B. Stokes, Richard C. Stockton, of Maryland, and Lucius W. Stockton, and Daniel Moore, of Pennsylvania; for extra services performed by them, as contractors for carrying the mail, under and by virtue of certain contracts therefor, alleged to have been made and entered into with them by William T. Barry, late postmaster general of the United States; and for this purpose to inquire into, and determine the equity of the claims of them, or any of them, for or on account of any contract or additional contract with the said postmaster general, on which their pay may have been suspended by the present postmaster general; and to make them such allowances therefor, as upon a full examination of all the evidence may seem right, according to the principles of equity; and that the said postmaster general be, and he is hereby directed to credit such mail contractors with whatever sum or sums of money, if any, the said solicitor shall so decide to be due to them for or on account of any such service or contract; and the solicitor is hereby authorized to take testimony, if he shall judge it to be necessary to do so; and that he report to congress, at its next session, the law and the facts upon which his decision has been founded: Provided, the said solicitor is not authorized to make any allowance for any suspension, or withholding of money by the present postmaster general for allowances or overpayments made by his predecessor, on route number thirteen hundred and seventy-one, from Philadelphia to Baltimore, for carrying the mail in steamboats, when it was not so carried by said Stockton and Stokes, but by the steamboat company; nor for any suspension or withholding of money as aforesaid, for allowances or overpayments made as aforesaid, for carrying an express mail from Balti-

more to York or Lancaster; nor for any suspension or withholding of money, as aforesaid, for allowances or overpayments, made as aforesaid, on route number thirteen hundred and ninety-one, from Westminster to M'Connerston, as described in the improved bid; nor for any suspension or withholding of money, as aforesaid, for allowances or overpayments, as aforesaid, on the route from Baltimore to Wheeling, for running a certain daily line to Hagerstown and Wheeling, from the first of September, eighteen hundred and thirty-two, to the first of April, eighteen hundred and thirty-three, when the line referred to only run tri-weekly; nor for any suspension or withholding of money, as aforesaid, for allowances or overpayments, made as aforesaid, on the route from Baltimore to Washington, under the contract of eighteen hundred and twenty-seven: but nothing in this proviso shall prejudice any application they may make, hereafter, in reference to these routes, if they shall think it proper to make such application."

The petition states, that in pursuance and in execution of this act, Virgil Maxcy, being solicitor of the treasury, did proceed to examine adjust and settle the said claims; and on the 12th day of November, 1836, did make out and transmit to the said Amos Kendall, postmaster general, in part, his award and decision upon certain items of said claims so referred to him; and on the 23d of November, 1836, he communicated to the postmaster general his decision and award on the residue of the claims of the petitioners.

The decision of the solicitor of the treasury of the 12th of December, 1836, after stating the particular items of account, from which the balances arose, was as follows:

"I, therefore, in pursuance of the authority conferred on me, by the aforementioned act of congress, make allowance to said Richard C. Stockton, for his said claims up to the 1st of April, 1835, of the above sum of eighty-three thousand two hundred and seventy-eight dollars.

I, also, by virtue of the same authority, make allowance to said Stockton, for his said claims for extra services, from the 1st of April to 31st of December, 1835, of the said sum of twenty-six thousand eight hundred and sixty-two dollars.

A claim for interest having been made, I have postponed the consideration of it until the equity of the other claims of the gentlemen

named in the title of the act, shall have been inquired into and determined."

On the 22d of November, 1836, the solicitor made a final award, which was also communicated by him to the postmaster general. That award, after setting forth the items of the accounts presented and established in the judgment of the solicitor of the treasury against the United States, was:

"I have examined the evidence touching the above claims, and find due to the petitioners, or to Richard C. Stockton, the following sums: For additional daily mail to Washington, thirty-four thousand two hundred dollars. For compensation for carrying the mail in the spring of 1831, between Baltimore and Philadelphia, and for other services connected therewith, less two hundred and ninety-four dollars, the sum of eleven thousand seven hundred and ninety-seven dollars and sixteen cents. Claims for interest, four thousand eight hundred and thirty-six dollars and eighty-nine cents; one thousand six hundred and sixty-four dollars and seventy cents, and three hundred and ninety-two dollars and thirty-four cents."

The petitioners state, that under and by virtue of the award of the solicitor of the treasury, they became entitled, to have the sum of one hundred and sixty-two thousand seven hundred and twenty-seven dollars and five cents carried to their credit; or at least, after allowing some deductions therefrom made by the said solicitor, with their assent, the sum of one hundred and sixty-one thousand five hundred and sixty-three dollars and eighty-nine cents, as the amount of principal and interest due to them by the terms of the award and decision.

But the said postmaster general, although fully notified of the premises, and after a considerable delay, only so far obeyed and carried into execution the said act of congress and said award, as to direct and cause to be carried to the credit of the petitioners, the sum of one hundred and twenty-two thousand one hundred and one dollars and forty-six cents, which said last mentioned sum of money has been accordingly paid, or credited to the petitioners; and he has from that time, and does still refuse, omit, and neglect, notwithstanding the provisions of said act of congress, and the said award and decision of said solicitor of the treasury; so made, communicated and reported, as aforesaid, to pay, or credit to the petitioners the residue of the said sum so awarded, being the sum of thirty-nine thousand four hundred and sixty-two dollars and forty-three cents; or to credit or

[Kendall v. The United States.]

pay to the petitioners, or either of them, the interest upon the said balance so unjustly and illegally withheld.

The petition states, that after the refusal, omission, or neglect of Amos Kendall, to execute his duty, by obeying the act of congress, in passing the amount awarded to his credit; the petitioners communicated the facts of their case to the President of the United States, requesting him to cause the said act of congress to be executed: who thereupon, transmitted the same to Amos Kendall, the postmaster general; and having received a reply to the same, stating why he had thus refused to comply with the award; and suggesting an application to congress for further legislation. The president, in December, 1836, transmitted this reply to the petitioners; and in his communication says: "It appearing that there is a difference of opinion between the solicitor and the postmaster general, upon the extent of the reference under the law to the solicitor, the postmaster general having yielded to what he believes to be all that was submitted by the law to the solicitor's decision, and paid the same. But, congress being now in session, and the best expounder of the intent and meaning of their own law, I think it right and proper, under existing circumstances, to refer it to that body for their decision. I deem this course proper, as the difference in opinion about the extent of the submission, under the law, arises between the head of the post office department and the solicitor of the treasury; and, as it appears, the solicitor has reversed, in part, his decision and award."

The petitioners, in consequence of this correspondence, presented to congress a memorial; which, in the senate, was referred to the committee on the judiciary.

The petition refers to the reports of the judiciary committee of the senate, of January 20th, 1837, and February 17th, 1837, and to the correspondence between the postmaster general and the chairman of the committee: copies of which are annexed to the petition. The concluding part of the report of the judiciary committee, of January 20th, 1837, was as follows:

"That congress intended the award of the solicitor to be final, is apparent from the direction of the act, 'that the postmaster general be, and he is hereby, directed to credit such mail contractors with whatever sum or sums of money, if any, the said solicitor shall so decide to be due to them,' &c. If congress had intended to revise the decision of the solicitor, the postmaster general would not have been directed to make the payment, without the intervention or fur-

ther action of congress." Unless it appeared, which is not suggested by any one, that some cause exists which would vitiate or set aside the award between private parties before a judicial tribunal; the committee cannot recommend the interference of congress to set aside this award, and more especially as it has been made by a high officer selected by the government; and the petitioners have been subjected to the trouble and expense of investigating their claims before a tribunal created by congress itself.

   " It appears that since the award was made by the solicitor, the postmaster-general has paid to the petitioners the sum of one hundred and twenty thousand nine hundred and thirty-eight dollars and thirty cents, leaving the balance of forty thousand six hundred and twenty-five dollars and fifty-nine cents unpaid of the sums awarded in favour of the petitioners. From the view which the committee have taken, the conclusion at which they have arrived is, that the whole amount decided to be due, and owing to the petitioners, by the solicitor of the treasury, ought to be paid to them out of the funds of the post office department; according to the directions of the act, entitled 'An act for the relief of William B. Stokes, Richard C. Stockton, Lucius W. Stockton, and Daniel Moore;' and that no further action of congress is necessary; therefore, the committee recommend the adoption of the following resolution:  ' ..

   "*Resolved,* That the postmaster general is fully warranted in paying, and ought to pay to William B. Stokes and others, respectively, the full amount of the award of the solicitor of the treasury."

   The report of February 17th, 1837, on the message of the president of the United States, of the 15th February, 1837, with the accompanying documents in relation to the claims of Stockton and Stokes and others, contain the following:

   " The committee have considered the documents communicated, and cannot discover any cause for changing their opinion upon any of the principles advanced in their former report upon this subject; nor the correctness of their application to this case. They therefore recommend the adoption of the resolution heretofore reported by the committee."

   The petition to the Court proceeds to state, that the principal ground of the refusal, neglect, and omission of the postmaster general to execute and obey the act of congress, and to give the petitioners credit for the full amount of the award of the solicitor of the treasury; was, as represented by him, that the said solicitor had trans-

cended the authority created and conferred on him by the act, in so awarding and deciding, whereas the contrary is the fact; and the solicitor, on being apprized that a doubt existed as to the extent of his authority, he did submit the said question to the attorney general of the United States, to obtain his opinion. The opinion of the attorney general confirmed the construction of the law given by the solicitor of the treasury.

The petition proceeds to state, that the "petitioners conceiving and believing that they are and have been entitled to the whole sum so awarded by the said solicitor passed to their credit on the books of the post office department, and to receive the amount which, after the said entry, should appear justly due to them, with legal interest upon the balance; have applied to the said Amos Kendall, postmaster general, as aforesaid, to have the said credits, so entered, and the said moneys so paid, which he has continually refused, and still refuses and neglects to do: and the congress of the United States will not pass any other or further law, as it is believed, merely because they have already passed one sufficient to meet the case; so that the only means of obtaining the money which is justly due to the petitioners, is, by application to your honourable Court.

"Wherefore, your petitioners do respectfully pray that your honours, the premises considered, will award the United States' writ of mandamus to be directed to the said Amos Kendall, postmaster general of the United States, commanding him—

1. "That he shall fully comply with, obey, and execute, the aforesaid act of congress, of July 2d, 1836; by crediting your petitioners with the full and entire sum so awarded, as aforesaid, in their favour, by the solicitor of the treasury, as aforesaid, in conformity with said award and decision..

2. "That he shall pay to your petitioners the full amount so awarded, with interest thereon, deducting only the amount which shall be justly charged, or chargeable to your memorialists against the same."

On the 26th May, 1837, the district court of the county of Washington made a rule in the case, on the motion of the relators, by their counsel: "That the said Amos Kendall, postmaster general of the United States, show cause on Thursday, the first of June next, why the said writ of mandamus should not issue, as prayed by the said memorialists; and that a copy of this order be served on the said Amos Kendall, postmaster general, as aforesaid."

A copy of the rule was served as directed; and was so certified by the marshal of the District of Columbia. Afterwards, on the 7th of June, 1837, on the motion of the relators, by their counsel; the court ordered a mandamus, nisi, to issue, directed to the postmaster general; which writ was issued on the same day.

The mandamus, nisi, after stating the proceedings which had taken place in the case, proceeded as follows: "Therefore you are hereby commanded and enjoined, that immediately after the receipt of this writ, and without delay, you do fully comply with, obey, and execute on your part, the aforesaid act of congress, of 2d July, 1836; by crediting said mail contractors with the full and entire sum so awarded and decided, as aforesaid, to be due to them by the solicitor of the treasury, according to the true intent and meaning of the said award and decision; so that complaint be not again made to the said circuit court: and that you certify perfect obedience to, and due execution of this writ to the said circuit court, on Saturday the tenth day of June instant; or that you do at ten o'clock of that day, show cause to the said Court, why you have not so done as commanded."

On the 10th of June, 1837, the relators, by their counsel; and Amos Kendall, by his counsel, appeared in court; and further time was given, on motion, to Amos Kendall to file his answer.

On the 24th day of June, 1837, the answer of the postmaster general was filed.

The answer contained the following causes "for declining obedience to the order of the court;" with a full argument upon each of them:

First. "It is doubted whether, under the constitution of the United States, it confers on the judiciary department of the government, authority to control the executive department in the exercise of its functions, of whatsover character.

Second. "If, according to the constitution, the circuit court for the District of Columbia might be clothed by law to issue a mandamus in such a case, no such power has been conferred upon them by the act of congress.

Third. "If, by the constitution, congress can clothe the courts with authority to issue writs of mandamus against executive officers, as such; and if they have vested the general power in this court by law; this is not a case in which that power can be lawfully exercised.

[Kendall v. The United States.]

Fourth. " The court have ordered the postmaster general to perform a legal impossibility."

To this answer of the postmaster general, the opinion of the attorney general of the United States on the whole of the case, and sustaining the views of the postmaster general, was annexed.

On the 13th July, 1837, the circuit court ordered a peremptory mandamus, to be directed to the postmaster general, to be issued. The postmaster general prosecuted this writ of error.

The case was argued by Mr. Key and by Mr. Butler, the attorney general, for the plaintiff in error; and by Coxe and Mr. Johnson for the defendants.

Mr. Key, for the appellant:

The record presents a case of conflict between two of the great depositories of the powers of government given by the constitution. The judiciary has assumed a power which the executive department resists. It is a power hitherto unknown to the judiciary—hitherto exercised by the executive alone, without question.

It is a vast power. It annihilates one great department of the government in one of its appropriate functions, if not all the departments; and vests, to a very considerable and undefined extent, all power in another.

The court below denies that there can be any such conflict. It has not only assumed the power, but fortified it by the doctrine that it is to be unquestioned and irresistible. When the court speaks, " it is in the name of the United States," "it is the sovereign power that speaks," and " commands the proper executive officers to execute that judgment." And this doctrine, it is thought by the court, cannot be opposed " without invoking principles which tend to set the executive authority above the restraints of law."

As the court has therefore not merely assumed the power, but assumed it as a sovereign, making the assumption the proof of its supremacy; this doctrine, as to the effect of the assertion of the power, may be considered as necessarily connected with that which relates to its nature and validity : and certainly, if such is the effect of the power, it ought to be considered in such an inquiry.

We hold, that this doctrine, as to the effect of the power, is as indefensible as that which led to its exercise; that where the sentence of a court is brought to any other independent tribunal, to be carried

into execution, preliminary questions, from the nature of things, must present themselves to such other tribunal, which it alone must decide for itself; those questions are: Is this sentence I am asked to execute, within or beyond the jurisdiction of the court pronouncing it? Is it pronounced judicially or extra-judicially? If the former, further inquiry is inadmissible, for it is to be obeyed; if the latter, unnecessary, for it is a nullity. We hold this principle as applicable to all the distinct independent departments of our government. We hold that to prescribe limits to power is idle, if the holder is to be the sole and unquestioned judge of what the limits are; if his possession of the power is conclusively proved by its assertion, he has unlimited power; and if any of the depositories of power under our constitution are placed on such an eminence, it is strange that the framers of that instrument should have thought it necessary to make it so complicated. For, if a safe depository of such a power was found, the great secret was discovered; and the government might have been made extremely simple.

He did not understand any writer upon the constitution as having sanctioned such a doctrine. On the contrary, he should show the very highest authority for a directly contrary doctrine: that occasional conflicts and encroachments upon each other's sphere of powers by the different departments of the government, were expected to arise; and that it was thought a matter of security, that each was left to the independent maintenance of its own rights, and bound by duty to resist the invasions of the others.

Here then is a conflict, and the parties to this conflict stand on ground of perfect equality; and the question is, where is the power in dispute?

That one of the parties is a judicial tribunal, gives it no superiority. It must show its jurisdiction by something more than assuming it. If it can show no other warrant for it, its sentence is a nullity.

Yet it must be admitted, there is a presumption in favour of the judiciary in such a contest. And it is a just one, arising from a proper respect for judicial proceedings; and a persuasion that as the usurpation of power is the most unbecoming, so it is least of all to be expected there.

Yet nothing human is infallible, and it may be found there. A court may mistake in deciding upon the extent of its own powers, as on any other question. It may honestly believe it has the power it

[Kendall v. The United States.]

assumes; and such no doubt was the case with the court where this controversy has arisen.

The executive department of the government, upon whom this power was exerted, has felt bound to question it. It has used the means which the constitution and the laws have given it to determine the course which, under such circumstances, it ought to take; and cannot believe that it would be justified in abandoning its duties to the power and control of any other department.

We assert, therefore, that judicial encroachment is as liable to question as legislative or executive; and this power in every department to defend itself, and assert its own independence, we contend is the undoubted doctrine of the constitution. Certainly the constitution has assigned limits to the powers of all the departments, and leaves each within its sphere independent. Certainly it is silent as to any such power being vested in either, as would enable it without question, to encroach upon the powers of the others. He cited, to show not only that it was competent for the executive department of the government to resist, but that it was its duty to resist any encroachment by the judiciary: Rose v. Himely, 4 Cranch, 269; 1 Wilson, 407, 410, 411; Federalist, 51, No. 324; 2 Story on the Constitution, 22, 23, 24; 3 Story, 458, 459; Elliot's Debates, Mr. Madison's Speech, 378; Speech of Mr. Ames, 397; 2 Dallas, 410; 5 Wheat. App. 16; Patterson v. United States, 2 Wheat. 226.

He was gratified that the contest was brought here. Here, where all encroachments upon the constitution would be brought to the same impartial test; where this high tribunal would watch with double vigilance, and rebuke with all its dignity, judicial encroachment; and he trusted it would be seen that this instance of judicial wrong, would here receive judicial correction.

They would show, he thought, in this appeal, a case in which the circuit court had assumed, for the first time, a power that had not been and could not be given to it. He charged it as no wilful usurpation; and believed it to be only a most unfortunate and a most extraordinary error of judgment.

That power, as appears from its application by the court and from their own statement of it, amounts to this: "The power to direct and compel by mandamus the official action of every public officer wherein individual rights are concerned."

Such appears to be the principle from the case to which it has

been applied. What is that case? He referred to the petition of the relators to the court; to the act of congress for their relief; their letter to the President; the President's letter to the relators referring their complaint to congress; and their memorial thereupon to congress.

These documents, exhibited by the relators themselves, show that when the postmaster general refused to allow them a further credit on the award, they called on the President, under his constitutional power to take care that the laws were faithfully executed, to require the postmaster general to execute this law, by giving them the further credit required. And that, when the President took the case into consideration, he referred it to congress to pass an explanatory act; and that one house of congress, the senate, took up the case: and in the language of the petition; " will not pass any further law, as there is already a sufficient one." Now, this is the case of the relators by their own showing. Where is it? Certainly not before the postmaster general. They appealed from his decision to the President; and he referred it, as he had a right to do, to congress: and the relators acquiesce in this reference, and present their petition to congress, and say, in their petition to the court, "that congress will not pass another law."

To whom, then, should the mandamus go? if to any. The postmaster general was discharged of the case. It should go to congress, or to the President.

2. The court below say, " every public officer, who neglects or refuses to perform a mere ministerial duty, whereby an individual is injured, is legally responsible to that individual, in some form or other; and a mandamus is one of the mildest forms of action that can be used:" making the liability to action, which should of itself prohibit the power of mandamus, the test of its correctness. They say " every public officer," including the President.

Mr. Lee, in Marbury v. Madison, 1 Cranch, 149, says not: though the Court, in that case, say, "it does not depend on the office, but the nature of the offence. As to the President, see judge Story's Constitutional Law, 3d vol. 419; where it is stated that he is amenable to no civil process, to an officer of any department, to the speaker of the house of representatives, should he refuse to sign a law. The court asserts its right to interfere with all those officers, as to their acts of "mere ministerial duty."

Now, the remedy by mandamus is just as applicable to their acts

of discretionary duty. So it appears in all the books on the subject of mandamus. So in 19 John. Rep. 259. So this Court, in 9 Peters, 604.

When a court has the power to order a mandamus, it goes, by its supervising authority to an inferior; and goes, and ought to go, as well to enforce the discharge of discretionary duties as ministerial duties: with this only difference, that the command goes, in the one case, to do the prescribed ministerial act; and in the other, to proceed and exercise the discretion, and do the act in the way that discretion may direct it. So that a mandamus is as applicable, to discretionary, as to ministerial acts; and in this case, if any mandamus could issue, it should have been, not to enter the particular credit required, but such credit as the postmaster general should consider the award of the solicitor authorized: for this would not be a mere ministerial act, but one requiring the exercise of discretion. It is the same as giving judgment on an award, which surely requires discretion. 9 Peters, 603, 604; 5 Binney, 104, 107.

Further: the principle of the court sanctioning this interference with the officers of other departments, "whenever individual rights are concerned;" is official action, in which the public, as well as the individual, are concerned. It was not so considered in Marbury v. Madison. That case only meant to allow it where there was no public, but only an individual interest concerned.

The postmaster general was to execute a law of congress affecting individuals, and also affecting the public. That execution first required of him to examine the solicitor's award, and the act of congress, and see if it was "so" awarded; that is, according to the terms of the law. Then, whatever was "so" awarded, he was to credit in his department, officially, so as to bind the government.

They were, therefore, executive acts; and it is admitted, in the court's opinion, "that the President was bound to see when he performed this act, and that he did it faithfully." But the court holds, that this power of the President gives him no other control over the officer than to see that he acts honestly, with proper motives; without any power to construe the law, and see that the executive action conforms to it: that is, the President is only to see to that which he can never see, at least with certainty, the motives of his subordinate; and is not to see to the conformity of the executive action to the law prescribing it; which is the very thing he should se ɔ, and can

see, and for which he is responsible. This is quite inconsistent with every opinion of every writer upon this subject; as in letters of Pacificus, 556, 557, 559; Wilson, 404; Chief Justice Marshall's argument on the case of Jonathan Robbins, 5 Wheat. Rep. 16; Judge Story, 3 Com. 414.

Not only is it the President's duty to see how the laws are executed: he is invested with discretion as to when they are to be executed. All the laws of congress are to be executed; but not at one and the same time. Some depend on others. Some must be postponed, and some executed with despatch. Various circumstances may occur to delay the execution of a law; circumstances which the executive department alone can know. This is stated in judge Johnson's opinion in the Cherokee case, 5 Peters, 1; and by the Court, in 1 Wheaton 1.

Now the circuit court assumes to direct and control all executive officers, in all these respects. It therefore assumes the power described, as "the power to direct and compel, by mandamus, the official action of every public officer, wherein individual rights are concerned;" and that, where the President is admitted, in regard to such official action of the officer, to be bound by his constitutional duty, to see that the officer does it faithfully, and to determine when he shall do it.

The attorney general has denied, in his opinion, that such a power can be given to the courts. That denial we now maintain.

It cannot be given to the courts, because it necessarily interferes with the power of control given by the constitution to the President. "Whenever a controlling power or power of appeal is exclusively lodged in any person or corporation, the court will not grant a mandamus. This is the case of visitors of colleges, or others of spiritual foundation." Rex v. Bishop of Chester, 1 Wil. 206; Rex v. Bishop of Ely, 2 Term Rep. 290.

It is impossible here to question the controlling power of the President over the postmaster general, as to the duty to which he is to be compelled by this proceeding. Here is an act of congress, relating to the public money, and requiring the postmaster general officially to do a certain act in relation to it. As to this act, the President is bound to have it executed. And the President, on whom this responsibility is cast, is armed by the constitution with full powers to enable him to have it fully and faithfully executed.

[Kendall v. The United States.]

For if the postmaster general will not execute it as the President thinks it ought to be executed, and the President acquiesces in this imperfect execution of it, then he violates his duty in having the laws executed. If the postmaster general should think that he is the judge, and that he ought not to execute it as the President thinks it ought to be executed, he should resign; or the President should remove him, and appoint another who will execute it.

The President, therefore, on whom the responsibility of seeing the laws faithfully executed plainly rests; has, under the constitution, full power to fulfil the duty cast upon him, and control the postmaster general in the execution of this act of congress. Therefore, according to the principle above referred to, the court cannot interfere by mandamus.

Further: The nature of this control, and the consequences of affirming the power of the court thus to interfere with it, will show the unreasonableness of the doctrine.

What becomes of the President's responsibility to have the laws of congress faithfully executed? Here is a law to be executed. The President is about to have it done as congress meant it should be done; but the circuit court of the District of Columbia, interpose, and command, by mandamus, that it shall be done otherwise. He is impeached for not doing it; or for doing it wrong. Can he defend himself by showing the mandate of the court?

And if the control is with the court, ought they not to be responsible for the execution of the laws? And are they? And shall that power, which is charged with the duty of executing the laws of congress, be irresponsible?

Again: It has been shown that the constitution casts this duty on the President; makes him responsible, and arms him with powers to fulfil it. Not so, in either respect, as to the court. If they assume the duty, it is by inference, from their power to try cases in law and equity. No responsibility is pretended; for, no matter how wrong they may decide, there is no responsibility for mistakes of judgment. And they are armed with no powers to carry out what they may command; it is brutum fulmen.

Suppose a peremptory mandamus to be the result in this case. It goes against Amos Kendall, postmaster general of the United States. He refuses obedience. They send an attachment for contempt. It goes against Amos Kendall, (as before,) postmaster general of the

United States. He is brought before them, and committed. If, then, the postmaster general of the United States is in jail, is he still postmaster general? Or is his office vacant, and must the President appoint another? Certainly, if the controlling power is with the court, this is what should be done; they would thus have the power of removal. And they also ought to have the power of appointment; for if they have the controlling power, they might get, (in the same way they get that,) by inference, all power necessary to make the controlling power effectual, so as to appoint such a successor as would carry their commands into effect, in opposition to that of the President. If the court cannot do this, they would then see that they had undertaken to command what they had no legal power to enforce.

Is it not more wise and dignified for a court to decline giving a command, which they see no law has given them the necessary power to enforce; and wait till they are invested with all the power necessary to attain the end in view? Must not every court decline a jurisdiction which the laws have not given them power to enforce?

If it be said that the President would be wrong and arbitrary in thus resisting the court; the plaintiff says, that would depend upon ascertaining where was the first wrong. If the court usurped power, ought not the President to use his constitutional power to resist it? The late Chief Justice Marshall, in the case of Jonathan Robbins, 5 Wheat. App. 16, says, that in such a case, it is the duty of the President to resist; so says general Hamilton, in Pacificus; and Judge Washington, as to the district court, in 2 Wheat.

It may further be supposed, that the postmaster general, on receiving the peremptory mandamus, takes another course. The command is to enter the credit to the relators for the amount awarded. Suppose he enters it, in his own handwriting, as done by him, not in virtue of his office as postmaster general of the United States, but as done by command of the circuit court, and so returns to the writ? Would the court hold this a performance? And then, what effect would be given to the entry in the post office? Would they pay a credit appearing to be allowed only on the authority of the circuit court? And if the paying officer refuses to pay, would the court enforce the payment?

Here, as to this matter of enforcing payment, whatever the compliance may be with the present command, the court say they are in doubt. Well may they doubt a power to take the public money

out of the treasury, and make the United States suable in this case of law or equity. But they doubt; and ought not the doubt, whether they could arrive at the end, stop their setting out? What purpose is to be answered by having an entry made in a book, if it may remain there as a dead letter? If it is to be read and treated as an entry made by an authority which is disputed; and which cannot be enforced?

The circuit court denied all this right of control in the President. If he sees the inferior executive officers acting honestly, he can look no further. How, or when they execute a law, are things he has no concern with. It is impossible to sustain this position. The post office, as established by congress, is an executive department of the government. The law of congress is conclusive as to this; for it gives him powers which could not be given according to the constitution, if he was not the head of an executive department.

As the head of a department that officer is, therefore, subject to the power of the President; " to call upon him for his opinion in writing, upon any matter appertaining to the duties of his office." This implies, plainly, that he is, as to these duties of his office, subject to the President's control. For why should he give any account of his opinions upon matters appertaining to those duties, if he is independent of the President? And why should the President have the power of requiring such opinions as to his duties, but to ascertain how he means to execute these duties; and to enable him, if he finds he is about to execute a law, or discharge any of his official duties improperly, to direct and control, and, if necessary, remove him from office?

And this is declaimed against as arbitrary power. It seemed to him directly the contrary. The President appoints these officers, and can remove them at pleasure. This all admit. He administers the affairs of government through them; and the presumption is, that they will execute the laws and the duties of their respective departments, in the manner he approves. Now, who does not see that if he can have his will thus done by his subordinates, and escape all censure and responsibility for what is done wrong, by saying it was done by them, and that they were independent of his control; his power would be far more arbitrary, and more dangerous, than if they were made subject to his control, and he responsible for their acts.

The framers of our constitution were wise enough to see this, and they have left him no ground for such an excuse; and the people

have always held him to this responsibility; and the opponents of every administration have always charged the chief magistrate as openly and distinctly with the alleged wrongs of his subordinates, as if their acts were purely his; and the supporters of no administration have ever pretended to defend the President from any of the alleged errors of his administration, on the ground that they were not his acts, but the acts of independent subordinates. And as long as the government shall last, this is the true constitutional ground, and the only safe one on which those who administer it, must stand: and was it not so, we should have the English maxim, that the king can do no wrong, made applicable to the President.

If the act in question affects the political powers of the President, as given by the constitution, the opinion in the case so much relied on of Marbury v. Madison, is conclusive as to this control; and against the power of congress to take it from the President and confer it elsewhere. One of the political powers or duties of the President, as given by the constitution, is to see that the laws are faithfully executed; and both the late Chief Justice, in the case of Tohathan Robbins; and Mr. Hamilton, in the passage referred to, in the letters of Pacificus; say, that he must ascertain what the law means; " must judge of it for himself." The opinion in Marbury v. Madison shows that there may be laws in the execution of which the public is not directly interested, where only individual rights are concerned. And such is the case mentioned of an individual's right to a copy of a paper, on paying for it, and the other similar cases given in illustration of the principle. There are cases in which individual interests alone are concerned, and therefore affect not the political powers of the President. But all laws which affect the public, are political; and the execution of those laws, their faithful execution, as he thinks they ought to be executed, the President must see to. And such are all the cases given in that opinion, as illustrations of executive acts, wherein the control belongs to the President.

If it be said, as it has been in the court below, that this is an act which affects only individual interests; we say the credit required to be entered in the relators' account, which account must be stated as having the credit, makes a sum of money due to them which must be paid out of the treasury; and therefore the execution of this act affects the public interest.

There are many reasons why such a control ought to belong to the executive, and not to the courts. And first, the power ought to be

[Kendall v. The United States.]

left with the executive, because from the organization of the government it has always exercised it. It has length of time, continued possession, and long and uniform usage to plead for it. This command, if it issues from the Court, is the nrst instance of such interference. The same lapse of time and continued usage that gives this claim to the executive, should bar the judiciary. It seems hardly possible to conceive how any court should possess such a jurisdiction for near forty years, and never be called on to exercise it till now. How has it happened that all the claimants in such cases, and all the lawyers and courts of the United States should be ignorant of it? It cannot be said no such case has occurred, for every claim made upon the government, and disallowed by the executive officers, might have been brought before the courts, as is the present one. In the next place, the executive ought to have this power, because it is executive in its nature. The executive is fitted to execute it, and armed with means to execute it. It can always execute it, (as executive power always ought to be executed,) promptly, uniformly, and in the time and manner that the public interests may require; and as its means may enable it. The contrary of all this is the case with the courts. They are unfitted to wield this power, because they have not the information of the state of the executive department; its duties; the means within its control; and the various circumstances which may obstruct and delay executive action. And they cannot get this information; for even if they had a right to call for it, they have not the time, unless they neglect their ordinary judicial business, to acquire this knowledge of executive affairs.

Then the executive, when t has the necessary means, and it is desirable to do so, can act promptly. But the courts are trying "a case in law or equity," and that is a business which is never done very promptly. Judicial robes are not the garments for quick action. Where the judgment or decree comes, it seems to be conceded there is an appeal to this Court, at the application of either the claimant or the officer. Is this appeal to suspend the execution of the law, or the act of executive duty required? If not, what is the worth of the proceeding; and if it is, what may not be the consequences of the delay?

Again, the executive acts uniformly throughout the Union; if that department directs the action, all executive acts will be performed alike; all the laws will be executed in the same way.

But if the courts assume the power, they may (as they often do

differ with each other. A law may be directed by the court in one state, to be executed in one way; and, by the court in another state, in another manner. It is true their differences may be settled by appeal to the Supreme Court; but could a government be endured, all whose laws or whose executive action, at the claim of any individual who may conceive his interests affected, were liable to be suspended till their judicial differences were investigated and decided?

And further, if the inferior executive officers are subjected to this double control, viz., that of the President and of the courts, how are they to serve these two masters? And if their commands differ, which is to prevail?

The case of Marbury v. Madison, shows there can be no such thing as this double control. It distinctly states that the act of duty sought to be commanded by the mandamus in that case, was one in relation to which the President had no control over the officer: and it as distinctly admits that where the officer is, in relation to the duty sought to be enforced, at all subject to the control or direction of the President, there the Court has no power to command him. In Gibbons v. Ogden, 9 Wheat. 209, the Supreme Court says: " It seems that a power, to regulate implies in its nature full-power over the thing to be regulated, and excludes necessarily the action of all others that would perform the same operation in the same thing,' Now, if the power to regulate is thus necessarily exclusive of all other regulating power, a fortiori; a power to execute must be exclusive of all other executive power.

Let it be supposed that the act of congress now in question, provided, in the very words of the constitution, " that the President should see that this law was faithfully executed by the postmaster general." Would not this provision have given the control to the President? And could the court, in that case, have interfered? And is not the provision in the constitution as effectual as it would have been in the act?

The power in question cannot be given to the courts, because, from the nature of the power, being the execution of a law which concerns the nation, it is political power; 5 Peters, 20 and 30; and belongs to the executive department; has always been exercised by it, and never by the courts; is fit for the executive, and unfit for the courts; and being, therefore, executive power, belongs to that department. The executive power is vested in the President, and can-

not be vested elsewhere. Martin v. Hunter, 1 Wheat. 304, 316, 320; 3 Story's Com. 451, 340, 414.

Again, it cannot be given to the courts, because it is not judicial power.

What power can be given, according to the constitution, to the judiciary? Certainly none but what is properly judicial power. Can the power of supervising executive officers, and directing them how and when they are to perform executive acts, be judicial power? There are two remarkable instances of the judiciary declining to exercise powers conferred upon them. One arose from the act of congress authorizing the circuit courts to report to the secretary of the treasury, the names of persons entitled to be placed on the pension rolls. The opinions of the judges are in 2 Dallas, 409. They thought this was not properly of a judicial nature; and that, therefore, congress could not constitutionally confer it on the courts.

There is certainly no comparison as to the judicial nature of the two powers, between the examination into a claimant's right to a pension under the laws of the United States, and reporting its determination to the secretary of the treasury; and the power now in question. If this is properly of a judicial nature, it will be difficult to account for the nicety of the judges in declining the power given by the act referred to.

The other instance is mentioned by judge Story, in a note, in page 420, vol. 3, on Const. Law; and refers to 5 Marshall's Life of Washington, 433, 441. It there appears that General Washington, as President, before he proceeded to the execution of the treaty with France, of 1778, called upon the Supreme Court to expound it, and direct how it should be executed; and they declined doing so, on the ground that they could give no opinion but judicially, in a case regularly brought before them.

Now, if the judiciary has this supervising power over executive acts, and can direct the officers how they are to discharge them on the application of any person interested; it is strange, that when the executive calls upon the Court for its direction, it should be incompetent to give it. Can any reason be given, why an individual claiming the benefit of executive action from an officer should receive the aid of the Court; and the officer when he asks it, be refused?

Nor are we left to conjecture what is judicial power. The con-

stitution defines it. It says, "the judicial power shall extend to all cases in law and equity arising under the constitution, the laws of the United States, and treaties," &c. A great deal, no doubt, has been accomplished in the way of deriving powers from the constitution, in the way of construction; but the ingenuity that shall acquire for the courts, from the power to try cases in law and equity, the power to send any public officer to jail, unless he will discharge his executive duties in the way the courts shall prescribe to him, will very far exceed any thing that has yet been attempted. It does not seem likely that the framers of this instrument were aware that there could be a case in law or equity, that could be brought to so strange a conclusion; otherwise, some provision would probably have been made for supplying the place of the imprisoned officer. And, as the officer, in such a case, whose disobedience, if it was conscientious, would not be guilty of an unpardonable offence, and ought not to be imprisoned for life; some limitation would, probably, have been attached to the period of his confinement.

But the court thinks there should be little scruple in assuming this authority, and no objection in submitting to it. That, "as it can only be used in cases where a duty is to be performed, and where it is still in the power of the officer to perform it, the cases cannot be very numerous."

With submission to the court, Mr. Key said, he could not but think otherwise. Let it be once established, that whenever a public officer will not do what an individual, claiming under "a particular act of congress," or, "the general principles of law," (for to this extent, according to Marbury v. Madison, the doctrine goes,) may require of him, this Court may take cognizance of the case; and compel the officer to do the act; and the cases for such interference will be innumerable.

What are most of the cases brought before the legislature at every session of congress, but claims of this description? Claims arising for compensation for services rendered, or losses sustained; and claimed under some "particular act of congress," or "the general principles of law," and which the officers of government have refused to allow. All the claims spoken of by judge Story, in his Commentaries, pages 538, 539, 540, 541, are of this description; and are spoken of as being without this or any other remedy: and have always, by all, been so considered.

What is the present case but a claim arising under a particular act

of congress? And was it not the same before this particular act of congress of the last session was passed? Was it not originally a claim for services under a contract with the postmaster general, under the post office laws, a particular act of congress? When it was disallowed, might not the claimants have brought it here as well under one act as another? as well under the post office law, without going to congress, and getting the special act under which they now claim, if they had only known of this supervising jurisdiction of the court they now invoke. And if this is a case now for the exercise of this jurisdiction by the circuit court, and was so when the claimants carried it, in their ignorance, to congress; what claim can there be, affecting individual rights, that arises under " an act of congress," or under " the general principles of law" where the public officers disallow it, or refuse or delay to act on it, that is not also such a case?

The court speak in their opinion of this remedy by mandamus against public officers, commanding them how and when they are to perform their executive functions, as the "mildest" and the "best" form of proceeding; and think that " the officers will be less harassed by it than by the usual forms of action" for injuries to individuals. It would certainly be not only the mildest, and the best, and the least harassing to the officers, but quite agreeable provided they should think it their duty not to do their duty, but to let the court do it for them, and obey their commands: but, if they should think it their duty to act and think for themselves, and that the court had no right to think and act for them, and that what the court commanded was contrary to their duty, and should do their duty, and not the command of the court; then it would not be so agreeable a remedy; unless they should think retirement in a prison, during the pleasure of the court, more agreeable than the cares of office.

He would beg leave to ask the Court to compare what is thus said, with what was said here in the case of M'Cluny v. Silliman, 6 Wheat. 605. This Court thinks exactly otherwise of this remedy; as being (even if the laws allowed it) the worst and the most harassing, and in every way the most improper. And whatever the officers might think of a remedy that seems so pleasant to the court, the public might not find it agreeable to be paying officers their salaries for attending to their business, while they were enjoying this "otium cum dignitate" under the sentence of a court.

The circuit court relies on passages extracted from Marbury v. Madison as a refutation of the attorney general's opinion, denying the power of congress to give the power claimed in this instance to the courts; and these dicta are assumed as settled decisions, and also as their chief, if not sole authority for assuming the power.

That there are some expressions in that case that seem to favour some of the positions taken by the circuit court, may be admitted. That they sanction their assumption of the jurisdiction, we deny.

How far are they examinable? Are they authoritative decisions? We respectfully say not. If not touching the point in controversy, nor necessary for its decision, they may be examined. And this Court has decided that there are such expressions in that case. Attorney General's Opinion, 29; Cohens v. Virginia, 6 Wheat. 399, 400. What was the point to be decided? The constitutionality of the law of congress was the first question; and the point of jurisdiction thus arising and being settled against the jurisdiction, all else is dictum and extra-judicial. Every thing else then is examinable.

In Cohens v. Virginia, 6 Wheat. 399, 400, it is admitted that there are dicta in that case, and one of them very near to the point decided is overruled.

In Wheelwright v. Columbia Ins. Co. 7 Wheat. 534, another is rejected. Another at the close of page 167, 1 Cranch, is directly opposed by the argument in Jonathan Robbins' case, in page 16 of App. to 5 Wheat.; and not reconcilable with 9 Wheat. 819, and 6 Peters, 465; and another (that which states the remedy by action as making a mandamus improper) is directly repudiated by the circuit court in their opinion in this case.

Marbury v. Madison, therefore, settles no other question than that which arose as to the jurisdiction. And the whole course of the court, and its settled and repeatedly declared doctrine is, that any opinions given on the merits of a case where a question, as to jurisdiction arises, (unless where the jurisdiction is affirmed,) are not only dicta, but extra-judicial. The following cases will show the strongest expressions of the court against entering upon any question, until that of jurisdiction is so decided as to make their consideration necessary to the determination of the cause. 2 Dall. 414; 5 Marshall's Life of Washington, 443; United States v. Moore, 3 Cranch, 172; Bradley v. Taylor, 5 Cranch, 221; Wilson v. Mason, 1 Cranch, 91; Osborn v. The Bank of U. S. 9 Wheat.; Cherokee Na-

tion v. Georgia, 5 Peters, 15, 21, 31, 51; Ex parte Crane, 5 Peters, 200.

If the case of Marbury v. Madison had been regarded by the circuit court as authoritative throughout, it would have supported the attorney general's opinion. The act sought to be enforced in Marbury v. Madison is plainly distinguished from the one now in question. There, all executive action had ceased, nothing official was to be done; and Mr. Madison was merely the holder of a paper to which the relator was entitled by his appointment, whether he received the commission or not. He was appointed by the signing and sealing of the commission. "No other solemnity (say the court) is required by law; no other act is to be performed or done on the part of the government. All that the executive can do to invest the person with his office is done." So that whether he got the commission or not, he had the office without it.

There was a case, then, in which, as the Court understood it, (and whether correctly or not is immaterial,) there was no executive act to be done. "It respected a paper, which, according to law is upon record, and to a copy of which the law gives a right on the payment of ten cents." It is an act on which "individual rights depend." This is the description of the nature of the act which the Court say may be thus enforced. Certainly, nothing like this can be said of the act now sought to be enforced here.

But this is not all. The Court contrasts with this act they have thus described as fit to be enforced by mandamus, other acts, in relation to which it admits there can be no such proceeding. What are they? They will be found a perfect description of the act now sought to be enforced. The Court say, page 166, "By the constitution of the United States, the President is invested with certain important political powers, &c.; to aid him in the performance of these duties he is authorized to appoint certain officers, who act by his authority, and in conformity with his orders. In such cases, their acts are his acts," &c. Here is a fair description of the act now sought to be enforced by the postmaster general. Among the important political powers vested in the President, one of the most important is to see that the laws be faithfully executed; and consequently this law that the postmaster general is now to be made to execute. That officer has been appointed by the President, to aid him in his duty of having the laws faithfully executed, by executing those that belong to his department. His acts are therefore the President's acts. And

this act, (unlike the act to be enforced in Marbury v. Madison,) is one which falls within the political powers invested in the President. Again, it is said of these acts which cannot be enforced, that "the subjects are political. They respect the nation, not individual rights, and being intrusted to the executive, the decision of the executive is conclusive," 166. Now the execution of a law of congress, in which the public is interested, is political; it respects the nation, not individual rights solely.

Here is a strong mark of distinction between the act in this case, and the act to be enforced in Marbury v. Madison. In this case, an entry of a credit is to be made in the books of the nation against the nation. It, of course, respects the nation. In that case the act, the delivering of the commission, the officer being already appointed without it, and entitled to his office without it, did not respect the nation, but the individual only. That this is the meaning of the Court; that, when they say "they respect the nation, not individual rights," they mean not individual rights solely, is obvious from another passage in page 170. The Court say, "that it may be considered by some as an attempt to intrude into the cabinet, and to intermeddle with the prerogatives of the executive. It is scarcely necessary for the Court to disclaim all pretensions to such a jurisdiction. An extravagance so excessive and absurd, could not have been entertained for a moment. The province of the Court is, solely, to decide on the rights of individuals; not to inquire how the executive, or executive officers perform duties in which they have a discretion.'

It seemed to him impossible to avoid seeing the likeness between the acts described by the Court, as those in which it could not interfere, and the act now sought to be enforced in this case; and the unlikeness between the acts described by the Court as proper for the exercise of the power, and the act now in question, and sought to be enforced against the postmaster general. If the liability to impeachment is considered, it seems clear that in relation to any laws respecting the public, (though they may also respect individual rights,) the President may be impeached for malexecution. Could the courts then assume the direction of the execution of such a law, and the President be still so liable?

Such cases would come here. And yet the Chief Justice would preside on the trial of the impeachment, who would have tried the question as to how the law should be executed here.

[Kendall v. The United States.]

A concluding remark as to this case. may be made here, though applicable to the remaining question as to whether congress has given the circuit court this jurisdiction.

When was the jurisdiction, if ever, given? It is said, in 1801, before the case of Marbury v. Madison. The circuit court had the jurisdiction then, if it has it now; and this Court was not unacquainted with its jurisdiction, nor were the learned and experienced counsel of Marbury. It is asked, why, when every question of law necessary for his success was settled by this Court, was not the application made there then? But, is it possible to believe that this Court would then have discussed these questions, if it had believed the case could have been taken before the circuit court, so as, in effect, to have tried for the circuit court questions of which it could not itself take cognizance?

He thought he had now shown that the power in question was executive power, not judicial; and that, by the constitution, it belongs to the president, and could not be given by congress to the courts.

But if he had not succeeded in this, he thought he might at least insist, that, as it was a power hitherto exercised by the executive department, and not by the courts, and as he thought it must be admitted to be more fit for the executive than the judiciary, it ought not to be assumed by the courts as given by inference, by construing general words in an act, as having, in the court's opinion, that meaning. A clear, distinct, positive law, admitting of no reasonable doubt as to its meaning, ought to be the sole warrant for the exercise of such authority. He was sure there was no such warrant here, no such clear, plain grant of the power to the court; and for this he could appeal to the learned court below, and to the able and ingenious counsel for the relators; one, or the other of whom, undoubtedly had failed to see it. For this case had been attended by this most remarkable circumstance: That the court were invited to assume this jurisdiction by the relators' counsel, as appears in their printed argument (now before him) upon grounds, all of which the court considered to be insufficient; for they adopted none of them; and this could hardly have happened where the power was clearly given. And the court then assumed the jurisdiction upon a ground which did not appear to the opposite counsel as of any account; for their argument contains not a hint of it; and this, too, could hardly

have happened where the power was clearly given. So that he had it in his power to say (what he never remembered to have had it in his power to say in any case before, and what seemed to him almost to supersede the necessity of saying any thing else,) that the grounds upon which the jurisdiction was claimed by the counsel, are insufficient, according to the opinion of the court; and the ground upon which it is assumed by the court, insufficient, according to the opinion of the counsel.

Surely he might say, in such a state of things, that this was a power not clearly given by a law; and not even clearly got by construction.

In the printed argument for the relators, he observed that the fifth section of the act establishing this court is not once referred to, as giving the jurisdiction in question; the third section, is alone relied on, as referring to the act of 13th February, 1801; considered, though repealed as to the other circuits, as being still in force here. The court, in its opinion, although this act of 13th February is recognised as unrepealed here, say not a word signifying their taking the jurisdiction under any of its provisions; but rely exclusively on the fifth section of the act establishing the court. Yet, he admitted it was possible, (though certainly in the highest degree improbable,) that the true ground of the jurisdiction assumed, might have escaped all the researches of the counsel and of the court, in the first instance; and only be discovered finally, when all other grounds appeared unavailable. He would only say that if this should prove to be successful, the relators were most fortunate litigants.

They presented their claim to the remedy they sought on one ground, (the third section of the act of 27th February, 1801, referring to the act of the 13th February, 1801.) And the court, having previously decided in United States v. Williams, that they could not assume any jurisdiction on that ground, assume it on another, (the fifth section; and appear to place their decision on the difference between the terms *case* and *suit*.) This was being very fortunate. But this was not all. The ground on which the court assume it, viz: this difference between *case* and *suit*, is found to be opposed by the Supreme Court, in 2 Peters, 464; and Judge Story, 3 Com. 507.

And then the relators' counsel light upon another ground for sustaining the jurisdiction assumed, viz: the words " concurrent with

the courts of the several states," which are found in the eleventh section of the judiciary act; and are considered as limiting the jurisdiction of the other circuit courts, the absence of which words from the fifth section of the act of 27th February, 1801, are held to invest the circuit court of this district with the jurisdiction in question.

He should not think this ground required any particular examination, was it not that it appeared now to be the only one on which this jurisdiction could be expected to stand.

He should proceed, therefore, to examine both the third and fifth sections of the act of 27th February, 1801, establishing the circuit court of this district; under one of which it is incumbent for the relators to show the jurisdiction they have invoked to be given.

It is settled by the cases of Wood v. M'Intyre, 7 Cranch, 504, and M'Cluny v. Silliman, 6 Wheat. 598, and 1 Paine, 453, that this jurisdiction is not given to the other circuit courts by the eleventh section of the judiciary act. Therefore, it must be shown, that one or the other of these sections gives a broader jurisdiction to the circuit court of this district, than is given by the judiciary act to the other circuit courts.

First, as to the third section. This gives to the court and the judges thereof, here, the same powers then vested by law in the other circuit courts and the judges thereof; and the argument is, that as the act of 13th February, 1801, (since repealed by the act of March 8th, 1802,) was then in force, all the jurisdiction then vested by the act of 13th February, 1801, was vested in this Court: and that as the act of March 8th, 1802, only repealed the act of 13th February, and not the act of 27th February, 1801, all the jurisdiction thus given by that act to this court, was unaffected by the repeal.

It admits of several answers:

First. This section should be expounded, according to the plain intent of congress, to give the court and its judges here the same powers with the other circuit courts not at any particular time, but at all times.

Second. The act of 8th March, 1802, not only repeals the act of 13th February, 1801, but re-enacts the judiciary act of 1789; and that re-enactment repeals all laws inconsistent with the act of 1789, thus re-enacted; and consequently all such parts of the act of 27th February, 1801, as gave, by reference to the act of 13th February, powers differing from those given by the act of 1789.

But if this act was unaffected by the act of 8th March, 1802, the construction attempted to be given to this section, could not be sustained. We are referred by it to the act of 13th February, 1801, for the powers of the courts. Must we not look for that section in it which relates to the powers of the courts? We find such an one, and it refers us again to the act of 1789. So that the powers then vested by the act of 27th February, 1801, in this court, are the powers given by the act of 1789. And that act, it is conceded, has been settled as giving neither power nor jurisdiction to issue a mandamus in such a case.

When, then, we are sent to the act of 13th February for the powers of the court, and the judges, can we pass by the section that relates expressly to that subject, and go to the one that relates to the jurisdiction of the courts. If there was no section to be found in the act of 13th February relating to powers, there might be some little excuse for saying that you might go to the section providing the jurisdiction; but as there is a distinct section giving powers, you can, by no rule of construction, go to any other.

And it is a fallacy to say powers and jurisdiction mean the same thing; for if they might have such a meaning elsewhere, they cannot here, in an act which contains a distinct section for each. In each of those acts, that of 1789, that of 13th February, and of the 27th February, there are distinct sections; one giving powers, and the other jurisdiction. And if in this act, the third section, by giving powers gave also jurisdiction, as pretended, why should the fifth section give jurisdiction over again? Such a construction strikes the latter section out of the law.

And they do not mean the same thing; jurisdiction refers to the cases and persons over whom the court is to have cognizance; and powers, to the means given to exercise its jurisdiction. And this distinct and precise meaning, is manifestly that in which the terms are used in all these acts.

If such a construction could be sustained, and the circuit court in this district, by thus having the powers given by the act of 13th February, could be considered as thus having the jurisdiction given by that act, and that jurisdiction was as extensive as is contended, how are we to account for its never having been exercised; for its being discovered only now, that this court has a jurisdiction denied to all the other courts? No case has been brought here of its exercise; though hundreds of cases like the present are now before con-

gress, which the claimants have never imagined they could bring before this or any other court. And no instance of the exercise of any jurisdiction under this act of 13th February, can be shown in the circuit court. And on the contrary, the circuit court in December term 1834, in the case of The United States v. Christina Williams, when this third section was brought before them, after argument in a deliberate written opinion, as we show in judge Cranch's notes of the case, disclaimed, expressly, all jurisdiction under it; saying: "this court takes its powers under the third section, not its jurisdiction."

The court below, therefore, was right in rejecting this ground thus presented by the relators' counsel, for taking the jurisdiction; and in saying, as they do in their first opinion after the first argument, "the court takes its powers by the third section, but its jurisdiction by the fifth."

2dly. It remains now to be seen, whether the court has been more fortunate in selecting the fifth section as their ground, and their only ground for assuming the jurisdiction.

Here, as it is admitted to be settled that the eleventh section of the judiciary act does not give this jurisdiction, it must be shown by our adversaries, that there is a difference between that section, and the fifth of the act of the 27th February, so that the jurisdiction denied by the one, is given by the other.

Comparing these two sections, omitting all immaterial terms, we find that by the eleventh section of the judiciary act, the circuit courts of the United States are to take cognizance of all suits in law or in equity, "concurrent with the courts of the several states." And, by the fifth section of the act of 27th February, the circuit court of this district is to take cognizance of all cases in law and equity. As it is now not questioned, but that by 2 Peters, 464, and 3 Story's Com. 507, it is settled that there is no difference between the terms "case" and "suit;" the only remaining difference rests on the words, "concurrent with the courts of the several states," contained in one statute, and omitted in the other. And the jurisdiction is now assumed by the court below, on the force of these words alone.

This obliges the court to maintain these two propositions:

1. That these words limit the jurisdiction of the circuit courts to such suits, or cases in law or equity, as the courts of the several states then had cognizance of: and,

2d. That the courts of the several states had no jurisdiction of cases in law or equity, arising under the constitution and laws of the United States; of which two propositions, the only difficulty is to say which is the most untenable. From them, however, they conclude that the United States' circuit courts have no jurisdiction in cases of law and equity, arising under the constitution and laws of the United States. And this, they think, must have been the ground upon which this Court, in the two cases referred to, have denied the jurisdiction of the circuit courts to issue a mandamus to an executive officer. He would undertake to deny both the premises from which this conclusion was drawn. That this Court laid down no such premises, and drew no such conclusion; was obvious from the cases referred to.

1. Did congress mean, by these words, to confine the jurisdiction of the United States' circuit courts to such cases of law and equity, as the courts of the several states then had cognizance of?

What is the language? They shall take cognizance of all cases in law or equity, " concurrent with the courts of the several states." And this means, it is said, that they shall take cognizance, not of all cases in law or equity, but of such only as the courts of the several states then had cognizance.

This was surely a strange mode of expressing such a meaning. The argument is, that as they were to take a jurisdiction concurrent with the state courts, congress meant they should only take what the state courts then had; and that the positive words, that they shall take cognizance of " all cases in law or equity," are to be controlled by the inference arising from the others. But, surely the court should have construed the law so as to give more effect to the express words, than to the inference; and say, they must take jurisdiction of " all cases in law or equity," (a jurisdiction which congress could give,) by force of those express words; and the words " concurrent with the courts of the several states," are to operate to show that congress meant not to give the jurisdiction exclusively (as they could have done,) of the state courts. It is clear, that if congress did not mean this, but intended what the court below has supposed, it would have been easy to have said, instead of " all cases," &c., " such cases," &c., as those state courts had cognizance of. The judiciary act shows in this, and several other sections, that congress did intend to give some portions of jurisdiction to the United States' courts, exclusively of state courts, and other portions concur-

rently with the state courts; and the constitution has been always so construed, as to admit the power and the propriety of doing so by congress. This is the interpretation of that part of the constitution given by General Hamilton, in the eighty-second letter of the Federalist; and by this Court, so also in Cohen v. Virginia, 396, 397, 419. Cited, Bank v. Devaux, 5 Cranch, 85; 3 Story's Com. 619, 620, 621, 622; and Houston v. Moore, 5 Wheat. 27, 28; 3 Wheat. 221; 1 Kent, 539, 96, 97, 342, 43, 319.

The language, therefore, used by congress does not admit of such a construction.

And if the act could be construed with this restriction of the circuit courts to the jurisdiction of the state courts; it may be asked, does it mean all of them; and if not, which? For we all know they greatly differed.

This law, it is known, was reported by a committee of congress, composed of eminent professional men, many of whom had assisted in forming the constitution, and one of whom was from each state. They, therefore, well knew the great differences of jurisdiction with which the different states had invested their tribunals: and if the intention was that the United States' courts should have the same jurisdiction that was given to the courts of the states where they were respectively held; then it would follow, that the federal courts would not have the same jurisdiction every where, but would differ with each other as the state courts did.

Congress cannot be supposed to have meant that: and it is settled that they did not so mean that their jurisdictions every where are the same. Livingston v. Story, 9 Peters, and the cases there cited; and Federalist, No. 82.

The Federalist, No. 82, shows that all these courts have in all the states the same legal and equitable jurisdiction, without any reference to the varying jurisdictions of the state courts. The first proposition then, that the United States' courts took only the jurisdiction of the state courts cannot be sustained.

Nor is the court below sustained in their second proposition, that the courts of the states have no jurisdiction of cases in law or equity, arising under the constitution and laws of the United States.

It would be most strange if it was so; for the constitution of the United States, art. 6, sec. 2, declares that "this constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties, &c., shall be the supreme law of the land; and the.

judges in every state: shall be bound thereby,—any thing in the con-stitution or laws of any state to the contrary, notwithstanding."

Now, if any state court, having, by the laws of the state, jurisdiction over all cases of law and equity, should be applied to, to take juris-diction in a case of law or equity arising under the constitution or a law of the United States, which is binding on them as their supreme law; on what possible ground could they decline the jurisdiction? A case in law or equity may undoubtedly arise under this constitu-tion, or a law of congress, or a treaty made in pursuance of its au-thority, as well as under any other law; and if so, all courts having jurisdiction in cases of law and equity, must entertain the case.

When a case is said to arise under the constitution or a law of the United States, is settled in Cohens v. Virginia, 6 Wheat. 378: and what are all the cases where the right of appeal is given by the judi-ciary act to this Court from the state courts, but cases arising under the constitution and laws of the United States?

Not a word from the Court, nor from any writer upon the consti-tution, or the jurisdiction of our courts, has been mentioned as giving any countenance to this new construction. They appear never to have entertained an idea of this limitation upon the circuit courts. He would refer to the 15th chapter of Sergeant's Constitutional Law, 2d edition, 123; 3 Wheat. 221; 4 Wheat. 115: and the act of congress of 26th of May, 1824, establishing the courts of Florida, which recognises the circuit courts as having by the judiciary act jurisdiction of cases arising under the constitution and laws of the United States.   See American Ins. Co. v. Canter, 1 Peters, 511.

According to the two propositions maintained by the court below, it would follow that cases in law and equity, arising under the laws and constitution of the United States, could not be tried any where: for the Court say the state courts could not try them, and the United States' courts have only the same jurisdiction, that is, no jurisdiction over such cases.

Neither of these propositions, therefore, can be sustained. And if they could, still it would be necessary for the court below to show that this claim of the relators was a "case in law or equity."

What is a case in law or equity?

"If B." says the Court's opinion, "a resident of this district is indebted to A. upon a promissory note, this Court has jurisdiction of the case."

He apprehended something more was necessary than a note's be-

[Kendall v. The United States.]

ing due between such parties, to constitute a case at law or equity. This Court, in Osborn v. The Bank of the United States, 9 Wheat. 819, prescribe other requisites. " That power, the judiciary, is only capable of acting where the subject is submitted to it by a party, who asserts his rights in the form prescribed by law. It then becomes 'a case.'" and Judge Story, in his Commentaries, vol. 3d, page 507, referring to this case, says: " It is clear, that the judicial department is authorized to exercise jurisdiction, &c., whenever any question shall assume such a form that the judicial power is capable of acting on it. When it has assumed such a form it then becomes 'a case;' and then, and not till then, the judicial power attaches to it.' In other words, a case is a suit in law or equity, instituted according to the regular course of judicial proceedings." So, 2 Peters, 449; 6 Peters, 405; 5 Wheat. App. 16; 6 Binney, 5. So that before A. can make a case in law or equity out of the promissory note which B. owes him, he must submit it to the Court, and assert his right, " in a form prescribed by law." And if he cannot find a law prescribing a form by which he is to assert his right, he cannot have a case in law or equity.

No doubt A. can find such a law, and therefore, he may have a case. But where do the relators find any law prescribing a form by which they may require an executive officer to be compelled to discharge a duty devolved on him by law? If it be said by a mandamus, under the 14th section of the judiciary law, as a writ necessary to enable the Court to exercise its jurisdiction; it is answered by M'Cluny v. Silliman.

Congress has not prescribed a form by which parties, who have rights to have official acts, in which they are interested, performed by the public officers on whom " the laws have devolved such duties," may turn these rights into cases at law or equity between them and the officers, and submit them as controversies to the courts.

Judge Story says, 3 Com. 541: " Congress have never yet acted upon the subject, so as to give judicial redress for any non-fulfilment of contracts by the national government. Cases of the most cruel hardship and intolerable delay, have already occurred," &c.

Again. "He is disposed to think that some mode ought to be provided, by which a pecuniary right against a state or against the United States might be ascertained, and established by the judicial sentence of some court; and when so ascertained and established,

the payment might be enforced from the national treasury by an absolute appropriation."

Can it be possible that the learned judge was mistaken in all these views? That these cases of hardship and delay need not have occurred? That adequate remedies in the courts, or at least in this circuit court are to be found, where they will be recognised as cases in law or equity? That the inability to sue the government, is to be obviated by enforcing execution without suit against the officer, and calling this process of execution a suit?

The section of the judiciary act which gave to this Court the authority to issue writs of mandamus, shows that congress did not consider claims calling for that remedy as cases in law or equity; and further shows, that congress meant to give that sort of jurisdiction only to this high tribunal, and not to the inferior courts.

Much is said in the opinion of the court below as to the distinction between the ministerial and discretionary acts of the executive officers. He did not admit that this was a true test of the jurisdiction by mandamus. In Curtis v. The Turnpike Co., in 6 Cranch, 235, the act to be done by the clerk was merely ministerial; and this Court thought that as there was no act giving the circuit court jurisdiction over the act, it had no power to control him. Why, if the court could not control its own clerk in a ministerial act, could it control, in a similar act, the head of another department?

But can the act sought to be enforced, be considered a merely ministerial act? If compared with the illustrations given in Marbury v. Madison, it would seem not. Griffith v. Cochran, 5 Bin. 87, decides that where an officer has to examine a contract, and be guided by that and a law in reference to it, (similar to which are the duties of the officer here,) it cannot be held as a mere ministerial act; and is not to be enforced by a mandamus. The same case, as also judge Winchester's opinion, in the American Law Journal before referred to, shows that if the act is to be followed by taking money out of the treasury, it cannot be enforced by mandamus. Judge Tilghman remarks, "we have no right to do that indirectly by mandamus, which we have no power to do directly; and we might as well be called on to issue a mandamus to the state treasurer to pay every debt which is claimed by an individual from the state," page 105.

It has been said that injunctions have been allowed by the circuit court, addressed to the treasury officers.

[Kendall v. The United States.]

This has only been done in cases where the funds enjoined (as in the claims under the French treaty) were not the public funds, but moneys held by the officers, in trust for the claimants. The circuit court has always put its right to interfere exclusively on this ground; and the government, in the time of Mr. Gallatin and ever since, has denied as to the public money, any power of the judiciary so to interfere. An opinion of Mr. Wirt, when attorney general, expressly denies such power to the courts.

And the court below held, some years ago, the same opinion. In the case of Vasse v. Comegys, MS. 364, they said, "the fund is in the treasury of the United States. Can this be said to be within the jurisdiction of this court? The officers of the United States, holding public money as money of the United States, are not accountable to any body but the United States; and are not liable to a suit of an individual on account of having such money in their hands."

It does not seem easy to reconcile this with the jurisdiction now assumed.

There remains another objection to the mandamus. There was, by action against the officer, another specific remedy. 3 Burr, 1266; 1 Term Rep. 296; 2 Bin. 361; 2 Leigh, 168; 2 Cowen, 444; 1 Wend. 325.

In Marbury v. Madison the principle of these cases is recognised; and it is said, if an action of detinue would lie, the mandamus "would be improper." And this is again sanctioned by what is said in the conclusion of this Court's opinion, in M'Cluny v. Silliman.

Yet the court below have overruled all these cases; their own decision in United States v. The Bank of Alexandria; and say, that the officer's being possibly unable to pay the damages that might be recovered in an action, prevents his liability to an action from being such a remedy as should forbid the mandamus. As there can be no action that is not subject to such a contingency; it follows, contrary to all these cases, that a mandamus is allowable, although the officer is also subject to an action.

If what has been said, should make it even only doubtful whether the court below has the jurisdiction, Judge Iredell in 2 Dall. 413, and Judge Baldwin in Ex parte Crane, 5 Peters, 223, would show, in very strong language, the impropriety and danger of assuming a jurisdiction which has slept ever since it was given, till the present occasion.

Coxe, for the defendants in error:

The facts and history of this case, as disclosed in the record, are peculiar. The questions which it presents are of the highest interest, as well as importance. It involves a large amount of property which the relators believe belongs to them, by as perfect a right as that by which any property can be held; and which has been unjustly and illegally withheld from their possession. It involves the examination of the proceedings of a high functionary, under the blighting influence of which a vast amount of personal suffering has been endured; and which has already brought to a premature grave, one of the parties on the record. It involves general questions as to the rights of the citizen, in his pecuniary transactions with the government, between whom and himself contract stipulations subsist. It involves a consideration of high and heretofore unknown powers, claimed as belonging to public officers, in withholding their action in cases where specific duties are imposed on them by positive statute; and of immunities asserted in regard to them, when private rights are violated, and the injunctions of the law disregarded. It involves a consideration of the extent of legislative power; and of the means by which that authority may be enforced. It involves the nature, character and extent of judicial power, under our institutions; and indeed, whether the judiciary be, or not, a co-ordinate and independent department of the government. It involves the true interpretation of some of the most important clauses in the constitution; the essential principles of all free governments, and especially of our own peculiar institutions.

Nor are these matters, thus forced upon our consideration, limited either in their application to the individuals who are parties on this record, to the particular territory under whose local jurisdiction this case has arisen, or to the particular period in our history which is now passing. They embrace every citizen of this vast republic; they are co-extensive with our geographical limits; they will retain all their interest and all their importance, so long as our fabric of government shall live, and our constitution continue in existence.

A brief review of the history of this case is essential to a correct presentation of the proper subjects to be discussed. It originated in an illegal act of the present postmaster general; who undertook to reverse the acts of his predecessor in office; to annul contracts which he had made; to withdraw credits he had given; to recharge moneys which he had paid. This proceeding has been declared by

this Court to be illegal, and beyond his authority. U. States v. Fillebrown, 7 Peters, 46.

Congress, on the memorial of the relators, referred the adjustment of their claims to the solicitor of the treasury, and made the award of that functionary conclusive. He made his award: the postmaster general assumed the right to reverse the decision; and to set at defiance the act of congress, which imposed upon him the plain duty of executing it. The attorney general, called upon for his official opinion on the question in which the postmaster represented the solicitor as having misconstrued the act of congress, and thereby transcended his authority, concurred with the solicitor in his interpretation of the law; and his opinion is treated with worse than contempt. The judiciary committee of the senate, after full consideration; and the senate, by an unanimous vote, ratify and sanction the action of the solicitor; yet this insubordinate inferior still hangs out the flag of defiance. The judiciary interpose; their mandate is disregarded, and language highly menacing in its character employed; in the intelligible intimation, that their process may be stricken dead, in the hands of the marshal, by dismissing him from office, for the simple reason that he has performed, or is about to perform, his positive duty.

Throughout, therefore, it appears, that this functionary has arrayed himself in an attitude of hostility against all the authorities of the government, with which he has been brought in contact; and the official interference by the district attorney and attorney general in this proceeding, conveyed the first information that he was sustained in any part of his course by any official influence.

Another singular feature in the case is, that the allegations made by the relators are substantially admitted to be true. The validity of the original contracts under which the services were rendered, is not denied; the extent and value of those services, is not controverted; the construction of the act of congress, is not questioned; the obligation to pay the money, is not put in issue. The postmaster general concedes all these points; but plants himself on the single ground, that however clear may be our rights, however just may be the debt, however precise the injunctions of the act of congress, the law cannot reach him: that the claimants still have no other remedy than such as he may graciously please to extend, or than may be found in the power of the executive to remove him from office. He insists, that notwithstanding the act of congress for their relief, and

the award made by the solicitor, the parties stand precisely as they did before they went to congress. Substantially, this Court is asked, by the plaintiff in error, to expunge the act of congress from the statute book; and to treat the proceedings of the solicitor as a nullity. Independently of them, we had the same remedies which it is contended we now h ʏ we might then have supplicated the postmaster general to do as justice; we might then have invoked the power of the executive to see that the law should be faithfully executed.

The ques ion is thus brought within a narrow scope. Is there any power in the judiciary of our country to reach such a case of acknowledged wrong; and to enforce against this party the performance of an unquestionable duty?

In discussing this case, it will be attempted to maintain the following propositions; which will be found to comprehend every thing essential to bring us to a correct conclusion:

1. That upon the general principles of the law governing this particular form of proceeding, and in the absence of any objections derived from the provisions of the constitution or acts of congress, this is a proper case for a mandamus.

2. That the constitution does authorize congress to vest in the courts of the United States, power to command the officer to whom the writ was directed, to perform the act which he was required to perform.

3. That congress has, in fact, exercised this authority, by conferring on the circuit court of this district power to award the mandamus, in the present case.

Before proceeding to discuss these propositions, it may not be irrelevant to remark, generally, that the return of the postmaster general, in this case, is defective in all the essential requisites of a good plea. No one fact is averred in such a form as to admit of being traversed, or to sustain an action for a false return. The return to a mandamus should be as precise in its averments as any form of plea, or even an indictment. 10 Wend. 25.

1. Is the remedy by mandamus the appropriate remedy in the present case?

The relators have a clear, precise right, absolute and unconditional, secured by an act of congress; and this right is withheld by an officer especially charged by law with the performance of an act essential to that right. Is there any other specific, adequate, appropriate

legal remedy? If none, then upon the principles which govern this form of proceeding, a mandamus will lie.

It has been argued that such other remedy exists: . 1. By personal action against the delinquent officer. 2. By indictment, if he has violated the law. 3. By petition to the executive, whose business it is to see the laws faithfully executed; and who can exercise in case of recusancy, his constitutional function of dismissing the party from office.

. Neither of these furnishes such a remedy as the law regards. Neither of them puts the party in possession of the right which is withheld. If a civil suit be instituted, it must be a special action on the case, in which damages may be recovered to the extent of the injury actually sustained by withholding the right; but after the recovery, the right to the specific thing remains perfect and unimpaired. This right is not extinguished by such recovery; and as long as it is withheld, the party may continue to institute new suits, and recover fresh damages. In an indictment, the public wrong only is punished; the private injury is unnoticed. The fine goes into the public treasury; the imprisonment of the delinquent leaves the private right unaffected. 2 Binney, 275; 4 Barnw. & Ald. 360; 6 Bingh. 668; 10 Wend. 246.

. We are, however, told, that the peculiarly appropriate remedy provided for the citizen in such a case, is to petition the executive to command the performance of the act; and if his command is disobeyed, to remove the insubordinate officer from his office?

Is this in the language or spirit of the law, a specific, adequate, and appropriate legal remedy? A petition, which is addressed to the grace of the executive; which may be disregarded and put in the fire, at the pleasure of the functionary to whom it is addressed; which, if granted, will not secure redress of the wrong, but at the utmost only punish the wrong-doer.

This doctrine, that an American citizen whose rights have been violated by a public functionary; whose property is withheld in opposition to the clear requisitions of a positive statute, has no remedy but by petition to the executive; is a monstrous heresy, slavish in the extreme. It has no ground of support in the language of the constitution, or the spirit of our institutions. The annunciation of such a doctrine in England, was made, more than a century since, the basis of one of the articles of impeachment exhibited against lord Somers: 14th article of impeachment, 14 Howell's State Trials.

These are not, however, the grounds upon which the plaintiff in error himself rests. He denies that the mandamus is the appropriate remedy: 1. Because he has a discretion under the law; and where the officer has a discretion, no mandamus lies. 2. Because the writ can only issue in cases in which it is necessary; not as a means of obtaining jurisdiction over a case, but as a means of exercising a jurisdiction already vested.

In any sense in which the doctrine advanced in the first objection can be made applicable to the case at bar, the position assumed is unfounded. In the general language in which it is expressed, it is denied.

It does not follow from the fact, that a discretion is vested in an officer, that therefore no mandamus will lie. If a statute empower an officer or an individual to do a particular act, but leaves it exclusively to his discretion whether to perform it or not, no mandamus will lie to compel its performance. If, however, he is directed to do an act, but he has a discretion to perform it in either of two ways, a mandamus will lie to compel him to exercise his discretion; and having done that, to perform the duty in the mode which he had selected. If, for instance, the act of congress for the relief of the relators, had directed the postmaster general to pay them the full amount awarded in gold or in silver, at his discretion; a mandamus would lie to compel him to determine in which metal he would pay: and having decided that to enforce the actual payment. Such is the doctrine of all the cases. 5 Wend. 122, 144; 10 Wend. 289; 13 Picker. 225; 3 Dall. 42; 1 Paine, 453. In order to bring himself within the correct principle of the law upon this subject, the postmaster general must show that under the act of congress he was authorized to give the credit claimed, or to withhold it at his pleasure.

His argument is, that because he must examine the provisions of the law, and the award of the solicitor, and compare them together to see whether the latter is within the power delegated by the former; he must exercise judgment, and consequently possesses a discretion. Because some preliminary examination may be necessary in order to ascertain the precise duty which is enjoined; does the obligation to perform it, when ascertained, become less imperative? If in order to know, distinctly, what is his duty, it be necessary to examine one statute or fifty, one section or many, the simple statute, or, in connexion with that, an award made under it; is wholly imma-

[Kendall v. The United States.]

terial, a sheriff has the same discretion in the service of all process; yet his act is purely ministerial, and he may be enforced to execute the writ placed in his hands.

2. A mandamus can be issued only as a means of exercising a jurisdiction already vested; not for the purpose of obtaining jurisdiction. The argument upon this point is so singularly deficient in precision, that it is somewhat difficult to determine its exact scope.

He says the circuit court has no original jurisdiction to adjudicate upon claims of contracts upon his department. From this proposition he deduces the inference, that all the jurisdiction which can be exercised must be of an appellate character. Then, from the fact that the act of congress makes the award final and conclusive, with no power of revisal or reversal vested any where, he reaches the conclusion that the court possesses no appellate jurisdiction.

The jurisdiction which has been exercised is not of that original kind which is thus denied to exist; for no action has been instituted against the department, for the purpose of adjusting the claims of the contractors: the existence and extent of those claims had been already determined by the special tribunal to which the power was confided.

No attempt has been made to subject that decision to the review of the circuit court, so as either to reverse or change it. The appellate power, therefore, which he denies, has never been claimed by or for the court; such high power has been claimed and exercised by himself alone. The circuit court assumes the conclusive character of the award: the object of this proceeding is to enforce, not to annul; to execute, not to reverse.

The result then of this inquiry is, that the case is one in which the remedy by mandamus is the appropriate remedy, according to the general principles of law governing that writ. 1 Cranch, 163, 167, 168, 169; 5 Bac. Abr. (new Lond. edition,) 261; 2 Brock. 11. Further illustration of this position will be found in the subsequent parts of the argument.

3. Unless, then, some constitutional objections fatal to our claim can be presented, or some deficiency in the provisions of the law to meet the case exist, the circuit court has not erred in awarding the mandamus. It is, however, objected, that under the constitution no such power can be vested in the judiciary.

This objection, as presented in the return, is, with characteristic modesty, put forth in the shape of a doubt. " It is doubted whether

[Kendall v. The United States.]

under the constitution of the United States, it confers on the judiciary department of the government authority to control the executive department in the exercise of its functions, of whatever character."

It appears to be assumed in the objection, as thus presented, that the jurisdiction claimed on behalf of the judiciary, is a power of control over the executive department. Much of the argument employed in this case has been directed against the mere figments of the imagination of this high functionary.

The mutual independence of the three great departments of the government is assumed throughout our entire argument. That each is to act in the performance of its appropriate functions, uncontrolled by either of the others; that each possesses all the powers necessary to the full and complete exercise of its own authority; if denied in any part of this case, is denied only by the postmaster general, and by his counsel.

The language of the constitution in describing the extent of the judicial power is large and comprehensive. Art. 3. sec. 2. It comprehends all cases in law or equity, arising under the constitution and laws of the United States. No limitation is expressed, no exception made in favour of any description of case; any character of party; or any occupant of office. No individual is in terms exempted from this jurisdiction, in consequence either of the office he may hold, or the character of his act. The judicial power embraces all the cases enumerated in the 3d article of the constitution. 1 Bald. 545. A case, affecting the postmaster general, or the President, is still a case under the constitution. Cohens v. Virginia, 6 Wheat. 379.

It must be obvious, that the question immediately under discussion, involves rather an inquiry into the extent of legislative than of judicial authority. It is not what has congress designed to do; but, under the constitution, what may it do.

The postmaster general, and the department of which he is the head, are the creatures of legislative power. Art. 1. s. 8. ¶. 7, of the constitution, confers upon congress the power to establish post offices and post roads. All the legislation of congress upon the subject is under this clause. All offices of the United States, except in cases where the constitution otherwise provides, must be established by congress. 2 Brockenb. 101.

If congress may, then, create the office, prescribe the duties of the officer; determine what he may do, and prohibit him from doing

other things; may not the same power constitutionally declare to whom he shall be responsible, and confer authority where it pleases to enforce such responsibility?

Such has been the uniform action of congress, and its validity has never yet been questioned. The act of September 22, 1789, 2 L. U. S. 53, s. 1, which erected the department, provides that the postmaster general shall be subject to the direction of the President in performing the duties of his office. The act of Feb. 2, 1836, newly organizing the department, and places the district attorneys, in relation to certain duties, under the control of the postmaster general. By the act of February 20, 1792, 2 L. U. S. 245, s. 4, the postmaster general is to render his accounts to the secretary of the treasury; and to this extent is subject to the authority of that functionary. By the 24th section of the same act, he is made responsible for certain omissions, and certain moneys are recoverable from him. By the very terms of the law he is made amenable to the jurisdiction of courts.

Are these provisions, one and all, unconstitutional? If not, how can the constitutional power of the same legislature to invest its courts with authority to direct the officer to act, as well as to punish him for not acting, be denied?

The argument of the postmaster general, and of the attorney general, assumes that the post office department is an essential part of the executive department of the government; and from this position infers the want of the jurisdiction claimed. The assumption has been shown to be inaccurate: but even if true, it is not easy to perceive the connection between the premises and the conclusion.

We are referred to the debates in the convention, to show the anxiety of that body to preserve separate and distinct the three great departments. I will, in return, refer to the 47th and to the succeeding numbers of the Federalist, for a correct exposition of this maxim of political philosophy, and its practical adoption in our constitution.

Starting from this basis, the constitution is appealed to; and by the aid of some interpolation and some extravagant interpretation, we are told substantially, if not in terms:

1. That the clause in the constitution which provides that the executive power shall be vested in the President, actually confers upon him all that power which, in any age of the world and under any form of government, has been vested in the chief executive functionary; whether king or czar, emperor or dictator.

2. That the clause which imposes upon the executive the duty of

seeing that the laws are faithfully executed, contains another large grant of power.

3. That, as a means to the performance of this duty, he is invested with the power of appointment to and removal from office

4. That the power of appointment and removal carries with it the power to direct, instruct, and control every officer over whom it may be exercised, as to the manner in which he shall perform the duties of his office.

My observations upon these points shall be few, and brief.

The first proposition was, perhaps, for the first time distinctly advanced by General Hamilton, in his Letters of Pacificus, No. 1, p. 535. A great and revered authority, but subject to occasional error. It was fully answered by Mr. Madison in the Letters of Helvidius, p. 594, &c., and has since remained dormant. The second is now for the first time broadly asserted. Its dangerous tendencies—its hostility to every principle of our institutions, cannot be exaggerated. The true signification of this part of the constitution, I take to be simply this, that the President is authorized to employ those powers which are expressly entrusted to him to execute those laws which he is empowered to administer; or, in the language of the late Chief Justice, he is at liberty to employ any means which the constitution and laws place under his control. 2 Brockenb. 101.

The third proposition is a palpable and unwarrantable interpolation of the constitution. The fourth, if the power claimed is derived from the power of appointment, would make the judges dependent upon executive dictation; if from that power and that of removal, conjointly, would make it the true theory of the English constitution, that the king might instruct, direct, and control the lord chancellor in the performance of his judicial duties. It would make him the keeper of the chancellor's conscience.

The right to command, direct and control, involves the correlative duty of obedience. No officer can be criminally or civilly punished for obedience to the lawful command of a superior, which he is bound to obey. This doctrine, then, asserts the entire irresponsibility of all officers, except to this one superior.

One of the practical inferences from these premises is, that the judiciary department cannot execute its own judgments; a proposition distinctly avowed by the postmaster general in his return, p. 127–8–9, and asserted, in terms equally distinct, by the attorney general, in p. 152.

The attorney general presses this argument still further, and, from the absolute inability of the courts to execute their judgment in the case of a peremptory mandamus, "without the consent of the executive department," considers the inference as clear, that no court has the capacity " to issue such a writ." How obvious is the inference, if this be correct, that the courts can issue no process, and exercise no jurisdiction of any description. If this process, to use the expression of the postmaster general, may be " struck dead" in the hands of the marshal, by dismissing him from office; may not every capias, and summons, and subpœna, and attachment? The law, however, has provided, that in case of removal from office the marshal may, nevertheless, proceed to execute the process then in his hands.

While adverting in this argument, to questions rather of political than of legal science, it is somewhat surprising that these learned gentlemen have overlooked one peculiarly important in the consideration of this subject. A maxim fully embodied in our institutions, recognised by every commentator on the constitution, whether judicial or political. This Court has, upon more than one occasion, laid down the position, that the judicial power of every well organized government must be co-extensive with the legislative and executive authority. Cohens v. Virginia, 6 Wheat. 354, 382, 384; Osborn v. Bank of United States, 9 Wheat. 818.

The true and sound constitutional doctrine upon this subject is, that whenever the legislature may constitutionally create an office, and prescribe its duties and its powers; they may make the incumbent responsible to the judiciary for the faithful performance of those duties.

When the legislature may rightfully command an act to be done by a public officer, they may confer upon the judiciary the power to enforce its performance, or to punish its omission. In fact, the judicial power is never exercised except for the purpose of giving effect to the will of the legislature. 9 Wheat. 866.

If, then, there be any limitation to, or any exception from this general rule, or the comprehensive language of the constitution in conferring the judicial power, let it be shown in the instrument itself. Such is the doctrine of this Court in Cohens v. Virginia, 6 Wheat. 378; and in Rhode Island v. Massachusetts, at this term. If there be any exception embracing this party, excluding him from the jurisdiction of the court, let it be shown. If he is entitled to any exemption, let him exhibit his right.

. In examining the constitution for any such exemption, we· are naturally led to that part of this instrument which defines and prescribes the extent of the judicial power, and to that which creates the executive department. In neither can it be discovered. On the contrary, the constitution, at least by powerful implication, recognises the executive officers as subject personally to the judicial power.

So far as the ground upon which this exemption is claimed has been presented, it seems to be derived from the official character of the party called upon to perform the duty enjoined, and from the character of the act which he is required to execute. This is not, however, to be found in any provision of the constitution, or in the genius of our government.

. That executive officers, as such, are amenable to courts of justice for their official acts, would almost seem too plain for argument. Such has ever been the law in England. In that country, exemption from legal process is confined exclusively to the monarch, and certain portions of the royal family. Yet anciently, when writs were in general mandatory to the party, the king might be sued as a private party, the form being Præcipe Henrico, Regi Angliæ. 5 Bac. Abr. 571; Gwil. Edit. Prerog. E. 7; 43 E. 3. 22. To the extent to which it existed in England at any time, it was a privilege, part of the royal prerogative, purely personal and incommunicable. Another branch of the same prerogative existed, under which the king granted writs of protection to such of his subjects as he might have occasion to employ in the public service, exempting them from arrest. Com. Dig. Prerog. D. 78, 79, 80, 81, 82. This was personal and temporary. With these exceptions, wholly inapplicable to the present times and to our institutions, no such principles as the postmaster general invokes ever existed in England; and since the revolution in 1688, it is believed no writ of protection has been issued.

. Frequently before, and uniformly since that great event in English history, jurisdiction has been exercised by the various courts of England over the highest dignitaries of the realm, in relation to their official acts, through the instrumentality of such writs as were adapted to the particular cases that occurred, without distinction. Offices are forfeitable for malfeasance, an for nonfeasance; and this forfeiture enforced by a criminal pros tion. In 2 Salk. 625, will be found a short note of lord Bellamont's case, who was prose-

cuted for an official act as governor of the then province of New York. In Mostyn v. Fabrigas, Cowp. 161, 11 Harg. St. Tr. 162, Lord Mansfield held, that an action might be sustained by a native of Minorca; emphatically, as he says, against the governor of that island for an act of official misconduct. In this country, such cases. are numerous. Hoyt v. Gelston is familiar to this Court. Livingston v. Jefferson, was a case in which the defendant was sued for an act done by him as President of the United States. 1 Brock. 203. The recent cases of Tracy v. Swartwout, 10 Peters, 80, and Elliott v. Swartwout, 10 Peters, 137, are also cases of this description.

Such jurisdiction is in terms recognised by the constitution in the clause relating to impeachment, and is distinctly admitted in various acts of congress. It is not necessary here to advert to more than one or two instances. The post-office act of 1792 has been already cited; but the act of Feb. 4, 1815, (4 L. U. S. 786,) in some of its provisions, recognises the amenability of the public officers of the United States, whether civil or military, to the judicial tribunals, even of the states, for their official acts.

To a certain extent, this responsibility is conceded in the return on record, p. 151. This concession is a virtual surrender of the entire case; unless the postmaster general, while acknowledging his general responsibility, shall insist upon and sustain a special exemption from this particular process. He admits that the court possesses the power to punish him if he does wrong, but denies that they can compel him to do right. A capias will lie notwithstanding his high office: this power may be constitutionally vested in the courts. A habeas corpus will lie, if a citizen is wrongfully imprisoned by the highest dignitary; and an action be sustained for the illegal arrest. Damages may be recovered for an illegal act, or an injunction issue to restrain it. This particular remedy by injunction is given by express statute, in certain cases in which the United States is a party. Act of May 15, 1830; 3 Story, 1791: and its validity recognised by this Court in United States v. Nourse, 6 Peters, 470; and impliedly in Cathcart v. Robinson, 5 Peters, 264; in Armstrong v. United States, 1 Peters' C. C. R. 46; 9 Wheat, 842, 843, 145; 1 Baldw. 214, 215.

If all or either of these writs may issue, why not a mandamus? So far as authority goes, we have the legislative opinion on the question in the judiciary act of 1789, expressly conferring this power upon this Court; and the force of this authority is not weakened by the circumstance that the unconstitutionality of that provision was

subsequently decided. Marbury v. Madison, 1 Cranch, 137, contains the deliberate opinion of this Court on the very point; and although the authority of that decision has been questioned by Mr. Jefferson, in his private correspondence; yet before a legal tribunal little weight can or ought to be attached to his opinion.

The full authority of that case has been recognised by all the distinguished commentators; by Dane, Story, and Kent; by this Court, in M'Intire v. Wood, 7 Cranch, 504; M'Cluny v. Silliman, 6 Wheat. 598; and in Ex parte Crane, 5 Peters 190. In no one judicial decision; in the elementary treatise of no jurist; is the authority of that case upon this point impugned or questioned.

But the attorney general supposes that this process is applicable only to inferior magistrates; that it grows out of a general supervisory jurisdiction; and he finds no instance in England of its being directed to any officer of the executive department. The circuit court, in its opinion, while partially falling into the same error of fact, yet distinctly avoids the erroneous inference of the attorney general.

This is, however, a clear mistake; and it is matter of great and just surprise, that it should have been committed. It would not, however, be very material if no direct precedent could be produced; for to employ the language used in 10 Mod. 49, 54, if there be no precedent in which the writ has been issued in such a case, it is because no such case has ever before been presented to a judicial tribunal, and no precedent can be found in which it has been denied. But the precedent and authorities in favour of this, and analogous proceedings, are numerous, both in ancient and modern days.

Neville's case, Plowd. 382, was, in all its essential features a mandamus to the officers of the exchequer, commanding them to pay a certain sum of money out of the royal treasure. Wroth's case, Plowd. 458, was another ease of the same character. The validity of such writ is expressly recognised in F. N. B., Hale's edit. 121, F. Writs of mandamus anciently lay to the escheator, 5 Bac. Abr. 258; Dyer, 209, 248. The whole proceeding in enforcing payment of debts due by the sovereign to the subject, is exhibited in the Banker's case, 14 How. St. T. 1; which is one of the most remarkable and interesting cases, as well judicially as politically, to be found in English history. In Vernon v. Blackerly, Barnard, 377, 399, it was considered by the chancellor as the proper remedy. In Rankin v. Huskisson, in 1830, 4 Simon, 13; and in Ellis v. Lord Grey, in 1833, 6 Simon, 214; the analogous process of injunction was award-

ed to the highest public functionaries in Great Britain, commanding them to do what the plaintiff in error contends no court can do. And in The King v. The Lords Commissioners of the Treasury, in 1835, the whole court of king's bench concurring, a mandamus was awarded to those high officers, commanding them to do what this party is required to do.

Is the American citizen less favoured by law than a British subject? Are the officers of this government clothed with loftier powers, and do they possess higher attributes than those with which the prime minister of the British crown, and his immediate associates are invested.

Is there any thing in the character of our institutions which can create a difference? Such is not the doctrine in the great state of New York; 10 Wendall, 26, in the case of a mandamus to the canal commissioners, charged with the interest and management of the great works of internal improvement. In Pennsylvania, the same law prevails, 2 Watts, 517: in Kentucky, Craig v. Register of the Land Office, 1 Bibb. 310; Hardin v. Register, &c., 1 Lit. Sel. Ca., 28; Commonwealth v. Clark, 1 Bibb. 531; Divine v. Harvey, 7 Monroe, 443: In Ohio, Ex parte Fenner, 5 Ham. 542; and 6 Ohio Rep. 447; and the only case cited as contravening our ground, 1 Cooke, 214, is a decisive authority to show that such also is the law of Tennessee.

But, after the extensive and recent precedents set by this Court, is it possible further to question the constitutional power of congress over this subject? What are the cases of U. States v. Arredondo, 6 Peters, 763; U. States v. Huertas, 9 Peters, 172, 73; Mitchel v. U. States, 9 Peters, 762; Soulard v. U. States, 10 Peters, 105; U. States v. Seton, 10 Peters, 311; Mackey v. U. States, 10 Peters, 342; Sibbald v. U. States, 10 Peters, 313? Each and every of these cases recognises the authority of the judiciary, under an act of congress, to issue its mandate to a ministerial officer commanding the performance of a ministerial act.

3. The only remaining question for discussion is, has congress, in this particular instance, authorized the issuing of this writ, and exercised its constitutional power?

To determine this question, reference must be had to the law organizing the circuit court of this district. The act of 27th February, 1801, Davis's Laws, 123, contains three sections bearing upon this point of inquiry. The first section provides, that the laws of the

state of Maryland, as they now exist, shall be and continue in force, in that part of the said district which was ceded by that state to the United States, and by them accepted. The third section provides, that there shall be a court; which shall be called the circuit court, &c. And the said court, and the judges thereof, shall have all the powers by law vested in the circuit courts, and the judges of the circuit courts of the United States. The fifth section provides that said court shall have cognizance of all cases in law or equity between parties, both or either of which shall be resident, or be found within said district. The words of the clause conferring jurisdiction, will be found as comprehensive as those employed in the constitution; and if I have been successful in showing that congress may confer such authority, the fifth section shows that it has been, in fact, granted.

There are no words of exemption or limitation which can apply to the case at bar.

The attorney general argues, 1. That the decisions of this Court, in M'Intire v. Wood, 7 Cranch, 504, and in M'Cluny v. Silliman, 6 Wheat. 598, show, that beyond the District of Columbia, the courts of the United States can exercise no such jurisdiction. 2. That the circuit court erred in supposing that the provisions of the act of 27th February, 1801, extend the powers of the circuit court in this district, beyond those of the other circuit courts.

After quoting the language of the judicial act of 1789, in relation to circuit courts in general, he institutes a comparison between that and the act of February, 1801, and insists that there exists no substantial difference between them; and that the inferences deduced from the language of this Court, in M'Intire v. Wood, are not only erroneous, but that they have been repudiated in M'Cluny v. Silliman.

1. The case of M'Intire v. Wood, came before this Court on a certificate of a division of opinion from the circuit court of Ohio; and it was decided that the circuit court had no jurisdiction to issue a mandamus to the register of the land office. That decision rested upon the provisions of the eleventh section of the act of 1789, which was held not to confer the jurisdiction claimed; but the Court expressly say, that had that section covered the whole ground of the constitution; in other words, vested all the power which the constitution authorized, the result would have been different. Aware that the language of that section was thus restrained, and that of the 27th February, 1801, was unlimited, we regarded the case so triumphantly

cited against us, as an authority in our favour. In 2 Wheat. 369, the same case under another name, presented the question whether a state court could award the mandamus desired. In 6 Wheat. 598, it came again before this Court presenting both questions. On this occasion, the case of M'Intire v. Wood is re-examined, and its doctrines reaffirmed; and the very question now at bar, was adverted to in the opinion of the Court, and our view of it sustained. This is again confirmed by the subsequent language of the Court, where it is observed:—"But when, in the case of Marbury v. Madison, and that of M'Intire v. Wood, this Court decided against the exercise of that power, the idea never presented itself to any one, that it was not within the scope of the judicial powers of the United States, although not vested by law in the courts of the general government."

2. There is, in our judgment, a broad and essential difference between the provisions of the two statutes. The attorney general brings the two enactments into juxtaposition, compares their phraseology, and treats the two laws after the fashion of an algebraic equation.

The 11th section of the judiciary act of 1789, provides that "the circuit courts shall have original cognizance concurrent with the courts of the several states, of all suits of a civil nature at common law or in equity," &c. The 5th section of the act of 27th February, 1801, ena s that "the said court shall have cognizance of all cases in law and equity," &c.

It may be remarked:

1. The subject matter of the two laws is essentially different. The object of the first law was to organize and create courts purely federal in their character, and therefore limited both as to the subjects and parties over which they might take cognizance; the object of the other was to provide a tribunal to administer not only the laws of the United States, but the Maryland law which was in terms retained, and without distinction as to the parties.

2. The act of 1789 was designed to comprehend all the courts of the Union; the Supreme, the circuit, and the district courts. The first was to be organized; but the extent of its jurisdiction, as conferred by the constitution could neither be enlarged nor diminished. The other courts were to be organized, and between them was to be apportioned and distributed such portion of the residue of the judicial power of the sovereign, as it pleased to vest in them respectively.

[Kendall v. The United States.]

By the 14th section of this act, the power to issue a mandamus in a case like the present, is, in terms, given to the Supreme Court. In interpreting the language, it is immaterial that this was afterwards, in Marbury v. Madison, held to be unconstitutional. Ex parte Crane, 5 Peters, 208. The express grant to the one court, excludes the idea of an implied grant to another tribunal to exercise the same authority.

3. Another distinction is striking and important. The laws of Maryland are expressly continued in force; all the rights and remedies furnished and sanctioned by those laws are preserved. By those laws, a mandamus would lie to a public officer commanding the performance of a ministerial duty. This is, to a certain extent, conceded by the attorney general, page 148. This concession is a virtual recognition of an essential difference between the two courts.

In making this concession, however, he denies its application to officers of the United States, because no such writ could be addressed to them under the laws of Maryland. This exception annihilates the admission, because all officers within this district, even the lowest officers of a corporation, derive their authority from acts of congress.

The distinction attempted to be drawn is fallacious. If the courts of Maryland possessed the jurisdiction over an officer of that commonwealth, the transfer of sovereignty would not vest the same power in the courts of the district. If the power over the Maryland officers terminated by the cession, and that over officers deriving their existence from congress did not arise; the courts of the district do not succeed to the powers of the Maryland courts: nor do the citizens of the district preserve those rights, and retain the same remedies to which they were entitled before the cession.

The effect of a cession of sovereignty is misapprehended. The same laws are preserved, the same rights continued, and there exist the same remedies for enforcing them. The relations between the subject and the sovereign are the same; the parties between whom these relations subsist are different.

This admits of various illustrations. An inhabitant of Florida, before the acquisition of that territory by the United States, owed allegiance to the king of Spain; he would have incurred the guilt and punishment of treason, had he borne arms under the United States against Spain. Since the cession he owes the same allegiance to his new sovereign, and would incur the same penalty were he to aid

[Kendall v. The United States.]

Spain against the United States. The law is unchanged, but the parties are changed.

So take the history of the mandamus, as given by the attorney general in his opinion. The colonial courts did not succeed to the jurisdiction over the same officers as the king's bench possessed, nor do the state courts. Our courts exercise a jurisdiction analogous to that of the king's bench, and issue a mandamus in analogous cases to persons holding analogous relations. This is our argument.

3. The 11th section of the judiciary act, confers upon the circuit courts no other jurisdiction than such as may be issued concurrently by the state courts. The design and policy of this provision, and the true meaning of this enactment may be found in 1 Kent, 395, &c.; 3 Story on Const. 619, &c. As no jurisdiction was or could be conferred by congress on the state courts, the reference to them was merely to furnish a standard by which to measure that of the circuit courts held within their territory.

It is then a fatal objection to the jurisdiction of a circuit court under the act of 1789, that a state court could not take cognizance of the case. That jurisdiction is still further limited, by being restricted to particular persons. No such limitations are found in the act of 1801. Upon this Court is conferred general jurisdiction over all cases in law and equity. Until a special act of congress conferred the jurisdiction, the postmaster general could not sue in the other circuit courts; they had no jurisdiction over cases arising under the patent laws or copyright laws, as such. But over all these cases the circuit court of this district always possessed and exercised jurisdiction.

The circuit courts, under the act of 1789, could not entertain jurisdiction of cases merely on account of their character or origin; they could not issue writs of mandamus or quo warranto to operate upon officers or courts of the Union, because over such cases the state courts had no concurrent jurisdiction. The circuit court of this district has from its origin exercised this jurisdiction.

4. It is said that in the circuit court a difference existed between the counsel and the court, as to the grounds upon which this jurisdiction was claimed. To a certain extent there was some difference. Independently of the grounds that have been mentioned, I asserted it as derivable from the 3d section of the act, which confers upon the Court all the powers vested by law in the other circuit courts.

The only law then, in existence referring to them, was the act of 13th February, 1801, which was afterwards repealed.

It was intimated by the court, that it derived its powers from the 3d, and its jurisdiction from the 5th sections. Strictly speaking, powers are not jurisdiction; the former are the means by which the latter is exercised. But in ordinary parlance, they are often employed indiscriminately; and in all cases, the one implies the other. Wherever jurisdiction is conferred, power to exercise it is implied; wherever power is granted, it is for the purpose of exercising jurisdiction. The word power is that which is alone employed in the constitution; and in the acts of 1789 and 1801, cognizance is used as an equipollent expression.

It is not very important to which section we especially refer. If this be a case in law or equity, and either of the parties has been found here; it is a case over which the jurisdiction of the circuit court rightfully extends. If it be not "a case," what is it that is the subject of discussion. It is the claim of a legal right, pursued in court by an appropriate legal process. Should any doubt exist as to the true construction of the act of 27th February, it should operate in favour of the jurisdiction; for if this Court was right in Martin v. Hunter, 1 Wheat. 329–30, in asserting that it was an imperative duty in congress to vest in some tribunal or another all the judicial power of the Union; no implication can be admitted to exclude any class of cases, where the words of the statute are sufficiently compre-. hensive to embrace it.

Mr. Butler, attorney general, in reply:

It has been correctly said, by the learned counsel for the defendants in error, that all the facts alleged in the petition are admitted in the return. On the relators' own showing, it was believed that the mandamus could not legally be issued: the return, therefore, set up no traversable matter of fact; but merely stated objections, in point of law, to the relators' application. It was substantially a demurrer to the petition. The authority and duty of the court to issue the writ on the case stated by the relators, were, therefore, the only questions in the court below; they are the only questions here. They are purely questions of law; and they neither require, nor authorize, any investigation of the merits of the original controversy. And yet the learned counsel have felt themselves at liberty to indulge in reiterated and unsparing censures of the plaintiff in error;

[Kendall v. The United States.]

not only irrelevant to the points to be decided, but founded on matters, in some cases not contained in the record, and in others, directly repugnant to it.

For example: The official action of the plaintiff in error in suspending the extra allowances made to the relators, by his predecessor, has been denounced as downright usurpation; illegal in itself, and cruelly oppressive: with how much justice, let the very words of the relators tell us. In their first petition to congress, after stating the extra allowances made to them, they go on to say; "that their account being unsettled in the books of the department, when the present postmaster general came into office, he considered himself bound, in the adjustment of their accounts, to reject any credits for the allowances thus made to them, for this extra duty. In his construction of the post office laws, he also felt himself without any legal authority to adjust the claims, and make any compensation for these services; and further, considering that there had been no legal sanction for the allowances thus made to your memorialists, he felt bound, by his duty, to stop the regular contract pay of your memorialists, till the sums they had thus received from the department, (and which he considered as over payments,) were refunded to the government. Those views, thus entertained by the postmaster general, of the post office laws, and of the powers and duties of that department, were, at the request of your memorialists, submitted to the decision of the attorney general of the United States. They refer to his opinion, accompanying this memorial, by which it appears, that he concurs in his view of these legal questions with the postmaster general: so that no other remedy is left to your memorialists, in a case, as they conceive, of very peculiar hardships; except that which is intimated in a passage of the attorney general's opinion, and expressed in reference to this and similar claims, in the conclusion of the postmaster general's report to your honourable body." The remedy referred to was an appeal to congress, to whose favourable consideration the case was recommended by both those officers. The injustice of the complaints on this head is still further aggravated, by the fact, forming part of our public history, that the allowances in question, and others of the like nature, had been the subject of investigation by congress; and however ancient the practice, or innocent the motives, in which they originated, had been conceded on all hands, to be wholly illegal. This entirely distinguished the case from that of Fille-

brown, 7 Peters, 46, cited by the other side: where it was held by this Court, that the secretary of the navy had legal power to make the allowances then in question. Under these circumstances, the accounts of the relators being unsettled, and the allowances not actually paid, the plaintiff in error might well think it his duty to confine the credits of the relators to such items as were authorized by law; and to refer any claims not so authorized to the decision of congress. On the case stated by him to the attorney general, his course was sustained by that officer; and the relators in their application to congress, did not attempt to question either the legality o his conduct, or the uprightness of his motives.

Equally groundless and repugnant to the record were the assertions, that the plaintiff in error had set at defiance the act of congress, and the authority of the solicitor: had treated with contempt the opinion of the attorney general, on the construction of the law; or had ever given out the monstrous pretension, that the relators "have no other remedy than such as he may graciously please to extend, or that may be found in the power of the executive to remove him from office," &c. &c.

It appears by the record, that the suspended allowances amounted to one hundred and twenty-two thousand one hundred and one dollars and forty-six cents, being for services prior to April, 1835. The claim for these allowances, until after the act of congress, constituted the whole subject of controversy. When the subject came before the solicitor, the relators claimed a large additional sum, (forty thousand six hundred and twenty-five dollars,) for similar allowances after April, 1835, and until the end of December, in that year, the period when the contracts expired. It certainly was not strange that the plaintiff in error should doubt as to the intention of congress to give the relators this additional sum. When has it before happened that a party whose claims have been rejected by a department, has obtained from congress a law, covering not only the sum in dispute, but authorizing a claim for a large additional amount? Congress, however, have the power to pass such a law; and if they think that justice requires it they should undoubtedly do so. This, the solicitor thought they had done, in the present case. On this point, he requested the opinion of the attorney general. That officer concurred with him. He thought, with the solicitor, and still thinks, that the words employed in the act gave the solicitor authority to decide on claims on the contracts described in the law, for services

[Kendall v. The United States.]

after as well as before April, 1835. The plaintiff in error, who had not been consulted as to this reference, complained of the manner in which it was made; and also questioned the solicitor's right to call for the opinion. In this latter objection he proved to be correct; the act of May 29th, 1830, which authorizes the solicitor of the treasury to ask the opinion of the attorney general, referring exclusively to "suits, proceedings, and prosecutions," under the care of the solicitor, by virtue of his general official duty. This did not occur either to the solicitor, when he made the reference, or to the attorney general, when he answered it; but was afterwards admitted by both: and it certainly may well shield the plaintiff in error from one of the charges made against him, that of contemning the opinion of the law officer. And, besides, one of the main grounds on which he relied was, that in truth there was no contract in the case; and if he was right on this question of fact, then neither the opinion nor the law sustained the award.

So far from setting congress at defiance, he expressly declares, in his letter to the President, of the 27th of December, 1836; "that inasmuch as congress is now in session, the most appropriate resort is to that body for an explanatory act, which, if it confirm the opinion of the solicitor, I will implicitly obey." Again, in his letter to the President, of the 31st of January, 1837, after saying that the balance cannot be paid without further legislation; he adds, that "if congress thinks proper to require the payment, it will be his duty to make it." The same willingness promptly to obey the direction of congress, if by an explanatory act or joint resolution, they should require the payment of the balance, is reiterated in the return to the mandamus. It is true, that he has not deferred to the report of a committee of the senate, nor even to a resolution of that respectable body, as to a valid and mandatory law. Weaker, and perhaps wiser men, would probably have yielded to an authority so imposing; but, whatever may be thought of the prudence of his conduct, his firmness of purpose should command our respect; and with unprejudiced minds, will go far to evince the justice of his intentions. In calmer times, it may also be seen that in insisting on the concurrence of both branches of the legislature, and especially of the house of representatives, as necessary to give to a resolution touching the public treasure the force of law, he was really upholding a very important part of the constitution.

Other instances might be mentioned of the like, and even greater

injustice done by the other side to the plaintiff in error. All fair
construction of his motives had been denied; he had been stigma-
tized as the relentless persecutor of unoffending and meritorious
citizens; the death, (not appearing on the record,) of one of the re-
lators, had even been imputed to him: and to all this had been added
the still graver charge, of a desire to break down the judiciary
establishments; to destroy the safeguards provided by the constitu-
tion; and to subject the legislative will to the control of the execu-
tive. In the argument just concluded, all the powers of a very bril-
liant vituperative eloquence had been put in requisition, to bring
down upon his head the indignation and abhorrence, which, in a
land of liberty and laws, are justly felt towards a functionary truly
chargeable with delinquencies so enormous. That no part of this
accusatory matter was really called for by the case, is obvious; that
much of it wants even a shadow of support, has already been shown;
that any of it would be pressed upon this court, was not to have
been expected. This hall had been regarded as holy ground; and
the consoling reflection had been cherished, that within thes walls
one spot had been preserved, where questions of constitutional law
could be discussed, with calmness of mind, and liberality of temper;
where the acts of a public servant might be subjected to free and
rigorous scrutiny, without any unnecessary assault upon his charac-
ter; where, though his conduct were proved to be erroneous, purity
of motive might be conceded, till the contrary appeared; where it
was usually deemed repugnant to good taste, to offer as argument, the
outpourings of excited feeling, or the creations of an inflamed imagi-
nation; and where vehement invective and passionate appeals, even
though facts existed, which in some other forum might justify their
use, were regarded as sounds unmeet for the judicial ear. That an
example so different from the course which might have been hoped
for; an example so novel and unpropitious, should have been set on
the present occasion; was not less a subject of regret to him, than he
was sure it would be to all who reverenced the dignity of this Court,
and who wished to perpetuate its usefulness and honour; and he
confidently trusted that the learned counsel themselves, when the
effervescence of professional zeal and exciting debate had passed
away, would participate in this feeling.

In replying to those parts of the opposing argument which be-
longed to the questions presented by the record, the attorney gene-
ral said he would pursue an order somewhat different from that

adopted by the other side. He would, first, look at the parties be-
fore the court; and, secondly, at the particular proceeding which
had been instituted, its nature and subject matter, and the purpose
desired to be accomplished by it. Under these two general heads,
all the material points insisted on for the defendants in error, would
be brought under review; and the conclusion, he trusted, would be,
that the court below had no jurisdiction to award the writ.

1. The court below had not jurisdiction of the parties.

The idea of the court below, and which has also been insisted on
here, that the United States are to be regarded as the plaintiffs because
the ancient form of the writ has been used, is palpably untenable. The
real plaintiffs are the relators, who are residents of Maryland, and
Pennsylvania. The defendant was proceeded against in his official
capacity, as postmaster general, for the purpose of compelling him
to do an act exclusively official. The postmaster general, as a public
officer, is required to be a resident of the District of Columbia, and
may be found within it; but he is not so resident or found, within
the meaning of the fifth section of the act of the 27th of February,
1801. The words "between parties, both or either of which shall
be resident, or shall be found within the district;" must be under-
stood to mean, not parties universally, but all parties capable of suing
or being sued, who may be resident or found, &c. Foreign minis-
ters, who are residents in the district; being incapable of being sued
in the courts of the district; are clearly not within the words of the
section. The postmaster general, or other head of a department, is
equally incapable of being sued, in his official character; because
there is no act of congress conferring such a capacity. Such an act
is necessary to enable the postmaster general to sue in his official
character. Osborn v. Bank United States, 9 Wheat. 825, 855, 856.—
A fortiori, is it necessary to make him suable.

Again: The United States are the real parties defendants; the
object of the suit being to cancel balances in the treasury books, and
to reach public moneys in the treasury. It cannot be said here, as
in Cohens v. The State of Virginia, 6 Wheat. 407, 408, that the ob-
ject is to get rid of a judgment recovered by the United States.
The original object of the proceeding was to charge the United
States. It is therefore, in effect, a suit against them. Such a suit,
independently of the general objection, that the government is not
suable, except when it chooses to waive its immunity in this respect;
could not be brought in the court below, for an additional reason.

The fifth section of the act of the 29th of February, 1801, gives the court jurisdiction of all actions or suits, of a civil nature, " in which the United States shall be plaintiffs, or complainants." This express, affirmative provision, necessarily excludes all cognizance of actions against the United States; even if they were otherwise capable of being sued.

It is no answer to the objections under this head, that they were waived by the appearance of the plaintiff in error, in the court below. That appearance was for the sole purpose of objecting to the jurisdiction; and as no plea in abatement could be interposed, the want of jurisdiction was assigned in the return.

2. The court below had not jurisdiction of the subject matter of the proceeding.

The application was for a peremptory mandamus to the postmaster general, in his official capacity. This officer, it is now admitted, is the head of one of the great executive departments. The court below has no jurisdiction to award such a writ, to such an officer. This Court has decided that the ordinary circuit courts have no such jurisdiction; not indeed in express words, but by decisions which embrace that proposition, and much more. M'Intire v. Wood, 7 Cranch, 504; and M'Cluny v. Silliman, 6 Wheat. 598, decide that the ordinary circuit courts cannot issue a mandamus, as original process, even to a mere ministerial officer; much less can they do so to an executive officer, the President, or the head of a department.

The circuit court of the District of Columbia, though it possesses much jurisdiction which the other courts have not, stands, in this respect, on the same ground. The words of the fifth section of the act of February 27th, 1801, so far as regards this question, are substantially the same as those of the eleventh section of the judiciary act of September, 1789, except that the latter includes the words " concurrent with the courts of the several states;" which words are not in the act of 1801. These words, it is said, restrict the jurisdiction of the ordinary circuit courts to those cases over which the state courts had jurisdiction, in September, 1789; and thereby exclude cases arising under the constitution, laws, and treaties of the United States. And as the restriction is not contained in the District act of 1801, the argument is, that the jurisdiction of the circuit court of this district extends to all such cases, provided the parties be resident or found within the district. Several of the objections to this doctrine, made in the opening, have not been answered by

the other side; and it is therefore the less needful to pursue it. The reason for inserting this clause in the act of 1789, was to prevent the doubt which might otherwise have arisen, as to the right of the state courts to decide, in suitable cases, questions growing out of the constitution, treaties, and laws of the United States. It was not inserted either to give jurisdiction to the state courts, or to restrict the jurisdiction of the circuit courts; but simply to exclude a conclusion. Houston v. Moore, 5 Wheat. 25 to 27. For that purpose, the clause was very proper in the act of 1789; but for any purpose, it would have been absurd in the act of 1801, for there are no state courts in this district: and this, no doubt, was the sole cause of the omission.

In support of this view, it is further said, that the subject matter of the two laws is essentially different; the act of 1789 being designed to organize the courts of the United States, under the constitution alone; and the act of 1801 to furnish such additional jurisdiction to the district courts, as was required by the local sovereignty exercised over the district. This change of circumstances undoubtedly demanded a much wider scope of judicial power; but this was abundantly provided for, by adopting the laws of the states; sec. 1; by extending the criminal jurisdiction of the circuit court to all crimes and offences committed within the district; and by enlarging the civil jurisdiction to all cases, in law and equity, between parties resident or found within the district; instead of confining, as is done in sec. 11, of the act of 1789, the criminal jurisdiction to offences against the laws of the United States, and the civil to certain suits between citizens of different states, and other special cases.

The change of sovereignty did not require that the courts of this district should possess a power denied to all the other courts of the United States, to superintend and control United States' officers appointed for the whole nation; nor can it be believed that congress could really have intended to confer such a power. It is said, however, that they have actually given it, by continuing in force the laws of Maryland; because, by those laws, a mandamus would lie to a public officer, commanding the performance of a ministerial duty, as well as in the cases of corporations, &c. No doubt, by virtue of the adopted laws of Maryland and Virginia, and under its general jurisdiction, the circuit court of the district may rightfully issue the writ of mandamus, in all cases of the same nature with those in which it could have been issued by the Maryland and Virginia courts, to any

officer, tribunal, or corporation, within the district. In other words, for the purposes of this question the Maryland side of the district is the state of Maryland; and the circuit court of the district now holds the supervisory power of the Maryland court, over all local officers in respect to all matters arising in the district, which, from their nature and quality, would have been subject to the supervision of the Maryland courts, had the cession not been made. But the mere act of adopting the Maryland laws, and of enabling the district courts to administer them as they were administered by the Maryland courts, could not enable the former to apply those laws to officers of the United States appointed for the whole nation, in respect to official acts affecting the interests of the whole nation. To authorize such a stretch of power, there must be an express grant of jurisdiction by act of congress. Until such a law shall be passed, the local courts, in this particular, will stand on precisely the same ground as the Maryland courts did before the cession. When congress sat in New York, or Philadelphia, and the officers of the federal government resided there, they were not subject to the supervision, by mandamus, of the courts of either of the states within whose territory they resided. Suppose, then, a cession of the city of New York, or of the city of Philadelphia, and an adoption of the state law; how could that have altered the case? As to all matters of local concern, like all other inhabitants, they would be subject to the adopted law: but in their official capacities, they would still have remained, as they were before, exclusively subject to the authority of the general government, acting strictly as such. Suppose this district had never been ceded to the United States, but the seat of the federal government established here, and all the other circumstances of the present case to have occurred; could the Maryland court have interfered, by mandamus? Surely not. How then can that court, which has merely taken the place of the Maryland court, claim, from that fact alone, any greater jurisdiction? The case of The Columbian Insurance Company v. Wheelwright, 7 Wheat. 534, so much relied on by the other side, does not touch the point. That was a private corporation, not growing out of, nor at all connected with the federal government, as such. It had, indeed, been created by an act of congress; but in this, congress acted as a local legislature under the cession; without which such a corporation could not have been created by the federal government. If the cession had not been made, the Maryland legislature could have done precisely the same thing. But

in creating the post office department, and the other executive departments, and in defining the duties of the officers employed in them, as well as in every other law concerning them, congress act entirely irrespective of the cession. Though the officers reside here, yet had no cession been made, every one of these laws might have been passed. On the other hand, if the district were yet subject to the government of Maryland, that government could not have interfered with the subjects, or with any of the officers concerned in them.

It is very true, as contended by the learned counsel, that the Maryland laws cannot be literally enforced here; that all the local officers of the district derive their existence from acts of congress; and that the Maryland law can only be applied to them by analogy: but there is no difficulty in ascertaining the analogy, nor in applying it. Informations in the nature of a quo warranto may be entertained, and writs of mandamus be issued, by virtue of the adopted law, in every case; except where the duties of the officer exclusively grow out of, and belong to the federal government. The present case being peculiarly one of this description, the court below acquired no jurisdiction over it from the mere adoption of the state law. If it has such jurisdiction, it must be derived in some other way.

The third section of the act of February 27th, 1801, cannot help out the jurisdiction, even if that part of the act of February 13th, to which it is said to refer, be regarded as yet in force; because this section refers only to the powers, and not to the jurisdiction of the court. The distinction between jurisdiction, or cognizance of a court, and the powers or means by which it exercises and enforces its jurisdiction, is a sound and familiar one, and is distinctly marked in all the judiciary acts; and among others, in this very act of the 27th of February, 1801, as the court below has itself decided in former cases. Again: there being no special reference to the act of February 13th, the provisions of that law were not so incorporated in the act of February 27th, as to require a special repeal in reference to this district; and when the act of February 13th was repealed, and the act of 1789 revived, and put in force in its stead, with what propriety can it be said that any part of the repealed law is yet in force? And how unreasonable to suppose, that congress could have intended to leave the repeal imperfect, and to create and keep up an anomalous and unnecessary distinction between the courts in and out of this district? The cases mentioned by the learned

counsel, of English statutes specially referred to and adopted by Maryland statutes; and in respect to which the Maryland courts have correctly held that the subsequent repeal of the English statute does not alter the law of Maryland; differ from the present case in several essential particulars. Not to speak of other differences, the repeal was not made by a legislative act intended to apply, or capable of applying to the state of Maryland; whilst here, the act of February 13th, if adopted in the act of February 27th, was also repealed by the same authority.

The jurisdiction of the court below, so far as regards the present case, depends then on the words of the fifth section of the act of February 27th, 1801. These words are, in substance, neither more nor less than the corresponding words in section eleventh of the act of 1789; and even if the judicial construction of that section, in M'Intire v. Wood, and M'Cluny v. Silliman, be inapplicable to the present law; still it has not been shown that the claim of the relators is a "case in law or equity." If we give to the law the broad construction on which the learned counsel insist, they cannot establish the jurisdiction of the court, unless they can also prove that the case presented in the petition was a "case in law or equity;" in other words, a controversy of a forensic nature, which, according to the established principles and forms of judicial proceedings, was properly referrible for discussion and decision to the judicial tribunals. The attorney general referred to the argument of his associate on this point; which, he remarked, had not been answered, nor even attempted to be answered; except by the allegation so often reiterated, but not proved, that the relators had an absolute, fixed. and unconditional legal right to the credits in question, the duty of entering which, was imposed on the postmaster general, as a mere ministerial act. If this were indeed so, then a "case in law or equity." had been presented, and the mandamus will be the proper remedy; if there be no other appropriate means of redress, and the court has received authority to issue it. But the position is untenable.

The relators claim under the special act of July 2d, 1836. They do not refer to, nor could they claim under any prior act. The attorney general agreed that the relators were deeply interested in the benefits proposed to be conferred by this law, and also that the good faith of. the nation was pledged to secure to them all those benefits; unless it should be found that by some fraud, or material error, congress were induced to grant what they would not otherwise

have given. But it is not every interest, nor even every interest which is guarantied by the faith of the nation, which is to be dignified by the name of a vested legal right. If the interest be subject to any contingency by which the right to its enjoyment can be cut off, it is not regarded, in law, as a vested legal right. Now the rights conferred by the act of July 2d, 1836, were subject to such a contingency. They were subject to the power of congress, at any time, before the actual entering of the credit, to amend, alter, or repeal the law. After the credit should be entered, congress could not deprive the parties of it; because there is no power, which after a fact has happened, can cause such fact not to have happened. But at any time prior to the actual entering of the credit, congress had the power to alter or repeal the law. This power was not reserved in terms in the law; nor was it necessary to be so reserved. It results from the nature of the case. There was no contract made or tendered by the law. The relators were to do no meritorious act under it. It was an act of relief, of grace, and favour to them. The proceedings before the solicitor were not like a suit in a regularly organized court; nor was his award like a judgment of such a court, so as to be out of the reach of the legislative power. It was the ordinary case of a law extending a favour or bounty to a party; and as to all such laws, congress have a locus penitentæ, so long as the law is unexecuted. The judiciary committee of the senate had no doubt as to the power of congress to repeal the law; though they thought it should not be exercised. This is decisive of the case. If congress had, and if they yet have, the power to modify, or repeal at pleasure, the act under which the relators claim; then it is not a case for the courts of justice at all, or at least not a case for a mandamus. All the authorities show, and the learned counsel themselves admit, that to entitle a party to this writ he must show that he has an absolute legal right to some specific thing. But where the interest of a party is liable to be thus affected by the action of the legislature, it is an abuse of terms to call it a fixed or vested right. It would, indeed, be a strange kind of absolute vested legal right, which is thus liable to be defeated. That the legislature have not interfered, is no answer to this argument; it is enough that they have a lawful power to do so.

Nor was the duty imposed on the postmaster general by the law of 1836 a mere ministerial duty, like that of the clerk of a court, in recording a judgment, giving copies, &c., to which it has been

[Kendall v. The United States.]

compared. It involved an examination of the award, to see that the solicitor had not exceeded his authority, either in giving too wide a scope to the enacting clause, or in violating the provisos. Nothing can be plainer than that if either were done, the award, pro tanto, would be void; precisely like that of any other arbitrator, whose award exceeds the submission. Suppose the solicitor had made allowances where there was no contract? Or for other contracts than those described in the law? Or had made allowances contrary to the provisos? Will any one contend, that the postmaster general, seeing these violations of the law on the face of the award, was yet bound to give the credits thus illegally allowed? If his duty was merely ministerial, if he possessed no authority to look into the award, as contended by the other side; then, however palpable the errors of the solicitor, and however excessive the allowances made by him, the credit is to be given. It would seem to be impossible, that such could have been the design of congress. It was clearly the duty of the solicitor to confine his allowances within the authority conferred on him by the law; and if so, it was as clearly incumbent on some one, before the credit was given, and the money drawn out of the treasury, to see that the allowances did not extend beyond the law. Who was to do this? In the first instance, at least, the postmaster general; because on him was specially devolved the duty of executing the award. Ex necessitate, therefore, he must look into it, and compare it with the law. Even the other side were compelled to admit this; they concede, too, that some preliminary examination was necessary, to enable him to ascertain the precise duty to be performed. This concession brings the case within the principle of the Commonwealth ex rel. Griffith v. Cochran, 5 Binney, 87, cited in the opening. According to that case and the whole current of authorities, where such a special tribunal is created by statute, without giving to the courts, in express terms, any power to supervise and control the action of the officer; all that they can do by mandamus, is, to compel the officer to take up the subject, and to act upon it; they cannot instruct him how to act. If the officer acts corruptly, he is liable to a private action, at the suit of the party injured; and to indictment, if he decides erroneously: the only remedy, in ordinary cases, is by a further appeal to the legislature; though under the constitution of the United States, if the duty be devolved on an executive officer, his action may indirectly be reached and affected by the President.

[Kendall v. The United States.]

It is in this view of the case, that the constitutional question, as to the power of congress to clothe the judiciary with authority to direct and control the executive, is supposed to arise. The doctrines of his associate and himself, on this head, and more especially those stated by the postmaster general in his return, had been denounced by the other side, as equally novel, unfounded, and alarming. Strong, and, perhaps, incautious expressions, had been quoted from that return; and by separating them from their context, and not attending to the fact, that the writer set out with the position that the duty imposed on him by the law, was an executive and not a ministerial duty, those expressions were made to bear a meaning which their author could never have designed. The like remark is to be made of the comments on the opinion of the attorney general, and on the opening argument.

In regard to this branch of the case, the attorney general said, that he could not consent to be held responsible for any language or reasoning except his own; and that he must protest against the version which had been given to his official opinion. That document, on some of the points discussed in it, might well be found to be erroneous; for it embraced questions by no means of easy solution, and in respect to which the most enlightened and upright might fairly differ. But as to the constitutional views presented by it, he could not apprehend any serious diversity of opinion among persons tolerably familiar with constitutional law; provided the points intended to be discussed, were first clearly understood, and then carefully kept in view. He had not denied, and did not intend to deny; on the contrary he fully admitted, the constitutional power of congress to invest the proper courts of the United States with jurisdiction to issue writs of mandamus to any ministerial officer of the United States, to compel the performance of his duty. And as the ordinary character of an officer's functions would not always determine the true nature of a particular duty imposed by law, he further agreed, that if an executive officer, the head of a department, or even the President himself, were required, by law, to perform an act merely ministerial, and necessary to the completion or enjoyment of the rights of individuals, he should be regarded, quoad hoc, not as an executive, but as a merely ministerial officer; and therefore liable to be directed and compelled to the performance of the act, by mandamus, if congress saw fit to give the jurisdiction. In short, he had no controversy with the court below, nor with the learned counsel

for the relators, in respect to the power of congress to authorize the circuit court of this district, or any other tribunal, inferior to the Supreme Court, to award a mandamus to the postmaster general, in precisely such a case as that now under discussion; if it be really true as contended by the court below, and by the other side, that the law of July, 1836, imposes on the postmaster general the performance of a merely ministerial act or duty.   The official opinion of June 19th, 1837, begins with the statement that the case was one in which an official duty, relating to claims depending in the post office department, growing out of contracts made with that department, imposed on its head by his name of office; and in every sense an official, executive duty, was sought to be enforced by mandamus.   This statement, he thought, had not been successfully impeached; and if well founded, it naturally led to the constitutional objection, by which it was merely affirmed that congress cannot "confer on any court of the United States the power to supervise and control the action of an executive officer of the United States, in any official matter, properly appertaining to the executive department in which he is employed."   The remainder of the opinion is devoted to the establishment and illustration of this precise and limited proposition.   The argument was chiefly rested on the distribution of the powers of government between three independent departments; the vesting of the executive power in the President, and the duty imposed on him of taking care that the laws be faithfully executed.   How has this argument been met by the other side?  By imputing to us the most extravagant doctrines in regard to the extent of the executive power; and by maintaining, on their own part, doctrines equally extravagant.

When we say that the constitution gives to the President the whole executive power, the learned counsel represent us as contending that all executive power, whether conferred by the constitution or not; all executive power which, in any age of the world, and under any form of government, has been vested in the chief executive functionary, is vested in the President of the United States: and they argue with great warmth against this notion, a notion too preposterous to need refutation.  What we say is, that all the executive power of the limited federal government created by our constitution: not the executive power of Great Britain, Russia, or Turkey: is vested, with certain specified exceptions, in the President:  And we mean by this, precisely what is meant when it is

said, that all the legislative power of this government is vested in congress, subject to the qualified veto of the President; or when it is said, that all the judicial power conferred by the constitution, is vested in this Court and the other courts of the United States; and no more.

The proposition, even as thus limited, is denounced by the other side as slavish in the extreme, although they admit that it is not entirely new. It was first broached, say the counsel, by Gen. Hamilton, in the Letters of Pacificus, but was promptly refuted by Mr. Madison, in Helvidius, and has since remained dormant. Never did gentlemen fall into a greater mistake. That all the executive power proposed to exist in the new government was to be vested in the President; was objected by the opponents, and explicitly admitted by the advocates of the federal constitution, when that instrument was under discussion before the people. Gen, Hamilton, in the Federalist, acknowledged that this was the effect and design of the constitution, but vindicated the arrangement. See Federalist, Nos. 69, 70 and 71. This doctrine was also announced and established by the congress of 1789, in the debates relative to the power of removal, referred to in the opening. It was the very pivot on which that famous discussion turned. The subject had been considerably discussed before Mr. Madison engaged in the debate. From the moment he entered it, we perceive the presence of a superior intellect, possessing unequalled advantages of knowledge and experience, and displaying itself in the clearest analysis of the principles and meaning of the constitution. He was the first speaker who referred to that clause which declares that the " executive power shall be vested in the President." From that provision, and from the direction that the President " shall take care that the laws be faithfully executed," he deduced the conclusion, that it was " evidently the intention of the constitution, that the first magistrate should be responsible for the executive department." 4 Elliot's Debates, 148. He showed that this principle of unity and responsibility was necessary to preserve that equilibrium which the constitution intended; and to prevent a direction towards aristocracy on the one side or anarchy on the other, 4 Elliot, 176: and that to give effect to these principles, the capacity to superintend and control the subordinate officers of the executive department, through the power of removal, had been left in the President alone. 4 Elliot, 147 to 150, 176 to 183, and 201 to 203. In these views, a large majority of both houses con-

curred; the senate conceding the power against itself: so that, if this doctrine as to the power of removal be really an unwarrantable interpolation, as the learned counsel say it is, it must be charged on the fathers of the republic. But, whether the particular question, as to the power of removal was correctly decided or not; no one, in that debate, disputed the position of Mr. Madison and his associates, that the constitution had actually vested in the President the whole executive power. On the contrary, Messrs. Gerry and others, of the minority, expressly conceded it; though they contended, either that the executive power did not include the power of removal; or if it did include it, that in analogy to the power of appointment, it could only be exercised with the consent of the senate. This latter idea had indeed been suggested by Gen. Hamilton, in the 77th No. of the Federalist; though, as has been seen, he had previously laid it down, in prior numbers of that work, and in the strongest terms, that the whole executive power was vested in the President. The whole course of this debate, independently of the conclusion to which it came, is, therefore, utterly irreconcilable with the recent suggestion adopted and maintained by our learned adversaries; that, when the constitution says, "the executive power shall be vested in a President," it only gives a name to the department, and merely means that he shall possess such executive power as the legislature shall choose to confer upon him.

The doctrine stated in Pacificus, published in 1793, was, therefore, nothing new. It was merely repeating what Gen. Hamilton had himself said before the adoption of the constitution, and what had been admitted on all sides, in the debate of 1789. Nor was it denied by Mr. Madison, in the letters of Helvidius; nor, indeed, could he venture to dispute it after the part taken by him in former discussions. He several times admits it in terms, and constantly by implication; but contends, in opposition to Pacificus, that the power to issue a proclamation of neutrality was included in the power of making war and peace, and therefore belonged to the legislature, and not to the executive. See pages 596 to 601, Appendix to Washington ed. of Federalist. This view of the constitution, so far, also, from remaining dormant since 1793, as alleged by the learned counsel, has been announced in every text book on the constitution published since that time, and in every decision of this Court in which the point has been discussed, as was abundantly shown in the opening.

[Kendall v. The United States.]

We are able, also, to answer the call so loudly made, for some decision of the state courts, in which it has been held, that similar words, in a state constitution, vest in a governor the executive power. The precise point was adjudged in the Commonwealth v. Bussier, 5 Serg. & R. 451, on the Constitution of Pennsylvania.

In regard to the President's responsibility for the officers of the executive department, and his power to supervise and control them, we intend to assert only what was admitted in the Federalist, and maintained by Mr. Madison, and those who concurred with him in the debates of 1789; and nothing more than has been understood by every President, from Washington inclusive, to belong to the high trust with which he is clothed. In the writings of Washington, recently published, his habit of directing all the heads of departments in the discharge of their duties, constantly appears. Nor does the idea, suggested by the court below, and before advanced by others, that the secretary of the treasury was not subject to this direction to so great an extent as the other heads of departments, derive any countenance from this correspondence. On the contrary, it will be seen, that on one occasion, Gen. Hamilton complained that President Washington did not take so large a share of the responsibility of some fiscal arrangements as the secretary thought he ought to bear. Sparks' Writings of Washington, vol. 10, p. 396, 554. When, therefore, the learned counsel affirm that the principle is now, for the first time, broadly asserted; they speak, to say the least, with very little historic accuracy. And when they represent us as pressing it to the extent of claiming for the President a power to direct, instruct, and control every officer appointed by him, judges as well as others, they show a great want of perspicuity on our part, or of attention on theirs. Our position is confined to the executive department; we speak of that alone; and we affirm, equally with the other side, the absolute independence of the judiciary, when proceeding in its appropriate sphere.

The practical inferences supposed by the other side to result from this doctrine, we must also repudiate. Where the President has controlled and directed the action of the inferior executive officer, they contend that the inferior is not responsible; and, as the President's liability to private action has been doubted, there will then, it is said, be no responsibility. The answer is, that whenever the President takes an active part in an illegal action, to the injury of an individual, though it be done by the hand of his subordinate, he

will be responsible in a civil suit, along with that subordinate: and that the latter cannot be excused for doing an unlawful act, by pleading the command of his official superior. This is the rule of the common law, in the analogous case of master and servant. 1 Black. Com. 430. The subordinate officer is not obliged to do any act which he believes to be unlawful; if the President insists on it, he may resign, or refuse, and take the chance of a removal.

Nor do we claim for the President any power to forbid or dispense with the execution of an act of congress, even though it relate to matters purely executive; nor have we ever affirmed that a citizen, interested in the execution of such an act, is obliged to submit his claims to the arbitrary determination of that functionary. It was with great propriety that the learned counsel, when bringing this charge against his associate and himself, had referred to the malicious and unsupported accusation made by a tory house of commons against one of the best patriots and soundest constitutional lawyers England ever produced, Lord Somers. What we say is, that where congress pass a law for the guidance and government of the executive, in matters properly concerning the executive department, it belongs to the President to take care that this law be faithfully executed; and we apply to such a case the remark of Gen. Hamilton, in Pacificus, that "he who is to execute the laws, must first judge for himself of their meaning." Pacificus, Letter 1st. If, therefore, the executive be clearly satisfied as to the meaning of such a law, it is his bounden duty to see that the subordinate officers of his department conform with fidelity to that meaning; for no other execution, however pure the motive from which it springs, is a faithful execution of the law. In a case of this kind, one which thus concerns the proper executive business of the nation, we do indeed deny the power of the judiciary to interfere in advance, and to instruct the executive officer how to act for the benefit of an individual who may have an interest in the subject; but we hold that every officer, from the lowest to the highest, who, in executing such a law, violates the legal rights of any individual, is liable to private action; and, if his act proceed from corrupt motives, to impeachment, and, in some cases, to indictment also. And we also agree, as has already been admitted, that when an act of congress imposes on an officer of the executive department, for the benefit of a private party, a duty purely ministerial, the performance of that duty may be coerced by mandamus, by any court to which the necessary jurisdiction shall have been given.

[Kendall v. The United States.]

Another of the practical inferences imputed to his associate and himself, related to the capacity of the judiciary department to execute its judgments. A strong and somewhat unguarded expression in the return of the plaintiff in error, had been made the theme of much animadversion; the comments which it was supposed to justify, were extended to the official opinion of the attorney general; and this latter document, it was said, pressed the argument to an extent which would deprive the courts of the power to issue any process, or exercise any jurisdiction whatsoever. As suggested in a former part of the argument, the language of the postmaster general had received an interpretation which was doubtless repugnant to the meaning of its author: but however this might be, the attorney general, speaking for himself, could truly say, that the sentiments imputed to him were never designed to be expressed; and on a fair construction of his language, he did not think they could be found in his official opinion. Having adopted the impression, whether correctly or not it was not for him to say, that the duty assigned to the postmaster general by the special act of July, 1836, was not a mere ministerial duty; but a duty which appertained to the regular official business of the department, as a branch of the executive; the opinion proceeded to show that the writ of mandamus could not be issued to the head of an executive department, to instruct and direct him in the performance of an official executive duty. Among other arguments, the inability of the judiciary to enforce any commands they might address to the executive officers, was insisted on, and illustrated by the supposed case of the officer refusing to obey the mandamus; and on his being committed to prison for the contempt, the President's removing him from office, and so defeating, ad infinitum, if he pleased, the execution of the writ; thus showing, that without the consent of the executive, a peremptory mandamus to an executive officer must forever remain inoperative. If this argument be confined, as was intended, to the case of a mandamus commanding the performance of an act strictly executive; no one, it is believed, can prove it to be unsound. To mark still more clearly the class of cases referred to, and to show that the independence and completeness of the judicial power, were, not intended to be impugned; it was carefully observed, that "in cases which properly refer themselves to the judiciary, it is rarely or never possible to defeat, in this way, the ultimate execution of the judgment of the court:" a passage, by the way, which the learned

counsel in their animated comments on this part of the opinion, had strangely overlooked. He, therefore, entirely agreed with his learned adversaries, that in all cases to which the judicial power extended, neither the executive nor the legislature could, rightfully, interfere with the judgments of the courts, much less "strike dead their process, in the hands of the marshal." It was, perhaps, to prevent any abuse of the power of removal by the executive, as well as to avoid inconvenience and delay, that the provision referred to by the other side, and by the court below, authorizing the marshal, though removed, to execute any process in his hands; was inserted in the act of 1789. This provision, however, does not apply to a mandamus: which is directed, not to the marshal, but to the officer who is to do the act required; and if that officer be the head of an executive department, there is, and there can be, no law to prevent the President from removing him at pleasure.

With this notice of some of the strictures on his official opinion, he was content to leave the general exposition of his views, on this branch of the case, to that paper: and would proceed to consider the doctrine, so strenuously pressed, that under the constitution of the United States, it is competent for congress, if they think proper, to empower the judiciary to supervise, direct and control, any officer of the executive department, in respect to any matter whatsoever. The learned counsel were driven to this extremity in order to sustain the judgment of the court below, in the event of its being held, that the duty assigned to the postmaster general was not a ministerial but an executive one. The constitution, say the learned counsel, does not expressly except any officer of the United States, or any act of any such officer, from the general grant of judicial power; and, therefore, the legislature may extend that power to every such officer and act: and, indeed, should do so, in order that the judicial power may be coextensive with the operation of the other departments. The post office department, they further say, and all the officers employed in it, including its head, derive their existence from acts of congress passed in pursuance of the constitution: and the power which creates these officers may subject them to the supervision of the judiciary, and may empower the judiciary to direct and control them. The like power to authorize the judiciary to direct and control, in advance, the action of the executive officers, was endeavoured to be inferred from the admitted fact, that these officers were liable, as individuals, to private action and to indictment; and

that this liability had often been declared and enforced by act of congress. This doctrine may, indeed, be pronounced not only novel, but utterly repugnant to the theory of the constitution; and to the best considered and most authoritative expositions of its meaning. In the note to Hayburn's case, 2 Dall. 409, the reasons of the judges of the circuit courts, including all the judges of this Court, for not executing the pension act of the 23d of March, 1792, are given at length. The New York circuit court, consisting of chief justice Jay, Cushing Justice, and Duane, District judge, were "unanimously of opinion, and agreed, that by the constitution of the United States, the government thereof is divided into three distinct and independent branches; and that it is the duty of each to abstain from, and to oppose encroachments on either. That neither the legislative nor the executive branches can constitutionally assign to the judicial any duties, but such as are properly judicial, and to be performed in a judicial manner." The judges in the other circuits expressed the same proposition, though in somewhat different words; and they all concurred in treating the law as unconstitutional, and in declining the functions assigned them, because they were not of a judicial nature. The axiom thus laid down by this high authority, an axiom plainly resulting from the distribution of powers made by the constitution, overthrows, from the foundation, all this part of the opposing argument. The attorney general said, that he had always regarded the opinions of the judges in the pension case, as entitled to the very highest respect. They were founded on the maturest deliberation; and were uttered very soon after the organization of the government, and before political parties had been formed with reference to any particular construction of the constitution. When his own views as to the independence of the different departments were denounced by his learned adversaries as revolutionary and disorganizing; he was consoled by the reflection, that the like charge had been insinuated, and even by the incumbent of the office he had the honour to fill, against the opinions above quoted. See letter of attorney general Randolph to President Washington, of August 5th, 1792, 10 Sparks' Writings of Washington, 513. The fame of Chief Justice Jay and his associates, had not been injured by these strictures; and those who merely repeat their language are equally secure against any permanent injustice.

As to the numerous cases cited from the English book and from our own reports, in which actions for damages had been brought

against public officers of all descriptions, for acts done by them in their official capacities; it was sufficient to say, that the liability of every officer of this government to private action and to public prosecution, in appropriate cases, had been repeatedly conceded. But none of these cases touch the point now in dispute; for no one of them involves any attempt, on the part of the court, to direct the officer in the performance of his duty. This, it is said, has been done in the injunction cases cited from 4 Simons, 13; 6 Peters, 470; and 6 Simons, 214; and other cases of the like nature. It will be seen, however, that in the first of these cases, 4 Simons, 13, the injunction was issued to restrain the commissioners of woods and forests, from erecting a building in violation of an agreement entered into by them with the plaintiffs, to whom they had leased an adjoining tract; and that in all the others the real controversy was between individuals, litigating in relation to moneys held by the treasury officers as trustees or stockholders; moneys received under treaties, &c., and not belonging to the government, but to one or other of the litigating parties. Injunctions to the treasury officers are issued by the courts of equity, in these latter cases, on the same principle on which they are issued, in analogous cases, to banks and other depositaries; that is to preserve the funds in controversy until the party really entitled can be ascertained. When such injunctions are served on the secretary of the treasury, they are usually observed; but it has not been supposed that they were obligatory.

When this case was before the court below, it was urged as a strong reason against the application that no instance could be found in the English books in which a mandamus "had been issued to any officer of the executive departments." The learned counsel could not then produce any such case, and the court conceded that they had not found any. The King v. The Lords Commissioners of the Treasury, 5 Neville and Manning, 589, a case, not in the country where this controversy began, is now referred to as one of this description. It was there admitted, on all sides, that a mandamus had never been issued to such officers; and, though the writ was awarded, all the judges put it expressly on the ground that the money in question had been appropriated by parliament for the use of the relator, and had been drawn out of the treasury and placed in the hands of a paymaster appointed by the defendants, and subject to their order; and that they were to be so considered as mere trustees or stockholders, of moneys belonging, no to the public, but to the relator. Neville's

case, Plowden, 377; the Banker's case, 14 Howell's State Trials, and the other cases of petitions to the barons of the exchequer, depend on the political organization and functions of the English exchequer; and the writs issued in those cases to the treasury officers, are not to be confounded with the prerogative writ of mandamus, which can only emanate from the king's bench. In the New York case, 10 Wendell, 25, the mandamus was directed to the canal commissioners; officers charged, it is true, with the care of a very important public work, but not a part of the state executive. In principle, their functions were precisely like those of surveyors, and commissioners of highways and sewers; ministerial officers, to whom writs of mandamus have often been directed in England.

Several of the other cases cited from the state courts, are of the like nature; and no one of them assumes a power to direct an executive officer in the discharge of a matter properly appertaining to his official functions. In the Tennessee case cited in the opening, 1 Cooke, 214, such a power was expressly disclaimed. And in 5 Binney, 105, Chief Justice Tilghman refused a mandamus to the state treasurer, because it would be but another mode of suing the commonwealth; thus applying the maxim of common sense and good morals, that what the law will not allow you to do directly, you shall not attempt to do indirectly. But English cases, and even cases from our state courts, however useful in furnishing principles and analogies, cannot determine a question arising on the constitution of the United States. Aware of this, the learned counsel had chiefly relied on the cases of Marbury v. Madison, 1 Cranch, 137; M'Intire v. Wood, 7 Cranch, 504; and M'Cluny v. Silliman, 6 Wheat. 598. In the first of these, it was said, the broad principle had been established, that in all cases where an individual was interested in the discharge of an official act, by an executive officer, the writ of mandamus was the appropriate remedy to compel the performance of such act; and the other cases were referred to as confirming this doctrine. In regard to these authorities, the attorney general referred to the observations in his official opinion in the record, and to the opening argument; and conceded, that if Chief Justice Marshall was correct, in considering the appointment of Marbury as complete, by the signing and sealing of the commission, and in holding that he thereby acquired a vested legal right to the office, and to the commission as the evidence of it, and that the secretary held the commission as a mere depositary, for the personal and exclusive benefit

of Marbury; there could then be no doubt that a mandamus might be issued, consistently enough with the constitution: because the delivery of the commission would, in that case, be a mere ministerial act, and the secretary of state, quoad hoc, a mere ministerial officer.

In this view of the case, he assented to the comment of Justice Story, that no lawyer could doubt the power of congress to authorize the proper courts to issue a mandamus in such a case; and to the similar declaration of Justice Johnson, in 6 Wheat.; and of Justice Thompson, in 1 Paine. This however falls very far short of the doctrine now under consideration, a doctrine which claims for the legislature the power to confer on the courts of justice unlimited authority to supervise and control executive officers, in all matters whatsoever. In support of this position, the 13th section of the judicial act of 1789, had been invoked as a legislative declaration that writs of mandamus might be issued to any officers of the United States, executive as well as others. And it was said, that although this section had been decided in Marbury v. Madison to be unconstitutional, as attempting to give to the Supreme Court an original jurisdiction in this respect; yet that it was entitled to respect in the point now under discussion. Independently of any other answer, it was enough to say that the section confined the writ to cases "warranted by the principles and usages of law:" that the principles of law forbid the issuing of a mandamus, except in cases strictly of judicial cognizance; and especially forbid the interference of courts of justice with executive functions: and that the usages in England and in this country, are in accordance with these principles. In the cases of The United States v. Arredondo and others, 6 Peters, 763; 9 Peters, 172, &c., the United States, in order to execute the stipulations for the protection of private property contained in the Florida treaty, consented to appear in court at the suit of the claimant; gave the courts ample authority to decide on the validity of claims under the treaty; and empowered them when a claim was established, to issue a mandate to a ministerial officer to make the necessary survey and execution of the decree. The irrelevancy of this procedure to the present discussion is obvious. Nor did this part of the opposing argument derive any support from any of the post office laws to which the learned counsel had referred; there being no provision in the sections which had been quoted, which empowered the judiciary to interfere, in any way, except by taking cognizance of suits regularly instituted.

[Kendall v. The United States.]

In, conclusion, the attorney general insisted, that even if the post-master general could properly be regarded in this case as a mere ministerial officer, and if the relators could be considered as having a vested legal right to the credits in question; still the court below had no jurisdiction to issue the mandamus, because its authority in this respect was no greater than that of the ordinary circuit courts. It was deserving of notice that no attempt had been made by the other side to explain how it happened that this extended jurisdiction had never before been exercised or asserted; although cases calling for its exercise must frequently have occurred.

But suppose this objection out of the way; suppose the jurisdiction clear, and the legal right of the relators to the credits claimed by them admitted; yet the court erred in awarding the mandamus. It is not every case of the denial of a vested legal right, which is to be redressed by this writ. It must appear that there is no other specific legal remedy. In the present case, if the rights of the relators be such as their counsel represent, an action on the case will plainly lie. This is conceded. But we are told, that the recovery in such an action, will be only for the damages prior to the commencement of the suit, and that they will be obliged to bring new suits ad infinitum. This, however, cannot be necessary, if in the first action the plaintiff choose to go for the total damages. Then it is said, that the damages may not be collected; and if collected, that the relators will not get the specific thing, the entry of the credits. This objection might have been made in each of the cases cited in the opening, where the liability of the defendant to an action on the case, was held a sufficient reason for denying the mandamus.

Nor does it follow, even if the ultimate efficiency of the legal remedy by action be really doubtful, that a mandamus is to be issued. This is not one of those writs which is demandable of strict right: the courts exercise a sound, legal discretion, in awarding it. Being founded on the prerogative of the crown, the English court of king's bench will not issue it, unless there be a real necessity for it. There must be a nodus, and one, too, dignus vendice; or the court will not interpose. This discretion the court below was bound to exercise: and if this Court see that they have violated it, the judgment may, and should be reversed. Now, it appears by the record not only that congress have full power to settle this whole controversy. and to give to the relators all they claim; but that they have applied to congress for relief, and that their application is still pending. In this

posture of the case, is it discreet for the court to interfere by mandamus? Suppose a resolution by the directors of a bank, or other monied corporation, instructing their cashier to pay certain moneys to a creditor of the corporation; the cashier makes a question as to the meaning of the resolution, and refers the party to the directors for further instruction; suppose the party to apply to them; but, before his application is decided, to ask for a mandamus; would it be a sound exercise of legal discretion to interfere? Would not the party be told that he had selected his remedy, and that he must pursue it to a conclusion, before he could ask for this prerogative writ? But the relators say, that congress will not pass any further law. How can this be judicially known? And why will not congress pass a further law? Because, say the relators, they consider the case so very plain that no new law is necessary. This, one would think, would justify an expectation directly the reverse. At any rate the subject having been actually referred to congress, by the executive; and the relators having gone to that body, it would seem to be manifestly indiscreet, and improper, for the courts to interfere until some more serious attempt be made to obtain the direction of that department to which the disposition of the public treasure peculiarly belongs.

Mr. Justice THOMPSON delivered the opinion of the Court:

This case comes up on a writ of error from the circuit court of the United States for the District of Columbia, sitting for the county of Washington.

This case was brought before the court below by petition, setting out certain contracts made between the relators and the late postmaster general, upon which they claimed certain credits and allowances upon their contracts for the transportation of the mail. That credits and allowances were duly made by the late postmaster general. That the present postmaster general when he came into office, re-examined the contracts entered into with his predecessor, and the allowances made by him, and the credits and payments which had been made; and directed that the allowances and credits should be withdrawn, and the relators recharged with divers payments they had received. That the relators presented a memorial to congress on the subject, upon which a law was passed on the 21st of July, 1836, for their relief; by which the solicitor of the treasury was authorized and directed to settle and adjust the claims of the relators

[Kendall v. The United States.]

for extra-services performed by them; to inquire into and determine the equity of such claims; and to make the relators such allowance therefor, as upon full examination of all the evidence may seem right, according to the principles of equity. And that the postmaster general be, and he is hereby directed to credit the relators with whatever sum or sums of money, if any, the solicitor shall so decide to be due to them, for and on account of any such service or contract. And the petition further sets out, that the solicitor, Virgil Maxcy, assumed upon himself the performance of the duty and authority created and conferred upon him by the law, and did make out and communicate his decision and award to the postmaster general; by which award and decision the relators were allowed one hundred and sixty-one thousand five hundred and sixty-three dollars and eighty-nine cents. - That the postmaster general, on being notified of the award, only so far obeyed and carried into execution the act of congress, as to direct and cause to be carried to the credit of the relators, the sum of one hundred and twenty-two thousand one hundred and two dollars and forty-six cents. But that he has, and still does refuse and neglect to credit the relators with the residue of the sum so awarded by the solicitor, amounting to thirty-nine thousand four hundred and sixty-two dollars and forty-three cents. And the petition prayed the court, to award a mandamus directed to the postmaster general; commanding him fully to comply with, obey and execute the said act of congress, by crediting the relators with the full and entire sum awarded in their favour by the solicitor of the treasury.

Such proceedings were afterwards had in the case, that a peremptory mandamus was ordered commanding the said Amos Kendall, postmaster general, forthwith to credit the relators with the full amount awarded and decided by the solicitor of the treasury to be due to the relators.

The questions arising upon this case, may be considered under two general inquiries:

1. Does the record present a proper case for a mandamus; and if so, then,

2. Had the circuit court of this district jurisdiction of the case, and authority to issue the writ.

Under the first head of inquiry, it has been considered by the counsel on the part of the postmaster general, that this is a proceeding against him to enforce the performance of an official duty. And

Vol. XII.—4 H

the proceeding has been treated as an infringement upon the executive department of the government; which has led to a very extended range of argument on the independence and duties of that department; but which, according to the view taken by the Court of the case, is entirely misapplied. We do not think the proceedings in this case, interferes, in any respect whatever, with the rights or duties of the executive; or that it involves any conflict of powers between the executive and judicial departments of the government. The mandamus does not seek to direct or control the postmaster general in the discharge of any official duty, partaking in any respect of an executive character; but to enforce the performance of a mere ministerial act, which neither he, nor the President had any authority to deny or control.

We shall not, therefore, enter into any particular examination of the line to be drawn between the powers of the executive and judicial departments of the government. The theory of the constitution undoubtedly is, that the great powers of the government are divided into separate departments; and so far as these powers are derived from the constitution, the departments may be regarded as independent of each other. But beyond that, all are subject to regulations by law, touching the discharge of the duties required to be performed.

The executive power is vested in a President; and as far as his powers are derived from the constitution, he is beyond the reach of any other department, except in the mode prescribed by the constitution through the impeaching power. But it by no means follows, that every officer in every branch of that department is under the exclusive direction of the President. Such a principle, we apprehend, is not, and certainly cannot be claimed by the President.

There are certain political duties imposed upon many officers in the executive department, the discharge of which is under the direction of the President. But it would be an alarming doctrine, that congress cannot impose upon any executive officer any duty they may think proper, which is not repugnant to any rights secured and protected by the constitution; and in such cases, the duty and responsibility grow out of and are subject to the control of the law, and not to the direction of the President. And this is emphatically the case, where the duty enjoined is of a mere ministerial character.

Let us proceed, then, to an examination of the act required by the mandamus to be performed by the postmaster general; and his obligation to perform, or his right to resist the performance, must

depend upon the act of congress of the 2d of July, 1836. This is a special act for the relief of the relators, Stockton & Stokes; and was passed, as appears on its face, to adjust and settle certain claims which they had for extra services, as contractors for carrying the mail. These claims were, of course, upon the United States, through the postmaster general. The real parties to the dispute were, therefore, the relators and the United States. The United States could not, of course, be sued, or the claims in any way enforced against the United States, without their consent obtained through an act of congress: by which they consented to submit these claims to the solicitor of the treasury to inquire into and determine the equity of the claims, and to make such allowance therefor as upon a full examination of all the evidence, should seem right, according to the principles of equity. And the act directs the postmaster general to credit the relators with whatever sum, if any, the solicitor shall decide to be due to them, for or on account of any such service or contract.

The solicitor did examine and decide that there was due to the relators, one hundred and sixty-one thousand five hundred and sixty-three dollars and ninety-three cents; of this sum, the postmaster general credited them with one hundred and twenty-two thousand one hundred and one dollars and forty-six cents: leaving due the sum of thirty-nine thousand four hundred and seventy-two dollars and forty-seven cents, which he refused to carry to their credit. And the object of the mandamus was to compel him to give credit for this balance.

Under this law the postmaster general is vested with no discretion or control over the decisions of the solicitor; nor is any appeal or review of that decision provided for by the act. The terms of the submission was a matter resting entirely in the discretion of congress; and if they thought proper to vest such a power in any one, and especially as the arbitrator was an officer of the government, it did not rest with the postmaster general to control congress, or the solicitor, in that affair. It is unnecessary to say how far congress might have interfered, by legislation, after the report of the solicitor. But if there was no fraud or misconduct in the arbitrator, of which none is pretended, or suggested; it may well be questioned whether the relators had not acquired such a vested right, as to be beyond the power of congress to deprive them of it.

But so far from congress attempting to deprive the relators of the

benefit of the award, they may be considered as impliedly sanctioning and approving of the decisions of the solicitor.   It is at least so to be considered by one branch of the legislature.   After the postmaster general had refused to credit the relators with the full amount of the award of the solicitor, they, under the advice of the President, presented a memorial to congress, setting out the report of the solicitor, and the refusal of the postmaster general to give them credit for the amount of the award, and praying congress to provide such remedy for the denial of their rights, as in their wisdom might seem right and proper.

Upon this memorial, the judiciary committee of the senate made a report, in which they say, " that congress intended the award of the solicitor to be final, is apparent from the direction of the act that the postmaster general be, and he is hereby directed to credit such mail contractors with whatever sum the solicitor shall decide to be due to them.",   If congress had intended to revise the decision of the solicitor, the postmaster general would not have been directed to make the payment, without the intervention or further action of congress.   That unless it appeared, which is not suggested by any one, that some cause exists which would vitiate or set aside the award between private parties before a judicial tribunal, the committee cannot recommend the interference of congress to set aside this award, and more especially as it has been made by a high officer, selected by the government; and the committee conclude their report with a resolution, " That the postmaster general is fully warranted in paying, and ought to pay to William B. Stokes and others, the full amount of the award of the solicitor of the treasury:" which resolution was unanimously adopted by the senate.   After such a decided expression of the opinion of one branch of congress, it would not have been necessary to apply to the other.   Even if the relators were bound to make any application to congress for relief, which they clearly were not; their right to the full amount of the credit, according to the report of the solicitor, having been ascertained and fixed by law, the enforcement of that right falls properly within judicial cognizance.

It was urged at the bar, that the postmaster general was alone, subject to the direction and control of the President, with respect to the execution of the duty imposed upon him by this law; and this right of the President is claimed, as growing out of the obligation imposed upon him by the constitution, to take care that the laws be

faithfully executed. This is a doctrine that cannot receive the sanction of this court. It would be vesting in the President a dispensing power, which has no countenance for its support in any part of the constitution; and is asserting a principle, which, if carried out in its results, to all cases falling within it, would be clothing the President with a power entirely to control the legislation of congress, and paralyze the administration of justice.

To contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the constitution, and entirely inadmissible. But although the argument necessarily leads to such a result, we do not perceive from the case that any such power has been claimed by the President. But, on the contrary, it is fairly to be inferred that such power was disclaimed. He did not forbid or advise the postmaster general to abstain from executing the law, and giving the credit thereby required; but submitted the matter, in a message to congress. And the same judiciary committee of the senate report thereupon, in which they say, "The Pres . ent, in his message, expresses no opinion in relation to the subject under consideration, nor does he recommend the adoption of any measure whatever. He communicates the report of the postmaster general, the review of that report, by the solicitor of the treasury, and the remarks of the postmaster general in answer thereto, together with such vouchers as are referred to by them respectively. That the committee have considered the documents communicated, and cannot discover any cause for changing their opinion upon any of the principles advanced in their former report upon this subject, nor the correctness of their application to this case; and recommend the adoption of the resolution before reported."

Thus, upon a second and full consideration of the subject, after hearing and examining the objections of the postmaster general, to the award of the solicitor, the committee report, that the postmaster general ought to pay to the relators the amount of the award.

The right of the relators to the benefit of the award ought now to be considered as irreversibly established; and the question is whether they have any, and what remedy?

The act required by the law to be done by the postmaster general is simply to credit the relators with the full amount of the award of the solicitor. This is a precise, definite act, purely ministerial; and about which the postmaster general had no discretion whatever.

The law upon its face shows the existence of accounts between the relators and the post office department. No money was required to be paid; and none could have been drawn out of the treasury without further legislative provision, if this credit should overbalance the debit standing against the relators. But this was a matter with which the postmaster general had no concern. He was not called upon to furnish the means of paying such balance, if any should be found. He was simply required to give the credit. This was not an official act in any other sense than being a transaction in the department where the books and accounts were kept; and was an official act in the same sense that an entry in the minutes of a court, pursuant to an order of the court, is an official act. There is no room for the exercise of any discretion, official or otherwise: all that is shut out by the direct and positive command of the law, and the act required to be done is, in every just sense, a mere ministerial act.

And in this view of the case, the question arises, is the remedy by mandamus the fit and appropriate remedy?

The common law, as it was in force in Maryland when the cession was made, remained in force in this district. We must, therefore, consider this writ as it was understood at the common law with respect to its object and purpose, and varying only in the form required by the different character of our government. It is a writ, in England, issuing out of the king's bench, in the name of the king, and is called a prerogative writ, but considered a writ of right; and is directed to some person, corporation or inferior court, requiring them to do some particular thing, therein specified, which appertains to their office or duty, and which is supposed to be consonant to right and justice, and where there is no other adequate specific remedy. Such a writ, and for such a purpose, would seem to be peculiarly appropriate to the present case. The right claimed is just and established by positive law; and the duty required to be performed is clear and specific, and there is no other adequate remedy.

The remedies suggested at the bar were, then, an application to congress; removal of the postmaster general from office; and an action against him for damages.

The first has been tried and failed. The second might not afford any certain relief, for his successors might withhold the credit in the same manner; and, besides, such extraordinary measures are not the remedies spoken of in the law which will supersede the right of resorting to a mandamus; and it is seldom that a private action at

law will afford an adequate remedy. If the denial of the right be considered as a continuing injury, to be redressed by a series of successive actions, as long as the right is denied; it would avail nothing, and never furnish a complete remedy. Or if the whole amount of the award claimed should be considered the measure of damages, it might, and generally would be an inadequate remedy, where the damages were large. The language of this Court, in the case of Osborn v. United States Bank, 9 Wheat. 844, is, that the remedy by action in such cases would have nothing real in it. It would be a remedy in name only, and not in substance; especially where the amount of damages is beyond the capacity of a party to pay.

That the proceeding on a mandamus is a case within the meaning of the act of congress, has been too often recognised in this Court to require any particular notice. It is an action or suit brought in a court of justice, asserting a right; and is prosecuted according to the forms of judicial proceedings.

The next inquiry is, whether the court below had jurisdiction of the case, and power to issue the mandamus?

This objection rests upon the decision of this Court, in the cases of M'Intire v. Wood, 7 Cranch, 504; and M'Cluny v. Silliman, 6 Wheat. 369. It is admitted that those cases have decided that the circuit courts of the United States, in the several states, have not authority to issue a mandamus against an officer of the United States. And unless the circuit court in the District of Columbia has larger powers in this respect, it had not authority to issue a mandamus in the present case.

It becomes necessary, therefore, to examine with attention the ground on which those cases rested. And it is to be observed, that although the question came up under the names of different parties, it related to the same claim in both: and, indeed, it was before the Court at another time, which is reported in 2 Wheat. 369.

The question, in the first case, originated in the circuit court of the United States, in Ohio, and came to this Court on a certificate of division of opinion. The second time, it was an original application to this Court, for the mandamus. The third time, the application was to the state court, and was brought here by writ of error, under the twenty-fifth section of the judiciary act.

By the first report of the case, in 7 Cranch, it appears that the application to the circuit court was for a mandamus to the register of a land office in Ohio, commanding him to issue a final certificate of

SUPREME COURT.

purchase for certain lands in that state, and the court, in giving its judgment, say: the power of the circuit courts to issue the writ of mandamus, is confined exclusively to those cases in which it may be necessary to the exercise of their jurisdiction. But, it is added, if the eleventh section of the judiciary act had covered the whole ground of the constitution, there would be much ground for exercising this power in many cases wherein some ministerial act is necessary to the completion of an individual right, arising under the laws of the United States; and then the fourteenth section of the act would sanction the issuing of the writ for such a purpose. But that although the judicial power under the constitution extends to all cases arising under the laws of the United States, the legislature have not thought proper to delegate that power to the circuit courts, except in certain specified cases. The decision, then, turned exclusively upon the point, that congress had not delegated to the circuit courts all the judicial power that the constitution would authorize: and admitting what certainly cannot be denied, that the constitution is broad enough to warrant the vesting of such power in the circuit courts; and if in those courts, it may be vested in any other inferior courts: for the judicial power, says the constitution, shall be vested in one Supreme Court, and such inferior courts as the congress may from time to time ordain and establish.

It is not designated by the Court, in the case of M'Intire v. Wood, in what respect there is a want of delegation to the circuit courts of the power necessary to take cognizance of such a case, and issue the writ. It is said, however, that the power is confined to certain specified cases, among which is not to be found that of issuing a mandamus in such a case as was then before the Court. It is unnecessary to enter into a particular examination of the limitation upon the power embraced in this eleventh section of the judiciary act. There is, manifestly, some limitation. The circuit courts have certainly not jurisdiction of all suits or cases of a civil nature at common law, and in equity. They are not courts of general jurisdiction in all such cases; and an averment is necessary, bringing the case within one of the specified classes. But the obvious inference from the case of M'Intire v. Wood, is, that under the constitution, the power to issue a mandamus to an executive officer of the United States, may be vested in the inferior courts of the United States; and that it is the appropriate writ, and proper to be employed, agreeably to the principles and usages of law, to compel the performance of a mi-

[Kendall v. The United States.]

nisterial act, necessary to the completion of an individual right aris-
ing under the laws of the United States. And the case now before
the Court, is precisely one of that description. And if the circuit
court of this district has the power to issue it, all objection aris-
ing either from the character of the party, as an officer in the execu-
tive department of the government, or from the nature of the act
commanded to be done, must be abandoned.

An application for a mandamus, founded on the same claim, was
made to this Court under the name of M'Cluny v. Silliman, as re-
ported in 2 Wheat. 369; and the application was refused on the au-
thority of Marbury v. Madison, 1 Cranch, 137, that this Court had
no original jurisdiction in such cases.

The case came up again under the name of M'Cluny v. Silliman,
6 Wheat. 598, on a writ of error to a state court, under the 25th sec-
tion of the judiciary act; and the only question directly before the
Court, was, whether a state court had authority to issue a mandamus
to an officer of the United States, and this power was denied. Mr.
Justice Johnson, who gave the opinion, and who had given the
opinion of the Court in M'Intire v. Wood, alluded to that case, and
gave some account of the application in that case, and the grounds
upon which the Court decided it; and observes, that the mandamus
asked for in that case, was to perfect the same claim, and, in point
of fact, was between the same parties; and in answer to what had
been urged at the bar, with respect to the character of the parties,
says, that case did not turn upon that point; but that both the ar-
gument of counsel, and the decision of the Court, show that the power
to issue the mandamus in that case, was contended for as incident to
the judicial power of the United States; and that the reply to the
argument was, that although it might be admitted that this control-
ling power over its ministerial officers would follow from vesting in
its courts the whole judicial power of the United States; the argu-
ment fails here, since the legislature has only made a partial delega-
tion of its judicial powers to the circuit courts. That all cases aris-
ing under the laws of the United States, are not, per se, among the
cases comprised within the jurisdiction of the circuit courts, under
the provisions of the eleventh section.

It is, he says, not easy to conceive on what legal ground a state
tribunal can, in any instance, exercise the power of issuing a manda-
mus to a register of a land office. The United States have not
thought proper to delegate that power to their own courts. But

when in the case of Marbury v. Madison, and M'Intire v. Wood, this Court decided against the exercise of that power, the idea never presented itself to any one, that it was not within the scope of the judicial power of the United States, although not vested by law in the courts of the general government. And no one will contend, that it was among the reserved powers of the states, because not communicated by law to the courts of the United States.

The result of these cases, then, clearly is, that the authority to issue the writ of mandamus to an officer of the United States, commanding him to perform a specific act required by a law of the United States, is within the scope of the judicial powers of the United States, under the constitution. But that the whole of that power has not been communicated by law to the circuit courts; or in other words, that it was then a dormant power not yet called into action, and vested in those courts; and that there is nothing growing out of the official character of the party that will exempt him from this writ, if the act to be performed is purely ministerial.

It must be admitted, under the doctrine of this Court in the cases referred to, that unless the circuit court of this district is vested with broader powers and jurisdiction in this respect, than is vested in the circuit courts of the United States in the several states, then the mandamus in the present case was issued without authority.

But in considering this question, it must be borne in mind that the only ground upon which the court placed its decision, was that the constitutional judicial powers on this subject had not been imparted to those courts.

In the first place, the case of Wheelwright et al. v. The Columbia Insurance Co. 7 Wheat. 534, furnishes a very strong, if not conclusive inference that this Court did not consider the circuit court of this district as standing on the same footing with the circuit courts in the states; and impliedly admitting that it had power to issue a mandamus in a case analogous to the present. A mandamus in that case had been issued by the circuit court of this district, to compel the admission of the defendants in error to the offices of directors in the Columbian Insurance Company; and the case was brought before this Court by writ of error; and the Court decided that a writ of error would lie, and directed affidavits to be produced as to the value of the matter in controversy. But it not appearing that it amounted to one thousand dollars, the sum required to give this Court appellate jurisdiction from the final judgments or decrees of

[Kendall v. The United States.]

the circuit court of this district, the writ of error was afterwards quashed.

It would seem to be a reasonable, if not a necessary conclusion, that the want of a sufficient value of the matter in controversy, was the sole ground upon which the writ of error was quashed, or dismissed. If it had been on the ground that the court below had not jurisdiction in the case, it can hardly be believed that the Court would have directed affidavits to be produced of the value of the matter in controversy. This would have been an act perfectly nugatory, and entirely unavailable, if the matter in controversy had been shown to be above the value of one thousand dollars. If the want of jurisdiction in the circuit court had been the ground on which the writ of error was quashed, the same course would have been pursued as was done in the case of Custis v. The Georgetown & Alexandria Turnpike Co. 6 Cranch, 233; where the writ of error was quashed on the ground that the court below had not cognizance of the matter.

But let us examine the act of congress of the 27th of February, 1801, concerning the District of Columbia, and by which the circuit court is organized, and its powers and jurisdiction pointed out. And it is proper, preliminarily, to remark, that under the constitution of the United States, and the cessions made by the states of Virginia and Maryland, the exercise of exclusive legislation in all cases whatsoever, is given to congress. And it is a sound principle, that in every well organized government the judicial power should be coextensive with the legislative, so far at least as private rights are to be enforced by judicial proceedings. There is in this district, no division of powers between the general and state governments. Congress has the entire control over the district for every purpose of government; and it is reasonable to suppose, that in organizing a judicial department here, all judicial power necessary for the purposes of government would be vested in the courts of justice. The circuit court here is the highest court of original jurisdiction; and if the power to issue a mandamus in a case like the present exists in any court, it is vested in that court.

Keeping this consideration in view, let us look at the act of congress.

The first section declares, that the laws of the state of Maryland, as they now exist, shall be, and continue in force in that part of the district which was ceded by that state to the United States; which is

the part lying on this side the Potomac, where the court was *sitting* when the mandamus was issued. It was admitted on the argument, that at the date of this act, the common law of England was in force in Maryland, and of course it remained and continued in force in this part of the district: and that the power to issue a mandamus in a proper case is a branch of the common law, cannot be doubted, and has been fully recognised as in practical operation in that state, in the case of Runkle v. Winemiller and others, 4 Harris & M'Henry, 448. That case came before the court on a motion to show cause why a writ of mandamus should not issue, commanding the defendants to restore the Rev. William Runkel into the place and functions of minister of a certain congregation. The court entertained the motion, and afterwards issued a peremptory mandamus. And in the opinion delivered by the court on the motion, reference is made to the English doctrine on the subject of mandamus; and the court say, that it is a prerogative writ, and grantable when the public justice of the state is concerned, and commands the execution of an act, where otherwise justice would be obstructed. 3 Bac. Ab. 527. It is denominated a prerogative writ, because the king being the fountain of justice it is interposed by his authority transferred to the court of king's bench, to prevent disorder from a failure of justice where the law has established no specific remedy, and where in justice and good government there ought to be one. 3 Burr, 1267. It is a writ of right, and lies, where there is a right to execute an office, perform a service, or exercise a franchise; and a person is kept out of possession, and dispossessed of such right, and has no other specific legal remedy. 3 Burr, 1266.

These, and other cases where a mandamus has been considered in England as a fit and appropriate remedy, are referred to by the general court; and it is then added, that the position that this court is invested with similar powers, is generally admitted, and the decisions have invariably conformed to it; from whence, say the court, the inference is plainly deducible, that this court may, and of right ought, for the sake of justice, to interpose in a summary way, to supply a remedy; where, for the want of a specific one, there would otherwise be a failure of justice.

The theory of the British government, and of the common law is, that the writ of mandamus is a prerogative writ, and is sometimes called one of the flowers of the crown, and is therefore confided only to the king's bench; where the king, at one period of

[Kendall v. The United States.]

the judicial history of that country, is said to have sat in person, and is presumed still to sit. And the power to issue this writ is given to the king's bench only, as having the general supervising power over all inferior jurisdictions and officers, and is coextensive with judicial sovereignty. And the same theory prevails in our state governments, where the common law is adopted, and governs in the administration of justice; and the power of issuing this writ is generally confided to the highest court of original jurisdiction. But, it cannot be denied but this common law principle may be modified by the legislature, in any manner that may be deemed proper and expedient. No doubt the British parliament might authorize the court of common pleas to issue this writ; or that the legislature of the states, where this doctrine prevails, might give the power to issue the writ to any judicial tribunal in the state, according to its pleasure: and in some of the states, this power is vested in other judicial tribunals than the highest court of original jurisdiction. This is done in the state of Maryland, subsequent however to the 27th of February, 1801. There can be no doubt, but that in the state of Maryland a writ of mandamus might be issued to an executive officer, commanding him to perform a ministerial act required of him by law; and if it would lie in that state, there can be no good reason why it should not lie in this district, in analogous cases. But the writ of mandamus, as it is used in the courts of the United States, other than the circuit court of this district, cannot, in any just sense, be said to be a prerogative writ, according to the principles of the common law.

The common law has not been adopted by the United States, as a system in the states generally, as has been done with respect to this district. To consider the writ of mandamus, in use here, as it is in England, the issuing of it should be confined to this Court, as it is there to the king's bench. But, under the constitution, the power to issue this as an original writ, in the general sense of the common law, cannot be given to this Court, according to the decision in Marbury v. Madison.

Under the judiciary act, the power to issue this writ, and the purposes for which it may be issued in the courts of the United States, other than in this district, is given by the fourteenth section of the act, under the general delegation of power " to issue all other writs not specially provided for by statute, which may be necessary for the exercise of their respective jurisdictions, and agreeable to the

principles and usages of law." And it is under this power, that this Court issues the writ to the circuit courts, to compel them to proceed to a final judgment or decree in a cause, in order that we may exercise the jurisdiction of review given by the law: and the same power, is exercised by the circuit courts over the district courts, where a writ of error or appeal lies to the circuit court. But this power is not exercised, as in England, by the king's bench, as having a general supervising power over inferior courts; but only for the purpose of bringing the case to a final judgment or decree, so that it may be reviewed. The mandamus does not direct the inferior court how to proceed, but only that it must proceed, according to its own judgment, to a final determination; otherwise it cannot be reviewed in the appellate court. So that it is in a special, modified manner, in which the writ of mandamus is to be used in this Court, and in the circuit courts in the states; and does not stand on the same footing, as in this district, under the general adoption of the laws of Maryland, which included the common law, as altered or modified on the 27th of February, 1801.

Thus far the power of the circuit court to issue the writ of mandamus, has been considered as derived under the first section of the act of 27th of February, 1801. But the third and fifth sections are to be taken into consideration, in deciding this question. The third section, so far as it relates to the present inquiry, declares: "That there shall be a court in this district, which shall be called the circuit court of the District of Columbia; and the said court, and the judges thereof, shall have all the powers by law vested in the circuit courts and the judges of the circuit courts of the United States." And the fifth section declares: "That the said court shall have cognizance of all cases, in law and equity, between parties, both or either of which shall be resident or be found within the district."

Some criticisms have been made at the bar, between the use of the terms power and cognizance, as employed in those sections. It is not perceived how such distinction, if any exists, can affect the construction of this law. That there is a distinction, in some respects, cannot be doubted; and, generally speaking, the word power is used in reference to the means employed in carrying jurisdiction into execution. But, it may well be doubted, whether any marked distinction is observed and kept up in our laws, so as in any measure to affect the construction of those laws. Power must include jurisdiction, which is generally used in reference to the exercise of

that power in courts of justice. But power, as used in the constitution, would seem to embrace both.

Thus, all legislative power shall be vested in congress. The executive power shall be vested in a President. The judicial power shall be vested in one Supreme Court, and in such inferior courts as congress shall, from time to time, ordain and establish: and this judicial power shall extend to all cases, in law and equity, arising under this constitution, the laws of the United States, and treaties made, or which shall be made, under their authority, &c. This power must certainly embrace jurisdiction, so far as that term is applicable to the exercise of legislative or executive power. And as relates to judicial power, the term jurisdiction is not used, until the distribution of those powers among the several courts, is pointed out and defined.

There is no such distinction in the two sections of the law in the use of the terms power and jurisdiction, as to make it necessary to consider them separately. If there is any distinction, the two sections, when taken together, embrace them both. The third gives the power, and the fifth gives the jurisdiction on the cases in which that power is to be exercised. By the fifth section, the court has cognizance of all actions or suits of a civil nature, at common law or in equity, in which the United States shall be plaintiffs or complainants; and also of all cases in law and equity between parties, both or either of which shall be resident or be found within the district. This latter limitation can only affect the exercise of the jurisdiction, and cannot limit the subject matter thereof. No court can, in the ordinary administration of justice, in common law proceedings, exercise jurisdiction over a party unless he shall voluntarily appear, or is found within the jurisdiction of the court, so as to be served with process. Such process cannot reach the party beyond the territorial jurisdiction of the court. And besides, this is a personal privilege which may be waived by appearance; and if advantage is to be taken of it, it must be by plea or some other mode at an early stage in the cause. No such objection appears to have been made to the jurisdiction of the court in the present case. There was no want of jurisdiction, then, as to the person; and as to the subject matter of jurisdiction, it extends, according to the language of the act of congress, to all cases in law and equity. This, of course, means cases of judicial cognizance. That proceedings on an application to a court of justice for a mandamus, are judicial proceedings, cannot admit of

a doubt; and that this is a case in law is equally clear. It is the prosecution of a suit to enforce a right secured by a special act of congress, requiring of the postmaster general the performance of a precise, definite, and specific act, plainly enjoined by the law. It cannot be denied but that congress had the power to command that act to be done; and the power to enforce the performance of the act must rest somewhere, or it will present a case which has often been said to involve a monstrous absurdity in a well organized government, that there should be no remedy, although a clear and undeniable right should be shown to exist. And if the remedy cannot be applied by the circuit court of this district, it exists nowhere. But, by the express terms of this act, the jurisdiction of this circuit court extends to all cases in law, &c. No more general language could have been used. An attempt at specification would have weakened the force and extent of the general words—all cases. Here, then, is the delegation, to this circuit court, of the whole judicial power in this district, and in the very language of the constitution; which declares that the judicial power shall extend to all cases in law and equity arising under the laws of the United States, &c.; and supplies what was said by this Court in the cases of M'Intire v. Wood, and in M'Cluny v. Silliman, to be wanting, viz: That the whole judicial power had not been delegated to the circuit courts in the states: and which is expressed in the strong language of the Court, that the idea never presented itself to any one that it was not within the scope of the judicial powers of the United States, although not vested by law in the courts of the general government.

And the power in the court below to exercise this jurisdiction, we think, results irresistibly from the third section of the act of the 27th of February, 1801, which declares that the said court, and the judges thereof, shall have all the powers by law vested in the circuit courts and the judges of the circuit courts of the United States. The question here is, what circuit courts are referred to. By the act of the 13th of February, 1801, the circuit courts established under the judiciary act of 1789 were abolished; and no other circuit courts were in existence except those established by the act of 13th February, 1801. It was admitted by the attorney general, on the argument, that if the language of the law had been, all the powers now vested in the circuit courts, &c., reference would have been made to the act of the 13th February, 1801, and the courts thereby established. We think that would not have varied the construction of the act.

[Kendall v. The United States.]

The reference is to the powers by law vested in the circuit courts. The question necessarily arises, what law? The question admits of no other answer, than that it must be some existing law, by which powers are vested, and not a law which had been repealed. And there was no other law in force, vesting powers in circuit courts, except the law of the 13th of February, 1801. And the repeal of this law, fifteen months afterwards, and after the court in this district had been organized and gone into operation, under the act of 27th of February, 1801, could not, in any manner, affect that law, any further than was provided by the repealing act. To what law was the circuit court of this district to look for the powers vested in the circuit courts of the United States, by which the court was to be governed, during the time the act of the 13th of February was in force? Certainly to none other than that act. And whether the time was longer or shorter before that law was repealed, could make no difference.

It was not an uncommon course of legislation in the states, at an early day, to adopt, by reference, British statutes: and this has been the course of legislation by congress in many instances where state practice and state process has been adopted. And such adoption has always been considered as referring to the law existing at the time of adoption; and no subsequent legislation has ever been supposed to affect it. And such must necessarily be the effect and operation of such adoption. No other rule would furnish any certainty as to what was the law; and would be adopting prospectively, all changes that might be made in the law. And this has been the light in which this Court has viewed such legislation. In the case of Cathcart v. Robinson, 5 Peters, 280, the Court, in speaking of the adoption of certain English statutes say: by adopting them, they become our own as entirely as if they had been enacted by the legislature. We are then to construe this third section of the act of 27th of February, 1801, as if the eleventh section of the act of 13th of February, 1801, had been incorporated at full length; and by this section it is declared, that the circuit courts shall have cognizance of all cases in law or equity, arising under the constitution and laws of the United States, and treaties made, or which shall be made under their authority: which are the very words of the constitution, and which is, of course, a delegation of the whole judicial power, in cases arising under the constitution and laws, &c.; which meets and supplies the precise want of delegation of power which prevented the exercise

of jurisdiction in the cases of M'Intire v. Wood, and M'Cluny v. Silliman; and must, on the principles which governed the decision of the Court in those cases, be sufficient to vest the power in the circuit court of this district:

The judgment of the court below is accordingly affirmed with costs, and the cause remanded for further proceedings.

Mr. Chief Justice TANEY:

As this case has attracted some share of the public attention, and a diversity of opinion exists on the bench; it is proper that I should state the grounds upon which I dissent from the judgment pronounced by the Court. There is no controversy about the facts; and as they have been already sufficiently stated, I need not repeat them.

Upon some of the points much argued at the bar, there is no difference of opinion in the Court. Indeed, I can hardly understand how so many grave questions of constitutional power have been introduced into the discussion of a case like this, and so earnestly debated on both sides. The office of postmaster general is not created by the constitution; nor are its powers or duties marked out by that instrument. The office was created by act of congress; and wherever congress creates such an office as that of postmaster general, by law, it may unquestionably, by law, limit its powers, and regulate its proceedings; and may subject it to any supervision or control, executive or judicial, which the wisdom of the legislature may deem right. There can, therefore, be no question about the constitutional powers of the executive or judiciary, in this case. The controversy depends simply upon the construction of an act of congress. The circuit court for the District of Columbia was organized by the act of February 27, 1801, which defines its powers and jurisdiction; and if that law, by its true construction, confers upon the court the power it has in this instance exercised, then the judgment must be affirmed.

There is another point on which there is no difference of opinion in the Court. We all agree that by the act of July 2, 1836, it was the duty of the postmaster general to credit Stockton and Stokes with the amount awarded by the solicitor of the treasury; that no discretionary power in relation to the award, was given to the postmaster general; and that the duty enjoined upon him was merely ministerial.

[Kèndall v. The United States.]

These principles being agreed on, it follows, that this was a proper case for a mandamus; provided congress have conferred on the circuit court for the District of Columbia; the prerogative, jurisdiction and powers exercised by the court of king's bench, in England; for Stockton and Stokes are entitled to have the credit entered in the manner directed by the act of congress, and they have no other specific means provided by law, for compelling the performance of this duty. In such a case, the court of king's bench, in England, would undoubtedly issue the writ of mandamus to such an officer, commanding him to enter the credit. Have congress conferred similar jurisdiction and powers upon the circuit court for this district? This is the only question in the case. The majority of my brethren think that this jurisdiction and power has been conferred; and they have given their reasons for their opinion. I, with two of my brethren, think otherwise; and with the utmost respect for the opinion of the majority of this Court, I proceed to show the grounds on which I dissent from their judgment.

It has been decided in this Court, that the circuit courts of the United States, out of this district, have not the power to issue the writ of mandamus to an officer of the general government, commanding him to do a ministerial act. The question has been twice before the Supreme Court; and upon both occasions was fully argued and deliberately considered. The first case was that of M'Intyre v. Wood, 7 Cra. h; 504, decided in 1813. It was again brought up in 1821, in the case of M'Cluny v. Silliman, 6 Wheat. 598, when the former decision was re-examined and affirmed. And it is worthy of remark, that although the decision first mentioned was made twenty-five years ago, yet congress have not altered the law, or enlarged the jurisdiction of the circuit courts in this respect; thereby showing, that it has not been deemed advisable by the legislature, to confer upon them the jurisdiction over the officers of the general government, which is claimed by the circuit court for this district.

As no reason of policy or public convenience can be assigned for giving to the circuit court here a jurisdiction on this subject, which has been denied to the other circuit courts; those who maintain that it has been given ought to show us words which distinctly give it, or from which it can plainly be inferred. When congress intended to confer this jurisdiction on the Supreme Court, by the act of 1789, ch. 20, they used language which nobody could misunderstand. In that law they declared that the Supreme Court should have power

to issue "writs of mandamus, in cases warranted by the principles and usages of law to any courts appointed, or persons holding office, under the authority of the United States." Here are plain words. But no such words of grant are to be found in the act of February 27, 1801, which established the circuit court of the District of Columbia, and defined its powers and jurisdiction. Indeed, those who insist that the power is given, seem to have much difficulty in fixing upon the particular clauses of the law which confers it. Sometimes it is said to be derived from one section of the act; and then from another. At one time it is said to be found in the first section; at another in the third section, and then in the fifth section; and sometimes it is said to be equally discoverable in all of them. The power is certainly no where given in direct and positive terms: and the difficulty in pointing out the particular clause from which the power is plainly to be inferred, is strong proof that congress never intended to confer it. For if the legislature wished to vest this power in the circuit court for this district, while they denied it to the circuit courts sitting in the states, we can hardly believe that dark and ambiguous language would have been selected to convey their meaning; words would have been found in the law equally plain with those above quoted, which conferred the power on the Supreme Court.

But, let us examine the sections which are supposed to give this power to this circuit court.

1st. It is said to be given by the first section. This section declares, that the laws of Maryland, as they then existed, should be in force in that part of the district ceded by Maryland; and the laws of Virginia in that part of the district ceded by Virginia. By this section, the common law in civil and criminal cases, as it existed in Maryland at the date of this act of congress, (February 27, 1801,) became the law of the district on the Maryland side of the Potomac; and it is argued, that this circuit court being a court of general jurisdiction in cases at common law, and the highest court of original jurisdiction in the district, the right to issue the writ of mandamus is incident to its common law powers, as a part of the laws of Maryland; and distinguishes it in this respect from the circuit courts for the states.

The argument is founded in a mistake as to the nature and character of the writ of mandamus as known to the English law; and as

[Kendall v. The United States.]

used and practised in Maryland at the date of the act of congress in question.

The power to issue the writ of mandamus to an officer of the government, commanding him to do a ministerial act, does not, by the common law of England, or by the laws of Maryland, as they existed at the time of the cession, belong to any court whose jurisdiction was limited to a particular section of country, and was not coextensive with the sovereignty which established the court. It may, without doubt, be conferred on such courts by statute, as was done in Maryland, in 1806, after the cession of the district. But, by the principles of the common law and the laws of Maryland, as they existed at the time of the cession; no court had a right to issue the prerogative writ of mandamus, unless it was a court in which the judicial sovereignty was supposed to reside; and which exercised a general superintendence over the inferior tribunals and persons throughout the nation, or state.

In England this writ can be issued by the king's bench only. It cannot be issued by the court of common pleas, or any other court known to the English law, except the court of king's bench. And the peculiar character and constitution of that court, from which it derives this high power, are so well-known and familiar to every lawyer, that it is scarcely necessary to cite authorities on the subject. Its peculiar powers are clearly stated in 3 Black. Com. 42, in the following words: " The jurisdiction of this court is very high and transcendant. It keeps all inferior jurisdictions within the bounds of their authority, and may either remove their proceedings to be determined here, or prohibit their progress below. It superintends all civil corporations in the kingdom. It commands magistrates and others to do what their duty requires in every case, where there is no other specific remedy. It protects the liberty of the subject by speedy and summary interposition," &c. It is from this " high and transcendant" jurisdiction that the court of king's bench derives the power to issue the writ of mandamus, as appears from the same volume of Blackstone's Commentaries, p. 110. " The writ of mandamus," says the learned commentator, " is in general a command issuing in the king's name from the court of king's bench, and directed to any person, corporation or inferior court of judicature, within the king's dominions, requiring them to do some particular thing therein specified, which appertains to their office and duty, and which the court of king's bench has previously determined, or

at least supposes to be consonant to right and justice. It is a high prerogative writ of a most extensively remedial nature." And Mr. Justice Butler, in his introduction to the law relative to trials at nisi prius, also places the right to issue this writ upon the peculiar and high powers of the court of king's bench. In page 195, he says: "The writ of mandamus is a prerogative writ issuing out of the court of king's bench, (as that court has a general superintendency over all inferior jurisdictions and persons;) and is the proper remedy to enforce obedience to acts of parliament, and to the king's charter, and in such a case is demandable of right." Indeed, in all of the authorities it is uniformly called a "prerogative writ," in order to distinguish it from the ordinary process which belongs to courts of justice; and it was not originally considered as a judicial proceeding, but was exercised as a prerogative power. In the case of Audley v. Jay, Popham, 176, Doddridge, Justice, said: "This court hath power not only in judicial things, but also in some things which are extra-judicial. The maior and comminalty of Coventry displaced one of the aldermen and he was restored; and this thing is peculiar to this court, and is one of the flowers of it."

These peculiar powers were possessed by the court of king's bench; because, the king originally sat there in person, and aided in the administration of justice. According to the theory of the English constitution, the king is the fountain of justice, and where the laws did not afford a remedy and enable the individual to obtain his right, by the regular forms of judicial proceedings, the prerogative powers of the sovereign were brought in aid of the ordinary judicial powers of the court, and the mandamus was issued in his name to enforce the execution of the law. And although the king has long since ceased to sit there in person, yet the sovereign is still there in construction of law so far as to enable the court to exercise its prerogative powers in his name; and hence its powers to issue the writ of mandamus, the nature of which Justice Doddridge so forcibly describes, by calling it extra-judicial, and one of the flowers of the king's bench. It is, therefore, evident, that by the principles of the common law, this power would not be incident to any court which did not possess the general superintending power of the court of king's bench, in which the sovereignty might by construction of law be supposed to sit, and to exert there its prerogative powers in aid of the court, in order that a right might not be without a remedy.

The English common law was adopted in the colony of Maryland.

and the courts of the province formed on the same principles. The proprietary government established what was, called the provincial court; in which it appears that, in imitation of what had been done in England, the lord proprietary, in an early period of the colony, sat in person.\* This court possessed the same powers in the province that belonged to the court of king's bench in England. Its jurisdiction was co-extensive with the dominions of the lord proprietary; and it exercised a general superintendence over all inferior tribunals and persons in the province; and consequently possessed the exclusive power of issuing the writ of mandamus.

When the revolution of 1776 took place, the same system of jurisprudence was adopted; and the fifty-sixth article of the constitution of Maryland provided, " that three persons of integrity and sound judgment in the law, be appointed judges of the court now called the provincial court, and that the same court be hereafter called and known by the name of the general court." No further description of the jurisdiction and powers of the general court is given. It, therefore, in the new order of things, was clothed with the same powers and jurisdiction that had belonged to the provincial court before the revolution. In other words, the general court was, in the state of Maryland precisely what the court of king's bench was in England. Afterwards, and before the cession of the District of Columbia to the United States, county courts were established in Maryland corresponding in character with what are called circuit courts in most of the states. These courts possessed general jurisdiction, civil and criminal, in the respective counties, subject, however, to the superintending power of the general court; which exercised over them the same sort of jurisdiction which the court of king's bench exercises over inferior tribunals. This was the system of jurisprudence in Maryland, at the time when the act of congress adopted the laws of the state for the district; and the power which the Maryland courts then possessed, by virtue of those laws, in relation to the writ of mandamus, are set forth in the case of Runkle v. Winemiller, 4 Harris & M'Henry, 449. Chief Justice Chase, in delivering the opinion of the court in that case, after describing the character and principles of the writ of mandamus, says:—"The court

---

\* I derive my knowledge of the fact that the Lord Proprietary sat in person in the provincial court, from a manuscript work of much value, by J. V. L. M'Mahon, esquire; whose History of Maryland, from its first Colonization to the Revolution, is well known to the public.

of king's bench having a superintending power over inferior courts of jurisdiction, may, and of right ought to interfere to supply a remedy, when the ordinary forms of proceeding are inadequate to the attainment of justice in matters of public concern. 3 Bac. Abr. 529, 530. The position that this Court is invested with similar powers, is generally admitted, and the decisions have invariably conformed to it: from whence the inference is plainly deducible, that this court may, and of right ought for the sake of justice, to interpose in a summary way to supply a remedy, where, for the want of a specific one, there would otherwise be a failure of justice." This case was decided in 1799, in the general court; and it shows, most evidently, that the power of issuing the writ of mandamus, was confined to that court, and was derived from its king's bench powers of superintending inferior courts and jurisdictions in the execution of the law; and that this power was not possessed by any other court known to the laws of Maryland. And so well and clearly was this understood to be the law of the state, that when the general court was afterwards abolished by an alteration in the constitution, and county courts established as the highest courts of original jurisdiction, no one supposed that the prerogative powers of the general court were incidental to their general jurisdiction over cases at common law; and a statute was passed in 1806, to confer this jurisdiction upon them. This act declares, "that the county courts shall have, use, and exercise, in their respective counties, all and singular the powers, authorities, and jurisdictions which the general court, at the time of the abolition thereof, might or could have exercised in cases of writs of mandamus." The adoption of the laws of Maryland, therefore, does not give to the circuit court for the District of Columbia, the power to issue the writ of mandamus, as an incident to its general jurisdiction over cases at common law. It has none of what Blackstone calls the "high and transcendent" jurisdiction of the court of king's bench in England, and of the general court in Maryland. It is not superior to all the other courts of the United States of original jurisdiction throughout the Union; it is not authorized to superintend them, and "keep them within the bounds of their authority;" it does not "superintend all civil incorporations" established by the United States; nor "command magistrates," and other officers of the United States in every quarter of the country, "to do what their duty requires in every case where there is no other specific remedy." Its jurisdiction is confined to the narrow limits of the district; and the

[Kendall v. The United States.]

jurisdiction which it derives from the adoption of the laws of Maryland, must be measured by that of the county courts of the state, which the court for this district in every respect resembles. These courts had no power to issue the writ of mandamus at the time when the laws of Maryland were adopted by congress; and when the county courts afterwards became, by the abolition of the general court, the highest courts of original jurisdiction, still, by the laws of that state, they could not issue this writ, until the power to do so was conferred on them by statute. As this act of assembly passed five years after congress assumed jurisdiction over the district, it forms no part of the laws adopted by the act of congress. I cannot, therefore, see any ground whatever for deriving the authority to issue this writ of mandamus from the first section of the act of congress, adopting the laws of Maryland as they then existed.

2. But it is insisted, that if the power to issue the writs of mandamus is not incidentally granted to this circuit court by the first section of the act of February 27th, 1831, which adopts the laws of Maryland; yet it is directly and positively given by the fifth section, which declares that the court shall have cognizance of "all cases in law and equity." It is said that a case proper for a mandamus is a case at law; and that the words abovementioned, therefore, authorize the circuit court to take cognizance of it.

The cases of Wood v. M'Intire, and M'Cluny v. Silliman, hereinbefore mentioned, appear to me to be decisive against this proposition. These cases decided that the circuit courts out of this district, have not the power now in question. It is true, that the eleventh section of the act of 1789, ch. 20, which prescribes the jurisdiction of the circuit courts out of this district, does not use the very same words that are used in the fifth section of the act now under consideration. The eleventh section of the act of 1789, declares that the circuit courts shall have cognizance of "all suits of a civil nature at common law, or in equity," &c. But these words, "all suits of a civil nature at common law," mean the same thing as the words "all cases at law," which are used in the act of February 27th, 1801; and Mr. Justice Story, in his Commentaries on the Constitution, Abr. 608, 609, in commenting on the meaning of the words, "cases at law and equity," as used in the constitution, says:—"A case, then, in the sense of this clause of the constitution, arises where some subject touching the constitution, laws, or treaties of the United States, is submitted to the courts by a party who asserts his rights in the

form prescribed by law. In other words, a case, is a suit in law or equity, instituted according to the regular course of judicial proceedings; and when it involves any question arising under the constitution, laws, or treaties of the United States, it is within the judicial power confided to the Union." Now, if a case at law means the same thing as a suit at law, and the latter words do not give jurisdiction to the circuit courts out of this district to issue the writ of mandamus to an officer of the general government, how can words, which are admitted to mean the same thing, give the power to the circuit court within this district? How can the cognizance of "cases at law," in the act of congress before us, be construed to confer this jurisdiction; when it has been settled by two decisions of this Court, that words of the same meaning do not give it to the other circuit courts? We cannot give this construction to the act of February 27th, 1801, without giving a judgment inconsistent with the decisions of this Court in the two cases abovementioned; and I cannot agree either to overrule these cases, or to give a judgment inconsistent with them.

But it is argued that if the 1st section of the act of congress does not give the circuit court this jurisdiction, and if the 5th section does not give it, yet it may be derived from these two sections taken together. The argument, I understand, is this: The general court of Maryland possessed the power to issue the writ of mandamus in a case of this description; and inasmuch as that court possessed this power, the cases which authorized the parties to demand it, were "cases at law," by the laws of that state; and consequently, the jurisdiction is conferred on the circuit court in similar cases, by the adoption of the laws of Maryland in the first section, and the words in the fifth, which give the circuit court cognizance of "cases at law."

The fallacy of this argument consists in assuming that the general court of Maryland had jurisdiction to issue the writ of mandamus, because it was "a case at law" whenever the party took the proper steps to show himself entitled to it. The reverse of this proposition is the true one. A "case at law," as I have already shown, means the same thing as a "suit;" and the general court had authority to issue the writ of mandamus, not because the proceeding was a case or suit at law, but because no case or suit at law would afford a remedy to the party. This is the basis upon which rests the power of the court of king's bench in England, and upon which rested the power of the general court in Maryland before that court was abolished.

These courts, by virtue of their prerogative powers, interposed "to supply a remedy in a summary way," where no suit or action known to the law would afford one to the party for the wrong he had sustained. It is not a suit in form or substance, and never has been so considered in England or in Maryland. For if it had been considered in Maryland as a suit at law, Chief Justice Chase, in the case of Runkel v. Winemiller, hereinbefore referred to, would hardly have put his decision on the prerogative powers of the general court in the manner hereinbefore stated. Since the statute of the 9th of Anne, authorizing pleadings in proceedings by mandamus, it has been held that such a proceeding is in the nature of an action; and that a writ of error will lie upon the judgment of the court awarding a peremptory mandamus. But it never has been said in any book of authority, that this prerogative process is "an action, or "a suit," or "a case" at law; and never suggested, that any court not clothed with the prerogative powers of the king's bench, could issue the process, according to the principles of the common law, unless the power to do so had been conferred by statute.

4. But it is said that if the jurisdiction exercised in this case by the circuit court for the District of Columbia, cannot be maintained upon any of the grounds hereinbefore examined, it may yet be supported on the 3d section of the act of February 27, 1801. This section, among other things, provides that this circuit "court and the judges thereof shall have all the powers by law vested in the circuit courts, and the judges of the circuit courts of the United States." And it is insisted that as the act of February 13, 1801, was at that time in force, the powers of this circuit court are to be measured by that act, although it has since been repealed; that the circuit courts established by the act of February 13th, 1801, did possess the power in question, and consequently that the circuit court for this district now possesses it, and may lawfully exercise it.

There are two answers to this argument, either of which are, in my judgment, sufficient.

In the first place, there are no words in the act of February 27, 1801, which refer particularly to the powers given to the circuit courts by the act of February 13, 1801, as the rule by which the powers of the circuit court for this district are to be measured. The obvious meaning of the words above quoted is, that the powers of this circuit court shall be regulated by the existing powers of the circuit courts as generally established, so that the powers of this circuit

court would be enlarged or diminished, from time to time, as con-
gress might enlarge or diminish the powers of the circuit courts in
its general system.    And when the law of February 13, 1801, was
afterwards repealed, and the act of 1789 re-enacted, the powers of
this circuit court were regulated by the powers conferred on the cir-
cuit courts by the last mentioned law.   It was the intention of con-
gress to establish uniformity in this respect; and they have used lan-
guage which, in my opinion, makes that intention evident.   The cir-
cuit court for this district cannot, therefore, refer for its "powers" to
the act of February 13, 1801, since that act has been repealed.

   In the second place, if the powers of the circuit court for the Dis-
trict of Columbia are still to be regulated by the law which was re-
pealed as long ago as 1802; yet it will make no difference in the re-
sult of the argument.   Much has been said about the meaning of the
words "powers" and "cognizance" as used in these acts of congress.
These words are no doubt generally used in reference to courts of
justice, as meaning the same thing; and I have frequently so used
them in expressing my opinion in this case.   But it is manifest that
they are not so used in the acts of congress establishing the judicial
system of the United States; and that the word powers is employed
to denote the process, the means, the modes of proceeding, which the
courts are authorized to use in exercising their jurisdiction in the
cases specially enumerated in the law as committed to their "cogni-
zance."   Thus in the act of 1789, ch. 20, the 11th section specifical-
ly enumerates the cases, or subject matter of which the circuit courts
shall have "cognizance;" and subsequent sections under the name of
"powers" describe the process, the means which the courts may em-
ploy in exercising their jurisdiction in the cases specified.   For ex-
ample, section 14 gives them the "power" to issue the writs " neces-
sary for the exercise of their respective jurisdictions;" and names
particularly some of the writs which they shall have the "power" to
issue; section 15, gives them the "power" to compel parties to pro-
duce their books, &c..; section 17, gives them the "power" to grant
new trials, to administer oaths, to punish contempts, and to establish
rules of court.   The same distinction between "powers" and juris-
diction or "cognizance" is preserved in the act of February 13,
1801.   The 10th section of this act gives the circuit courts thereby
established, all the "powers" before vested in the circuit courts of
the United States, unless where otherwise provided by that law ; and
the next following section, (the 11th) enumerates specifically the

[Kendall v. The United States.]

cases or controversies of which they shall have "cognizance." And so also in the act of February 27, 1801, establishing the circuit court for this district, the same distinction is continued; and the 3d section (the one now under consideration) gives the court "all the powers by law vested in the circuit courts;" while the 5th section enumerates particularly the matters and controversies of which it shall have "cognizance;" that is to say, over which it shall exercise jurisdiction, by the means and the "powers" given to it for that purpose, by this same act of congress.   With these several laws before us, in each of which the same terms have evidently been always used in the same sense, it appears to me impossible to doubt the meaning which congress intended to affix to them.   If they had used the word "powers" and the word "cognizance," as meaning the same thing; would they, in the 10th section of the act of February 13, 1801, have given jurisdiction in general terms under the name of "powers" to the courts thereby established; and then have immediately followed it up with a specification of the cases of which it should take "cognizance:" and if such an unusual mode of legislation had been adopted in this law from inadvertence or mistake, would it have been adhered to and repeated in the act of February 27, 1801?   It is hardly respectful to the legislative body, for this Court to say so.   It is clear that the word "powers" must have been constantly used in these laws in the sense I have already stated; and if the 3d section of the last mentioned act is to be construed as referring particularly to the act of February 13, 1801, it will not affect the present controversy.   For we find the "powers" of those circuit courts given by the 10th section; and they are there given by referring as generally to the "powers" conferred on the circuit courts by preceding laws; so that after all we are still carried back to the act of 1789, in order to learn the powers of the circuit courts established by the act of February 13, 1801; and consequently we are also to learn from that law, the "powers" of the circuit court for this district.   And upon turning to the act of 1789, we find there the power given to the Supreme Court to issue the writ of mandamus "to persons holding office under the authority of the United States;" but we find no such power given to the circuit courts.   On the contrary, it has been decided as hereinbefore stated, that under the act of 1789, they are not authorized to issue the process in question.   The 3d section of the act of February 27, 1801, will not, therefore, sustain the jurisdiction exercised in this case by the circuit court.

But the principal effort on the part of the relators, in this branch of the argument, is to give to this third section such a construction as will confer on this circuit court a jurisdiction coextensive with that given to the circuit courts, by the eleventh section of the act of February 13, 1801. In other words, they propose to expound the act of February 27th, as if this section of the act of February 13th was inserted in it. The eleventh section of the act referred to, enumerates and specifies particularly the cases of which the circuit courts thereby established had " cognizance;" and the relators insist that jurisdiction in all the cases mentioned in that section, is also conferred on the circuit court for this district, by reason of the provision in the third section of the act of February 27th, above mentioned. And they contend that the aforesaid eleventh section gave to the circuit courts established by that law, jurisdiction to issue the writ in question; and that the circuit court for this district, therefore, possesses the same jurisdiction, even although it is not given by the fifth section of the act establishing it. The object of this argument is to extend the jurisdiction of this circuit court beyond the limits marked out for it by the fifth section of the act which created it; provided the eleventh section of the act of February 13th shall be construed to have given a broader jurisdiction.

Now, it appears to me that, when we find the eleventh section of the act of February 13th enumerating and specifying the cases of which the circuit courts out of this district should have " cognizance;" and the fifth section of the act of February 27th, enumerating and specifying the cases of which the circuit court within this district should have " cognizance;" if there is found to be any substantial difference in the jurisdictions thus specified and defined in these two laws; the just and natural inference is, that the legislature intended that the jurisdiction of the courts should be different; and that they did not intend to give to the circuit court for this district the same jurisdiction that had been given to the others. This would be the legitimate inference in comparing any laws establishing different courts; and the conclusion is irresistible in this case, where the two laws were passed within a few days of each other, and both must have been before the legislature at the same time. It would be contrary to the soundest rules for the construction of statutes, in such a case, to enlarge the jurisdiction of this circuit court beyond the limits of the fifth section, by resorting to such general words as those contained in the third; and to words, too, which much more

appropriately apply to its process, to its modes of proceeding, and to other " powers" of the court; and, which certainly have no necessary connection with the cases of which the court is authorized to take " cognizance."

I do not, however, mean to say, that the eleventh section of the act of February 13th, conferred on the circuit courts which it established, the power to issue the writ of mandamus, in a case like the present one. I think it did not; and that a careful analysis of its provisions would show that it did not: especially when taken in connection with the provisions of the act of 1789, which had expressly conferred that power on the Supreme Court. But it is unnecessary to pursue the argument on this point, because no just rule of construction can authorize us to engraft the provisions of this section upon the act of February 27th, so as to give to the circuit court for the District of Columbia a wider jurisdiction than that contemplated by the fifth section of the last mentioned act.

Upon a view of the whole case, therefore, I cannot find the power which the circuit court has exercised either in the first section, or the third section, or the fifth section; and it is difficult to believe that congress meant to have given this high prerogative power in so many places, and yet, in every one of them, have left it, at best, so ambiguous and doubtful. And if we now sanction its exercise, we shall give to the court, by remote inferences and implications, a delicate and important power which I feel persuaded congress never intended to entrust to its hands.

Nor do I see any reason of policy that should induce this Court to infer such an intention on the part of the legislature, where the words of the law evidently do not require it. It must be admitted that congress have denied this power to the circuit courts out of this district. Why should it be denied to them, and yet be entrusted to the court within this district? There are officers of the general government in all of the states, who are required by the laws of the United States to do acts which are merely ministerial, and in which the private rights of individuals are concerned. There are collectors and other officers of the revenue, who are required to do certain ministerial acts, in giving clearances to vessels, or in admitting them to entry or to registry. There are also registers and receivers of the land offices, who are, in like manner, required by law to do mere ministerial acts, in which the private rights of individuals are involved. Is there any reason of policy that should

lead us to suppose that congress would deny the writ of mandamus to those who have such rights in the states, and give it to those who have rights in this district? There would be no equal justice in such legislation; and no good reason of policy or convenience can be assigned for such a distinction.

The case of the Columbian Insurance Company v. Wheelwright, 7 Wheat. 534, has been relied on as sanctioning the exercise of the jurisdiction in question; and it is said, that this Court, in determining that a writ of error would lie from the decision of the circuit court of this district, awarding a peremptory mandamus, have impliedly decided that the circuit court had jurisdiction to issue the process. I confess I cannot see the force of this argument. The 8th section of the act of February 27, 1801, provides, " that any final judgment, order, or decree, in said circuit court, wherein the matter in dispute, exclusive of costs, shall exceed the value of one hundred dollars, may be re-examined, and reversed or affirmed, in the Supreme Court of the United States, by writ of error or appeal, which shall be prosecuted in the same manner, under the same regulations, and the same proceedings shall be had therein as is or shall be provided in the case of writs of error, or judgments, or appeals, upon orders or decrees rendered in the circuit court of the United States." Now the order for a peremptory mandamus in the case cited, as well as in the one now before the Court, was certainly " a final judgment" of the circuit court. It decided that they had jurisdiction to issue the mandamus, and that the case before them was a proper one for the exercise of this jurisdiction. Being the " final judgment" of the circuit court, it was liable to be re-examined in this Court by writ of error; and to be reversed, if upon such re-examination, it was found that the circuit court had committed an error; either in assuming a jurisdiction which did not belong to it, or by mistaking the rights of the parties, if it had jurisdiction to issue the mandamus. In the case of Custis v. The Georgetown and Alexandria Turnpike Company, 6 Cranch, 233, the Supreme Court sustained the writ of error, and reversed the judgment of the circuit court of this district, quashing an inquisition returned to the clerk; and this was done upon the ground that the circuit court had exercised a jurisdiction which did not belong to it. There are a multitude of cases where this Court have entertained a writ of error for the purpose of reversing the judgment of the court below, upon the ground that the circuit court had not jurisdiction of the case, for the

[Kendall v. The United States.]

want of the proper averments in relation to the citizenship of the parties.

It is certainly error in a circuit court to assume a jurisdiction which has not been conferred on it by law. And it would seem to be a strange limitation on the appellate powers of this Court, if it were restrained from correcting the judgment of a circuit court when it committed this error. If such were the case, then an error committed by a circuit court in relation to the legal rights of the parties before it, could not be examined into and corrected in this Court; if it happened to be associated with the additional error of having assumed a jurisdiction which the law had not given. Such, I think, cannot be the legitimate construction of the section above quoted. And if the circuit court mistakes its jurisdiction, either in respect to the persons, or the subject matter, or the process, or the mode of proceeding; the mistake may be corrected here by a writ of error from its final judgment, or by appeal in cases of equity or admiralty jurisdiction. And whether the final judgment is pronounced in a summary or other proceeding, if it be in a case in which the circuit court had not jurisdiction, its judgment may be re-examined here, and the error corrected by this Court. The decision of this Court, therefore, in the case of The Columbian Insurance Company v. Wheelwright, that a writ of error would lie from the judgment of the circuit court of the District of Columbia, awarding a peremptory mandamus, is by no means a decision that the court below had jurisdiction to issue it.

In fine, every view which I have been able to take of this subject, leads me to conclude that the circuit court had not the power to issue a writ of mandamus in the case before us. And, although I am ready to acknowledge the respect and confidence which is justly due to the decision of the majority of this Court; and am fully sensible of the learning and force with which their judgment is sustained by the learned judge who delivered the opinion of the Court, I must yet, for the reasons above stated, dissent from it. I think that the circuit court had not, by law, the right to issue this mandamus; and that the judgment they have given ought to be reversed.

Mr. Justice BARBOUR:

In this case, I have no doubt but that congress have the constitutional power to give to the federal judiciary, including the circuit court of this district, authority to issue the writ of mandamus to the

postmaster general, to compel him to perform any ministerial duty devolved on him by law.

I have no doubt, that the act which in this case was required to be done by the postmaster general, is such an one as might properly be enforced by the writ of mandamus; if the circuit court of this district had authority by law to issue it.

But the question is, whether that court is invested with this authority by law? I am of opinion that it is not; and I will state the reasons which have brought me to that conclusion.

It was decided by this Court, in the case of M'Intire v. Wood, 7 Cranch, 504, upon a certificate of division from the circuit court of Ohio; that that court did not possess the power to issue a writ of mandamus to the register of a land office, commanding him to issue a final certificate of purchase to the plaintiff, for certain lands in the state of Ohio.

The principle of this case was approved, and the same point affirmed, in the case of M'Cluny v. Silliman, 6 Wheat. 598.

In the views, then, which I am about to present, I shall set out with the adjudged and admitted proposition, that no other circuit courts of the United States have power to issue the writ of mandamus. And then the whole question is resolved into the single inquiry, whether the circuit court of this district has power to do that which all admit the other circuit courts of the United States have not the power to do? It has been earnestly maintained at the bar, that it has; because, it is said, that it has by law a larger scope of jurisdiction.

To bring this proposition to the test of a close scrutiny, let us compare the precise terms in which the jurisdiction of the circuit courts of the United States is granted by the judiciary act of 1789, with those which are used in the grant of jurisdiction to the circuit court of this district, by the act of the 27th February, 1801.

The eleventh section of the judiciary act of 1789, so far as it respects this question, is in these words: "That the circuit courts shall have original cognizance, concurrent with the courts of the several states, of all suits of a civil nature, at common law or in equity, where the matter in dispute exceeds five hundred dollars; and the United States are plaintiffs or petitioners, or an alien is a party, or the suit is between a citizen of the state where the suit is brought, and a citizen of another state."

The fifth section of the act of the 27th February, 1801, giving

jurisdiction to the circuit court of this district, so far as respects this question, is in these words: "That said court shall have cognizance of all cases in law and equity, between parties, both or either of which shall be resident, or shall be found within the said district; and also of all actions or suits of a civil nature, at common law or in equity, in which the United States shall be plaintiffs or complainants."

Having placed these two sections in juxtaposition, for the purpose of comparing them together, I will now proceed to examine the particulars, in which it has been attempted to be maintained, that the grant of jurisdiction to the circuit court of this district, is more extensive than that to the other circuit courts of the United States, so as to enable it to reach this case, which it is admitted the others cannot do.

In the first place, we have been told, that in the grant of jurisdiction to the other circuit courts, by the eleventh section of the judiciary act of 1789, the words "concurrent with the courts of the several states," are found; which words are not contained in the fifth section of the act of the 27th February, 1801, giving jurisdiction to the circuit court of this district. It is argued, that these words are restrictive in their operation, and limit the jurisdiction of those courts to those cases only, of which the state courts could take cognizance, at the time the judiciary act of 1789 was passed. That as the ordinary jurisdiction of the state courts did not then extend to cases arising under the constitution and laws of the United States, therefore the jurisdiction of the circuit courts, given by the eleventh section of that act, did not extend to those cases, because it was declared to be concurrent, and consequently only coextensive.

This position is, in my estimation, wholly indefensible. I think it a proposition capable of the clearest proof, that the insertion of the words "concurrent with the courts of the several states," was not intended to produce, and does not produce, any limitation or restriction whatsoever, upon the jurisdiction of the circuit courts of the United States.

No such consequence could follow; for this obvious reason, that the state courts could themselves rightfully take cognizance of any question whatever which arose in a case before them, whether growing out of the constitution, laws, and treaties of the United States; or, as is said in the eighty-second number of the Federalist, arising under the laws of Japan. The principle is, as laid down in the num-

ber of the Federalist, just referred to—"That the judiciary power of every government looks beyond its own local or municipal laws, and in civil cases lays hold of all subjects of litigation, between parties within its jurisdiction, though the causes of dispute are relative to the laws of the most distant part of the globe." In conformity with this principle, it is said by this Court, 1 Wheaton, 340, speaking of the state courts: "From the very nature of their judicial duties, they would be called upon to pronounce the law applicable to the case in judgment. They were not to decide merely according to the laws or constitution of the state, but according to the constitution, laws, and treaties of the United States, the supreme law of the land." And in the same case, after putting cases illustrative of the proposition, and a course of reasoning upon them, they conclude by saying, "it must therefore be conceded, that the constitution not only contemplated, but meant to provide for cases within the scope of the judicial power of the United States, which might yet depend before state tribunals. It was foreseen that in the exercise of their ordinary jurisdiction, state courts would incidentally take cognizance of cases arising under the constitution, the laws, and treaties of the United States."

From these quotations, it is apparent, that no restriction can have been imposed upon the jurisdiction of the circuit courts of the United States by words which make it concurrent with that of the courts of the states; when it is admitted, that there is no question which can arise before them, in a civil case, which they are not competent and indeed bound to decide, according to the laws applicable to the question; whether they be the constitution, laws and treaties of the United States, the laws of Japan, or any other foreign country on the face of the earth.

The same number of the Federalist already referred to, furnishes the obvious reason why these words were inserted. It is there said, that amongst other questions which had arisen in relation to the constitution, one was whether the jurisdiction of the federal courts was to be exclusive, or whether the state courts would possess a concurrent jurisdiction? The author reasons upon the subject; quotes the terms in which the judicial power of the United States is vested by the constitution; states that these terms might be construed as importing one or the other of two different significations; and then concludes thus: "The first excludes, the last admits, the concurrent jurisdiction of the state tribunals, and as the first would

amount to an anenation of state power, by implication, the last appears to me the most defensible construction." The reason, then, why these words were inserted in the eleventh section of the judiciary act, was to remove the doubt here expressed, to obviate all difficulty upon the question whether the grant of judicial power to the federal courts, without saying more, might not possibly be construed to exclude the jurisdiction of the state courts. Its sole object was, as is sometimes said in the law books, to exclude a conclusion.

Congress cannot, indeed, confer jurisdiction upon any courts but such as exist under the constitution and laws of the United States, as is said in Houston v. Moore, 5 Wheat. 27; although it is said in the same case, the state courts may exercise jurisdiction on cases authorized by the laws of the state, and not prohibited by the exclusive jurisdiction of the federal courts. This, however, is not because they have had, or can have any portion of the judicial power of the United States, as such, imparted to them; but because, by reason of their original, rightful judicial power, as state courts, they are competent to decide all questions growing out of all laws which arise before them: and accordingly, the framers of the judiciary act, proceeding on the idea that questions arising under the constitution, laws and treaties of the United States, might and would be presented and decided in the state courts, inserted the 25th section; by which those cases, under certain circumstances, might be brought by writ of error, or appeal to this Court.

The difference in the phraseology of the two sections has been adverted to. It has been said that the words in the 11th section of the judiciary act of 1789, are all suits of a civil nature, at common law, or in equity; and those in the 5th section of the act of 1801, giving jurisdiction to the circuit court of this district, are " all uses in law and equity." Now, it is impossible to maintain that there is any difference in legal effect between these two modes of expression. What is a case in law or equity? I give the answer in the language of the late Chief Justice of this Court: " To come within this description, a question must assume a legal form, for forensic litigation, and judicial decision." And what is a suit? I give the answer also in the language of the late Chief Justice, who, in 2d Peters, 464, says, in delivering the opinion of the Court, " if a right is litigated between parties in a court of justice, the proceeding by which the decision of the court is sought, is a suit." It is then unquestionably true, that the court which has jurisdiction over all

suits in law and equity, has as much judicial power by those terms, as a court has by the terms, all cases in law and equity. The only difference between the two sections under consideration, in relation to the question before us, consists in the two limitations contained in the 11th section of the judiciary act; the one as to the character of the parties, the other as to the value of the matter in dispute.

When, therefore, we suppose a case in which the plaintiff and defendant are citizens of different states, (the one being a citizen of the state where the suit is brought,) and in which the value of the matter in dispute is five hundred dollars; with these parties, and a subject matter of this value, all the circuit courts of the United States can take cognizance of it; whether it shall have arisen under the constitution, laws or treaties of the United States, the laws of a state, or of any foreign country, having application to the case. Whenever, therefore, it is said that those courts cannot take cognizance of cases in law and equity arising under the constitution, laws or treaties of the United States, it is only meant to say that they cannot do it on account of the character of the questions to be decided, unless the parties and the value of the subject matter come within the description of the 11th section; but when they do, there cannot be a possible doubt. And this will explain the case of a patentee of an invention, referred to in the argument; to whom a right to institute a suit in the circuit courts, has been given by special legislation. The only effect of that is, that such a patentee can sue in the circuit courts, on account of the character of the case, without regard to the character of the party, as to citizenship, or the value of the matter in dispute; whereas, without such special legislation, he could have sued in the circuit courts, if his character as a party, and the value of the matter in dispute, had brought his case within the description of the 11th section of the judiciary act. In the case of M'Cluny v. Silliman, however, this difficulty did not exist; for it is distinctly stated in that case, page 601, that the parties to that controversy were competent to sue under the 11th section, being citizens of different states; and yet this Court refers to and adopts the response which they had given to the question stated in M'Intire v. Wood; which answer was in these words: "that the circuit court did not possess the power to issue the mandamus moved for."

It has been attempted to be maintained in the argument, that the circuit court of this district has a more extensive jurisdiction than

the other circuit courts of the United States, by the following course of reasoning: We have been referred to the third section of the act of the 27th of February, 1801, establishing the circuit court of this district, which section is in these words:—"The said court, and the judges thereof, shall have all the powers by law vested in the circuit courts, and the judges of the circuit courts of the United States." It is then assumed in the argument, that the powers of the court, and its jurisdiction, are the same thing; it is also assumed, that the third section has reference not to the powers of the circuit courts of the United States, and their judges, as they shall be from time to time modified by legislation, but to those which were established by the act of the 13th February, 1801, entitled "an act to provide for the more convenient organization of the courts of the United States;" which, though since repealed, was passed fourteen days before the act establishing the circuit court of this district, and was in force at the date of the passage of this latter act.

We are then referred to the eleventh section of the act of the 13th of February, 1801, by which jurisdiction is given to the circuit courts thereby established, over "all cases in law or equity, arising under the constitution and laws of the United States, and treaties made, or which shall be made under their authority."

Even conceding, for the present, all these assumptions in favour of the argument, it wholly fails to sustain the position contended for. To prove this, I need only refer to my previous reasoning in this case; by which I have shown, that under the eleventh section of the judiciary act of 1789, the circuit courts had as ample jurisdiction in all cases arising under the constitution, laws and treaties of the United States, as is given them by the section now under consideration; subject only to the two limitations as to parties, and value of the matter in dispute. So that beyond all question, the only difference is, that by the section now under consideration, the circuit courts could take cognizance on account of the character of the case, no matter who were the parties, or what the value in dispute; whereas, by the eleventh section of the judiciary act, they could take cognizance of the same questions, provided the parties were, for example, citizens of different states, and the matter in dispute was of the value of five hundred dollars. And yet, as I have already stated, in M'Cluny v. Silliman, in which the parties corresponded to the requirements of the law, and there was no question raised as to the value of the matter in dispute, this Court reaffirmed the proposition,

[Kendall v. The United States.]

that the circuit courts of the United States did not possess the power to issue the writ of mandamus. But let us briefly examine one of the assumptions which I have, argumenti gratia, conceded, for the purpose of giving the fullest force to the argument founded on it; I mean that which takes for granted, that the powers and the jurisdiction of the court are the same thing. I say nothing of the other assumption, simply because it is wholly immaterial to the view which I take. Are the powers and jurisdiction of the court equivalent? Whatever may be the meaning of these terms in the abstract, they are clearly used as of essentially different import in the acts of congress; and this difference will, in my opinion, go far to show the error in the conclusions drawn from the assumption, that they are of equivalent import. There are several reasons which conclusively prove that they were used in different senses by congress. In the first place, as well in the act of 1789, establishing the circuit courts of the United States, and the act of the 13th February, 1801, reorganizing them, as in the act of the 27th February, 1801, establishing the circuit court of this district; the jurisdiction of the court is defined in one section, and its powers are declared in another. Now, it is an obvious remark, that if powers and jurisdiction were considered as equivalent, here was mere useless tautology. For, upon this hypothesis, the grant of powers carried with it jurisdiction; and, e converso, the grant of jurisdiction carried with it powers.

In the next place, we not only find that in some sections the term cognizance, or jurisdiction, (which are synonymous,) is used, whilst in others, the term power is made use of; but in the very same section, that is, the thirteenth, in relation to the Supreme Court, both terms are used thus:—"The Supreme Court shall have exclusive jurisdiction of all controversies of a civil nature, where a state is a party, except," &c.; and in the same section, "and shall have power to issue writs of prohibition to the district courts." &c.

Again: The act of 1789, after defining the jurisdiction of the different courts in different sections, viz., that of the district courts in the ninth, that of the circuit court in the eleventh, and that of the Supreme Court in the thirteenth, together with the power to issue writs of prohibition and mandamus; proceeds in subsequent sections to give certain powers to all the courts of the United States. Thus, in the fourteenth, to issue writs of scire facias, habeas corpus, &c.; in the fifteenth, to require the production of books and writings; in the 17th, to grant new trials, to administer oaths, punish contempts,

&c.   It is thus apparent, that congress used the terms jurisdiction, and powers, as being of different import.   The sections giving jurisdiction, describe the subject matter, and the parties of which the courts may take cognizance; the sections giving powers, import authority to issue certain writs, and do certain acts incidentally becoming necessary in, and being auxiliary to, the exercise of their jurisdiction.   In regard to all the powers in the fifteenth and seventeenth sections, this is apparent beyond all doubt, as every power given in both those sections, necessarily presupposes that it is to be exercised in a suit actually before them, except the last in the seventeenth section, and that is clearly an incidental one, it being a power "to make and establish all necessary rules for the orderly conducting business in the said courts," &c.   And this brings me directly to the fourteenth section, under which it was contended, in the case of M'Cluny v. Silliman, that the circuit courts could issue writs of mandamus. That section is in these words:—"That all the beforementioned courts of the United States, shall have power to issue writs of scire facias, habeas corpus, and all other writs not specially provided for by statute, which may be necessary for the exercise of their respective jurisdictions, and agreeable to the principles and usages of law." As the writ of mandamus is not specially provided for by law, except in the case of the Supreme Court; it is obvious, that to enable any circuit court to issue it, it must be shown to be necessary to the exercise of its jurisdiction.   It is argued here, as it was in the case of M'Cluny v. Silliman, that a mandamus is proper, where there is no other specific legal remedy; and that therefore, in such a case, it is necessary to the exercise of the jurisdiction of the court, and so within the words of the statute.   But what was the answer of the Court in that case?   Amongst other things, they said:—" It cannot be denied, that the exercise of this power is necessary to the exercise of jurisdiction in the court below.   But why is it necessary? Not because that court possesses jurisdiction, but because it does not possess it."   Again they said:—"The fourteenth section of the act under consideration, could only have been intended to vest the power now contended for, in cases where the jurisdiction already exists; and not where it is to be courted, or acquired by means of the writ proposed to be sued out.   Such was the case brought up from Louisiana, in which the judge refused to proceed to judgment, by which act the plaintiff must have lost his remedy below, and this Court have been deprived of its appellate control over the question

of right." As this answer was considered conclusive in the case referred to, it would be sufficient for me to stop here, with giving the same answer. But let us pursue the subject a little further. The proposition which I maintain is, that this section did not contemplate any original writ, but only those which are incidental and auxiliary. That it did not contemplate any writ as original process, is apparent from this consideration; that by an act passed at the same session, and within five days thereafter, entitled an act to regulate processes in the courts of the United States, the forms of writs and executions, except their style and modes of process then used in the supreme courts of the states, were adopted.

But it seems to me, that there is an argument to be derived from the nature and character of the writ of mandamus, and the legislation of congress in relation to it, which is, of itself, decisive against the power of the circuit court to issue it. It is declared by all the English authorities, from which in general our legal principles are drawn, to be a high prerogative writ. Accordingly, it issues in England only from the king's bench, in which the king did formerly actually sit in person; and in which, in contemplation of law, by his judges, he is still supposed to sit. It never issues, but to command the performance of some public duty. Upon this principle, 5 Barn. & Ald. 899, the court of king's bench refused a mandamus to a private trading corporation, to permit a transfer of stock to be made in their books; declaring that it was confined to cases of a public nature, and that although the company was incorporated by a royal charter, it was a mere private partnership. Upon the same principle, I believe that it may be affirmed, without exception, unless where a statutory provision has been made, that in every state of the Union, where the common law prevails, this writ issues only from the court possessing the highest original common law jurisdiction. The congress of the United States adopted the same principle, and by the thirteenth section of the judiciary act of 1789, gave to the Supreme Court of the United States, power in express terms, to issue writs of mandamus, " in cases warranted by the principles and usages of law, to any courts appointed, or persons holding office under the authority of the United States," thus covering the whole ground of this high prerogative writ. If then, there ever were a case in which the maxim that expressio unius, est exclusio alterius, applied, this seems to me to be emphatically that case. It is of the nature of the writ, to be issued by the highest court of the government; the Su-

preme Court is the highest; and accordingly, to that Court, the power to issue it is given. It is given in express words to that Court, and is not given in terms to any other court. It is given to that Court in express terms, in the thirteenth section; and although not given in terms in the fourteenth section, immediately following, the power to issue it is attempted to be derived, by implication, from that section. And last, but not least, where it is given, it is subject to no limitation, but that it is to issue " in cases warranted by the principles and usages of law," and may be issued to any courts appointed by, or persons holding office under the authority of the United States:" Whereas, in the fourteenth section, all the courts of the United States are empowered to issue certain writs, naming them, and then others, not naming them; and not mentioning the writ of mandamus, which may be necessary for the exercise of their respective jurisdictions. Nor is the force of this argument at all weakened by the circumstance that this Court, in the case of Marbury v. Madison, 1 Cranch, 137, declared that part of the judiciary act, which empowered the Supreme Court to issue the writ of mandamus to be unconstitutional, so far as it operated as an act of original jurisdiction. Because this case was decided nearly fourteen years after the law was passed, and we must construe the act as if it were all constitutional, because congress certainly so considered it; and we are now inquiring into what was their intention, in its various provisions, which can only be known by construing the act as a whole, embracing its several parts, of which the power in question was one. But if the other circuit courts of the United States under the powers given to them, cannot, as has been decided by this Court, issue the writ of mandamus, then the circuit court of this district cannot do it, under the powers given to it, because its powers are the same with those of the others. For, by the third section of the act establishing it, it and its judges, are declared to have all the powers by law vested in the circuit courts, and the judges of the circuit courts of the United States; and even supposing that to refer to the powers of the circuit courts, as organized by the act of 1801, that does not vary them; because, by the tenth section of that act, those courts are invested with all the powers heretofore granted by law to the circuit courts of the United States; that is, those by the judiciary act, unless where otherwise provided by that act; and there is no pretence, that there is any power given in that act, which affects this question. If then, the jurisdiction and the powers of the circuit court of this

district are the same with the jurisdiction and powers of the other circuit courts of the United States; and if, as has been solemnly decided by this Court, that jurisdiction and those powers do not authorize the other circuit courts to issue the writ of mandamus, it would seem to follow, as an inevitable consequence, that neither can the circuit court of this district issue that writ.

Finally, it was argued, that if all the other sources of power failed, there is a sufficient one to be found in that section of the act of 1801, establishing the circuit court of this district, by which it is enacted, that the laws of Maryland as they now exist, shall be, and continue in force in that part of the district which was ceded by that state to the United States, &c. The argument founded upon this section, is in substance this: The laws of Maryland are declared to be in force in this part of the district; the common law of England constitutes a part of those laws; by the common law, in such a case as this, a writ of mandamus would lie: therefore, the circuit court of this district can issue a mandamus in this case. This part of the argument proceeds upon the principle, that the adoption of the common law, per se, authorizes the issuing of the writ. But, it must be remembered, that the adoption of the common law here, cannot give any greater power, than the same common law would give to the courts of Maryland, from which state it is adopted. Now, in M'Cluny v. Silliman, it was decided, that a state court could not issue a mandamus to an officer of the United States; consequently, it follows, that no court in Maryland could have issued the writ in this case: and yet, the argument which I am now considering, seeks to maintain the position, that whilst it is conceded that a Maryland court, with the common law in full force there, could not have issued this writ, the circuit court of this district has the authority to do so, by reason of the adoption of that very law which would not give the authority to do it there.

It does seem to me, that to state this proposition is to refute it. The object of this provision appears to me to have been plainly this: That the citizens of that part of this district, which formerly belonged to Maryland, should, notwithstanding the cession, continue to enjoy the benefit of the same laws to which they had been accustomed; and that, in the administration of justice in their courts, ther should be the same rules of decision: thus placing the citizens of this district substantially in the same situation in this respect, as the citizens of the several states; with this difference only; that,

whilst in the states there are federal and state courts, in the one or the other of which justice is administered, according to the character of the parties, and other circumstances; in this district, by its judicial organization, the same justice which in the states is administered by the two classes of courts, is here dispensed by the instrumentality of one court, viz: the circuit court of this district. But that, as in the states, the federal circuit court cannot issue the writ of mandamus, because the jurisdiction and powers given to them by congress do not authorize it; so here, the circuit court of this district cannot issue it, by virtue of the jurisdiction and powers given to it by congress; (exclusively of the adoption of the laws of Maryland;) because, exclusively of those laws, its jurisdiction and powers, as I think I have shown, are neither more nor less, in reference to this subject, than those of the other circuit courts of the United States. And as in the states, the state courts cannot issue it, although the common law is in force there; so the circuit court of this district cannot issue it, although the common law, by the adoption of the laws of Maryland, is in force here; it being, in my opinion, impossible to maintain the proposition, that the adoption of the common law here, can impart a greater authority than it does to the courts of the very state from which it was adopted.

The result of that adoption, as it regards this question may, as it seems to me, be summed up in this one conclusion: That, as in Maryland the common law is in full force which authorizes the writ of mandamus; and yet a Maryland court can only issue it to a Maryland officer, and not to an officer of the United States; so here, the same common law, upon the same principles, would authorize the circuit court of this district to issue the writ to an officer of the District of Columbia, the duties of whose office pertained to the local concerns of the district; but not to an officer of the United States.

Under every aspect in which I have viewed the question, I feel a thorough conviction, that the circuit court of this district had not power to issue the writ in question; and, consequently, I am of opinion that the judgment demanding a peremptory mandamus, should be reversed.

Mr. Justice CATRON concurred in opinion with the Chief Justice, and Mr. Justice BARBOUR.